[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 29, 2010
JOHN LEY
CLERK

_____

No. 08-10997

_____

D. C. Docket No. 06-00237-CR-ORL-31-DAB

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

WILLIAM IREY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(July 29, 2010)

Before DUBINA, Chief Judge, and TJOFLAT, EDMONDSON, BIRCH, BLACK, CARNES, BARKETT, HULL, MARCUS, WILSON, PRYOR, MARTIN and HILL,[*] Circuit Judges.

---

[*] Senior United States Circuit Judge James C. Hill elected to participate in this matter pursuant to 28 U.S.C. § 46(c).

CARNES, Circuit Judge:

"The federal courts of appeals review federal sentences and set aside those they find 'unreasonable.'" Rita v. United States, 551 U.S. 338, 341, 127 S. Ct. 2456, 2459 (2007) (citing United States v. Booker, 543 U.S. 220, 261–63, 125 S. Ct. 738 (2005)). With that statement the Supreme Court opened its opinion in the Rita case. Later in the opinion the Court was more specific and emphatic:

> In sentencing, as in other areas, district judges at times make mistakes that are substantive. At times, they will impose sentences that are unreasonable. Circuit courts exist to correct such mistakes when they occur. Our decision in Booker recognized as much.

Rita, 551 U.S. at 354, 127 S. Ct. at 2466–67. We believe that the Supreme Court meant what it said in the Rita opinion and elsewhere about our duty to correct sentencing mistakes. At the same time, we recognize that our substantive review of sentences is deferential and that we only look to see if the district court abused its discretion by committing a clear error in judgment. Even so, the sentence in this case can withstand review only if deference amounts to abdication, if sentencing discretion is unbridled, and if "unreasonable" is a hollow term. The sentence that the district court imposed is a clear error in judgment, a mistake, and it is our responsibility to "correct such mistakes when they occur."

The sentence is substantively unreasonable primarily, but not solely, because of the nature and extent of William Irey's criminal conduct. The steady stream of

2

criminal cases flowing through this Court brings us many examples of man's inhumanity to man, and we see a depressingly large number of crimes against children. But the sexual crimes that Irey committed against some of the most vulnerable children in the world set him apart. He raped, sodomized, and sexually tortured fifty or more little girls, some as young as four years of age, on many occasions over a four- or five-year period. He also scripted, cast, starred in, produced, and distributed worldwide some of the most graphic and disturbing child pornography that has ever turned up on the internet.

The horrific nature of Irey's crimes resulted in an adjusted offense level that would have led to an advisory guidelines range of life imprisonment. Because the government had charged all of Irey's crimes in just one count, the statutory maximum was 30 years and that had the effect of reducing the guidelines range to 30 years as well. The district court, however, did not impose that sentence. Instead, after deciding that pedophilia was an "illness" that had impaired Irey's volition, and pronouncing that Irey himself was a victim, like all of the little children he had sexually violated for so long, the district court deviated downward from the 30-year guidelines range and imposed a sentence of only 17 ½ years. Our duty to set aside unreasonable sentences requires that we set aside this one.

3

# I. The Criminal Conduct

William Irey had a seemingly insatiable sexual appetite. Or as a psychiatrist he later retained would phrase it, Irey was "highly sexualized." While in Orlando, where he lived and had his business, Irey indulged his sexual appetite by consorting with prostitutes on a weekly basis. As the psychiatrist put it, Irey "engaged in other forms of sexually disordered behavior with prostitutes (e.g., sadomasochistic acts)." That went on for 15 years, despite the fact that he was married the entire time.

Starting in 2001 Irey began spending two weeks out of every month in China on business. On the weekends when he was there he would indulge himself in more "sexually disordered behavior" by traveling to brothels in different Asian countries. Early on he went to a brothel in Cambodia that featured underage girls and discovered that he enjoyed having sex with children. Over a period of four or five years, he "visited numerous brothels where they had underage children." Irey, who is 5'10" and weighs 200 pounds, was in his forties at the time. All of the children he sexually abused were underage girls; none of them was older than sixteen, and some of them were only four, five, or six years old.

Irey went to those brothels and had sex with the children "many many times," as he recounted it, during his numerous trips to that part of the world, and

as time went on he became "more and more obsessed and was returning to Asia more and more often" to sexually abuse children. He paid the Cambodian brothels up to $1,500 for the use of each child, and he would typically buy two or three of the children at a time. When he was too busy in China on business to get away for weekend visits to Cambodia, Irey would sometimes pay to have some of the young girls flown to him so that he could sexually abuse them when he found the time. Irey's sexual violation of the children did not end until August of 2006 when law enforcement in this country finally caught up with him.

The little Cambodian children whom Irey victimized were "abjectly impoverished" and, as the district court noted, "perhaps the most vulnerable of the world's society." We know some of the details of what Irey did to them because law enforcement agents seized his computers and found that he had memorialized at least part of what he had done in photographs and videos for his later viewing pleasure. On one of his computer hard drives there were more than 1,200 images of Irey sexually abusing the children, and that number does not include the obscene images Irey produced of the children that do not show him in the picture. Differentiating the children in so many images taken over a period of years is difficult, but we know that Irey sexually victimized at least fifty different underage

girls.[1]

The photographs and videos Irey produced reveal some details of how he violated and debased the children.[2]  There are images showing "Irey on a bed with several prepubescent female Asian children performing oral sex on him while he performs oral sex on them."  Other images depict "Irey engaged in anal and vaginal intercourse with a prepubescent Asian female with the words '9 Yo Fuck' marked on her body," and "an arrow is painted on her body which points to her vaginal area."  Some of them show "the writing 'Front,' 'Back,' 'Brown,' 'Back

_____

[1] The number of little children who were Irey's victims is literally countless.  Irey himself apparently did not keep count, although he did recall that he bought children to sexually abuse "many many times," usually two or three at a time, over a four- or five-year period.  Some of the more than 1,200 obscene images Irey produced to preserve his perverse exploits show the faces of many children, but the images were not framed and focused to aid a head count, and with the passage of years the appearances of the children undoubtedly changed as they grew older while being sexually abused.

The Presentence Report states that "[t]here were over forty victims," and Irey did not object to that statement but instead admitted it was true.  During the sentencing hearing Assistant United States Attorney Cynthia Hawkins, who prosecuted the case, described Irey's criminal conduct.  In doing so she represented to the court that the number of his child victims was "over 50."  She also showed the court photographs of the faces of "about 50" of the child victims taken from the more than 1,200 images of Irey abusing them.  Irey did not object to those photographs or to the representation that they showed about 50 of his victims or that there were "over 50" victims.  In setting out its sentence findings, the district court stated about the circumstances of the crime: "I cannot quarrel with Ms. Hawkins' description of that."  Based on that finding, and considering the AUSA's undisputed representations at the sentence hearing, as well as the probability of an undercount, we will use 50 or "at least 50" as the number of victims.

[2] All of the descriptions of Irey's conduct contained in this and the next paragraph in the text are quoted from the Presentence Report.  Irey did not contest the accuracy of these descriptions.  Instead, he wrote to the district court that:  "I have read the presentence investigation report dated 11-26-07.  I have done the things which are graphically spelled out in it."  The district court adopted all of the factual statements contained in the report as the findings of the court.

door,' '9 Yo Fuck' on prepubescent girls' bodies. The writing has arrows pointing to the vaginal and anal areas." Other images are of Irey "engaged in vaginal and anal intercourse with prepubescent Asian girls" who are "tied up and bound with black and grey duct tape." There are also images "of Irey with nude prepubescent children posing as trophies."

Irey's defilement of the little children did not stop at rape, sodomy, and humiliation. He also tortured them. There are images of "Irey inserting a plastic green/yellow glow stick, dildos, cockroaches and candy in the vaginal cavity of prepubescent Asian females." Some images show "Irey inserting a plastic tube into the vagina of a prepubescent Asian female. Several of the images show the plastic tube containing cockroaches crawling into the vagina of these children." One image shows him "performing vaginal intercourse on a prepubescent girl" and "[i]mbedded on the image [in all capitals] is the phrase: 'Big Cock Push Bug Deep Into 9 Yo Girl, She Hurt in Pane.'"

If Irey felt any guilt about purchasing helpless little girls and subjecting them to pain and degradation, the images he recorded do not show it. In some of them he can actually be seen smiling as he inflicts the sexual abuse.

Irey did not use the massive amount of child pornography he produced only for his own prurient perusal; he did not keep it to himself. He used copies of the

images he made to gain access to the collections of other purveyors of child pornography. Irey gave them copies of the pictures and videos he had produced showing his sexual violation and humiliation of the little Cambodian children in return for their waiver of the access fee to the collections they already had on their websites. Through that type of trade the operators of those websites were able to add Irey's graphic images to their collections, which led to those images being spread around the world. Irey in turn was able to save some money while expanding his collection of child pornography, and he was also able to minimize the use of his credit card, which made it easier for him to hide what he was doing from his wife.

## II. The Capture and Conviction

Irey's use of the internet led to his capture. Federal agents intercepted and traced to Irey email messages that he had sent to an illegal website offering child pornography. In one of those emails, which Irey sent in mid-January 2006, he asked the website operator: "do you remember me from before. could I trade you some of my latest pics for 30 days on your site. Let me know a good address to send you some samples." About a month later, agents intercepted another email from Irey, which stated: "do you want trade some new pics never saw before. I trade this for site access."

8

The agents searched Irey's house on August 13, 2006, and seized six computers. On a hard drive they found a collection of more than 1,200 images of Irey sexually violating young girls. The agents sent those 1,200 plus images to the National Center for Missing and Exploited Children, which in turn provided an extensive report about where the images had been seen before. More than 100 separate law enforcement agencies reported to the National Center that they had previously turned up some of those images of Irey's sexual abuse of underage girls in their investigations of child pornography. The graphic images Irey had produced and distributed were already widely known as the infamous "pink wall series," so named because of the pink walls that could be seen in the background of some of the photos and videos. The series included images of some of the worst child sexual abuse the agents had ever seen. And, as the Assistant United States Attorney pointed out at the sentence hearing: the pictures of these children, some of whom are "four or five, six years old . . . will forever be out there online." As the record of their abuse continues to circulate, "[t]hey will be victimized over and over again."

In a one-count indictment filed on December 13, 2006, Irey was charged with violating 18 U.S.C. § 2251(c). The indictment alleged that he "did knowingly employ, use, persuade, induce, entice, and coerce minors to engage in sexually

explicit conduct outside the United States, for the purpose of producing visual depictions of such conduct, and transporting such visual depictions to the United States by any means, including by computer and mail."

Irey was taken into custody on December 14, 2006. He was released on an unsecured bond conditioned on his being housed in a psychiatric facility "for treatment of mental health issues related to the current charges." He remained at that facility near his home for at least thirteen months.

At a change of plea hearing on July 2, 2007, Irey pleaded guilty to one count of violating 18 U.S.C. § 2251(c). When asked to tell the court what he had done, Irey replied: "Went to—overseas, visited numerous brothels where they had underage children and photographed them, had sex with them, and had them on my laptop when I entered the United States." He added that it happened over a period of four years,[3] the last time being in 2006. Irey agreed with the government's statement at the hearing that he had admitted to the agents that while overseas he had sex with children he knew were minors, had produced pornographic images of that, and had then transported those images back into this country.

---

[3] Although Irey stated at the change of plea hearing that his sexual abuse of the children occurred over a period of four years, he told Dr. Ted Shaw that it occurred over a period of five years.

10

### III. The Sentencing Proceedings and Sentence

### A. The Calculation of the Guidelines Range

The Presentence Report began the calculation of Irey's guidelines sentencing range with a base offense level of 32 under U.S.S.G. § 2G2.1(a), because the offense was one involving the sexual exploitation of minors by production of sexually explicit visual or printed matter. Added to that base offense level were four levels under § 2G2.1(b)(1) because the offense involved children under the age of 12; two levels under § 2G2.1(b)(2)(A) because the offense involved the actual commission of sexual acts; two levels under § 2G2.1(b)(3) for distribution of child pornography; and four levels under § 2G2.1(b)(4) because it involved material portraying sadistic conduct, producing an adjusted offense level "subtotal" of 44. Then two levels were added under § 3D1.4 as a result of grouping because of multiple victims.[4] Those additions produced a combined adjusted offense level of 46.[5] From that were deducted two levels under § 3E1.1(a) for acceptance of

---

[4] Although only one count was charged in the indictment, the guidelines consider each separate victim as a separate "group" for purposes of offense-level calculation. U.S.S.G. § 2G2.1(d)(1). In this case, the PSR did not proceed beyond two groups because two were enough to put the defendant's combined adjusted offense level at 46 and his final offense level at 43, which is the maximum level available under the guidelines. Had the PSR considered all fifty children, five levels would have been added rather than two (the grouping ceiling is fixed at 5 levels regardless of the number of offenses), which would have given Irey a combined adjusted offense level of 49 and a final offense level of 46.

[5] The Presentence Report pointed out that under § 2G2.1 cmt. n.6, "[a]n upward departure may be warranted because the offense involved more than ten minors." No upward departure was requested by the government or applied by the district court, probably because it

11

responsibility and an additional level under § 3E1.1(b) for timely notification of intent to plead guilty. Subtracting those three levels from the 46 produced a final offense level of 43.

Because Irey had no prior convictions his criminal history category was I. Even with that category an offense level of 43 produces an advisory guidelines imprisonment range of life. The statute under which he was convicted, however, carries a statutory maximum of 30 years. See 18 U.S.C. § 2251(c). As a result, the guidelines "range" became 360 months (30 years); there was no spread—the top and bottom of the range were the same. See U.S.S.G. § 5G1.1(a) ("Where the statutorily authorized maximum sentence is less than the minimum of the applicable guideline range, the statutorily authorized maximum sentence shall be the guideline sentence.").

Neither party objected to the calculation of the guidelines range. In his sentencing memorandum, Irey's counsel stated: "Mr. Irey does not object to the Probation Officer's advisory guideline calculations and does not seek a downward departure from the guideline range described in the PSR." Irey did, however, ask for a sentence below the guidelines range of 30 years. The statute requires a minimum sentence of 15 years. See 18 U.S.C. § 2251(c). Irey's sentencing

would not have made any difference since the adjusted offense level and criminal history score worked out to a guidelines imprisonment range of life even without an upward departure.

12

memorandum argued that "[a] sentence of 15–20 years in prison, followed by a substantial term of supervised release" should be imposed.

The government filed a sentencing memorandum arguing that "[i]f this case is atypical, it is because of aggravating, not mitigating, factors," and it urged the court to impose a sentence equal to the guidelines range and statutory maximum of 30 years. The government told the court that it "should give great weight to the findings of Congress . . . that departures should be extremely rare in child sex crime cases" because of the seriousness of those crimes. It specifically argued that any variance based on Irey's "diminished capacity, aberrant behavior, or family ties and responsibilities" would result in an unreasonable sentence. The government also pointed to precedent establishing that a guidelines sentence may be appropriate even where, in the government's words, the defendant's "psychological evaluation [had] found that he was not a significant risk to children or likely to molest children in the future." See United States v. Scott, 426 F.3d 1324, 1327, 1330 (11th Cir. 2005).

In anticipation of the argument that Irey's actions were "not purely volitional," the government argued that Irey "has not shown that his mental condition is outside the heartland of similar cases" and cited two of our decisions in support of that proposition. See United States v. Caro, 309 F.3d 1348, 1353

13

(11th Cir. 2002) ("[M]ost people who collect a sizeable amount of child pornography are in someway addicted to collecting it."); United States v. Miller, 146 F.3d 1281, 1285 (11th Cir. 1998) ("Nor would poor impulse control be unusual [for a collector or purveyor of child pornography], regardless of whether it stemmed from an impulse control disorder. . . . An impulse control disorder is not so atypical or unusual that it separates this defendant from other defendants."). Acknowledging that Irey may have "rationalized his crimes against children by failing to perceive the harm he was inflicting," it argued that "is not so uncommon as to take this case out of the heartland." In regard to the possibility that Irey, as a pedophile, may have "experience[d] self-deceptive thought processes," the government emphasized that he "has horribly sexually abused numerous children over a period of years." The government's sentencing memorandum concluded by arguing that "any variance under 18 U.S.C. § 3553(a) would be unreasonable because there is nothing unusual about the nature or circumstances of this offense or the defendant's personal characteristics."

### B. The Reports of the Psychiatrist and Psychologist

In connection with sentencing defense counsel hired two experts in the field of psychology and psychiatry, and he furnished their reports to the court. One of the reports was from Dr. Fred Berlin, who is board-certified in both general and

forensic psychiatry. Although he did not testify at the sentence hearing, his report is mentioned in the Presentence Report, a copy of it was attached to defense counsel's objections to the Presentence Report, and it was discussed by Dr. Shaw, who did testify at the hearing.

Dr. Berlin reported that Irey "has a psychiatric disorder known as heterosexual pedophilia," which means "he experiences a strong sexual attraction to prepubescent girls; girls who ordinarily are less than thirteen-years-of-age." Dr. Berlin stated that Irey was capable of relating intimately to an adult woman, but he found that Irey "experienced intense sexual cravings for female children as well." Irey was "highly sexualized" and admitted to having "engaged in other forms of sexually disordered behavior with prostitutes (e.g. sadomasochistic acts), and . . . having viewed images involving bestiality on the Internet." Nonetheless, Dr. Berlin asserted that "to the best of my knowledge and belief, he has never coerced an unwilling person against their will."[6]

Dr. Berlin gave his opinion that "a sexual disorder such as pedophilia does

---

[6] In view of the undisputed facts, that statement is astounding. We find it inconceivable that Dr. Berlin believes impoverished Cambodian children, who are among the most vulnerable people in the world, willingly submitted to being bound by duct tape and sexually penetrated orally, vaginally, and anally by a 200-pound adult male, as well as to having various objects, including glow sticks, dildos, and cockroaches pushed into their vaginas, while they, in Irey's words, "Hurt in Pane." The only plausible explanation is that Irey was less than forthcoming with Dr. Berlin about the details of what he had done to those children "many many times" over at least a four-year period.

not develop as a consequence of a volitional decision." He also stated, however, that "[a]lthough it is not [Irey's] fault that he has the disorder, it is his responsibility to do something about it." Dr. Berlin thought that Irey needed professional treatment but he also pointed out that "[e]ven without treatment, in the past, he had been able to refrain from any sexual contact with children within the United States."

Dr. Berlin's report stated that he had found no evidence to suggest that Irey was "characterlog[icall]y flawed," and concluded that he was "not generally anti-social or psychopathic in his psychological makeup," nor was he "a man who has generally lacked a sense of conscience." Instead, he thought that Irey had often simply been unable to "readily appreciate the extent of his improprieties" with the children. Dr. Berlin denied that Irey had "a malicious disregard for the well-being of the girls in question." Instead, in his professional opinion, "Mr. Irey did have a genuine affection and concern for those youngsters at that time" and actually thought he was helping the little girls he was sexually abusing.[7] Dr. Berlin's view

_____

[7] Irey himself probably would disagree with Dr. Berlin's opinion that he had not fully appreciated the wrongfulness of his conduct. In a letter he wrote to the district court a week before sentencing, Irey admitted to having visited the child brothels in Cambodia "many many times," even though he knew the girls were minors and that it was wrong, adding "but it was to[o] late, my sex addiction was now in full control of me." Later in the letter, Irey said: "I [had] wanted to stop this insanity for at least 15 years, but I could not. I was sneaking out to pick up prostitutes, I was leading a double life. I had developed this terrible dark side."

Dr. Berlin's theory that Irey had not fully appreciated the wrongfulness of what he was

16

is that, except for the fact that he had spent four or five years raping, sodomizing, and sexually torturing some of the most vulnerable children in the world, Irey is "an otherwise decent man."

Dr. Ted Shaw, a psychologist, was also retained by the defense, and he submitted a "psychosexual evaluation report" on behalf of Irey. When Dr. Shaw evaluated Irey on August 23, 2007, Irey was at the Lifestream Behavioral Center in Leesburg, Florida, "on conditional release from jail." He was undergoing treatment for alcohol abuse problems and sexual addiction. According to Dr. Shaw, a review in May 2007 indicated that Irey "was making appropriate progress," although his wife and children "refused to attend personal counseling" as part of the family sessions.

Irey admitted to Dr. Shaw that he had used prostitutes in this country and in doing so had contracted a venereal disease, which he passed along to his wife. Irey had also "experimented with bisexuality" and had "enjoyed consensual bondage" with adult females. Irey "described a lack of interest in well-endowed

---

doing to the little children in Cambodia apparently was too much of a stretch for Irey's defense counsel. Counsel did argue in his sentencing memorandum that "Irey has been diagnosed as a pedophile, and had a limited ability to control the behavior supporting the offense of conviction." He never argued, however, that Irey had not realized what he was doing was wrong or failed to appreciate fully the wrongfulness of his criminal conduct—not in his sentencing memorandum, or at the hearing, or in his panel brief, or in his en banc brief. More importantly, the district court never found that Irey had not fully appreciated the wrongfulness of his conduct, but only that the conduct was not purely volitional and instead was in substantial part due to his pedophilia.

17

women," telling Dr. Shaw that "when he married his wife she was thin and had small breasts," but "[h]er physique has changed over the years." Irey admitted that he had visited child brothels in Cambodia "for the past five years." He did, however, lie to Dr. Shaw about some of the details of his sexual abuse of children.[8] Irey acknowledged, though, that the children "suffer the most and are victims."

Dr. Shaw's report noted Irey's escalating sexual interest over the preceding ten years, which "could be described as a 'sexual addiction,' with many behaviors and an obsessive fixation which included frequent masturbation, anonymous sex with prostitutes and the eventual use of brothels in Cambodia." He described Irey as "sexually obsessed for at least the last ten years," and stated his opinion that "Irey's paraphilias clearly drove his behaviors, in spite of being an otherwise moral and responsible individual, upon whom many people, including family, clients and employees, depended."

Under one of the risk assessments that Dr. Shaw applied, Irey's score "places him in the Medium-Low risk category for sexually re-offending."

---

[8] Irey told Dr. Shaw that some of the girls he had sex with "were in their early teens, with the youngest being about twelve." In fact, as Irey knew and would later acknowledge, the photographs he made showed that many of the girls were younger than twelve and some were as young as four years of age. Irey also told Dr. Shaw that he would only have oral sex with the girls who appeared younger than twelve years of age. However, a photograph Irey made shows him having vaginal intercourse with a young girl, and "[i]mbedded on the image [in all capitals] is the phrase: 'Big Cock Push Bug Deep Into 9 Yo Girl, She Hurt in Pane.'"

18

Another one, the Minnesota Sex Offender Screening Tool-Revised, resulted in a score that placed Irey in the "Moderate Risk Range." More specifically, Dr. Shaw said, "the five-year, ten-year, and fifteen-year recidivism rates for individuals in the development research study with Mr. Irey's score are 12%, 14%, and 19%." Overall, he reported, "the dynamic and static factors, suggest a moderate to low moderate risk of a new charge," which "can be reduced through continued treatment and informed supervision upon his release."

### C. The Sentence Hearing

The court began the sentence hearing, which was held on January 29, 2008, by noting that it had reviewed the sentencing memoranda, the presentence report, and Dr. Shaw's report. The first witness was Dr. Shaw. He gave his opinion that Irey has "a long-standing problem with sexual obsession," and "something like sexual addiction," and in American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed. text rev. 2000) (DSM-IV TR) terms, "obsessive-compulsive type disorder, not the full-blown disorder, but with the sexual behavior being the most prominent feature." So far as he could tell, there was not enough evidence to diagnose Irey with any personality disorder. Dr. Shaw said that Irey is "very low in psychopathy" and explained that "he has this encapsulated area where he was cheating, where he was lying, where he was

19

violating laws; but outside of that, he was—appears to be—to have been a law-abiding citizen."

As for Irey's risk of sexually abusing children again, Dr. Shaw testified that: "He's essentially in the medium low to medium or moderate risk categories, which is—which is below a threshold of likely." The risk might be further reduced with the use of certain drugs, but he was hesitant to recommend that the court require them given all of their side effects and the fact "that they're not always useful." He also noted that Irey is going to be older "when and if he's released, and he's going to have experienced a reduction naturally in testosterone and a reduction in sex drive." Dr. Shaw summed up the risk situation:

> So overall, I find him to be, as I said, a moderate risk, a low-moderate risk, low in psychopathy. He does have—has deviant interests. Those interests, he himself has been working on reducing and are likely somewhat reduced already. They are fueled by obsessive thinking and masturbating and by the sex acts themselves.

The court questioned Dr. Shaw about pedophilia, asking him: "I mean, is it an illness? I mean, how would you describe that as a mental health professional?" After noting that Dr. Berlin was on the committee that defined it for purposes of the DSM–IV TR, Dr. Shaw testified:

> I'll take my shot at it. It is a disorder of sexual interest and behavior, and you can have the diagnosis with only the interest. So you could be fascinated, sexually attracted to children and never act on it, and—but if it troubled you or caused any problems for you, you

20

would still be diagnosable with that disorder, and that is being attracted to or engaging in behaviors, sexual behaviors, with prepubescent children.

So it is clearly a well-recognized disorder, and I thought that Dr. Berlin did a good job of saying that it's not a disorder that someone chooses. It's something that is within you and you have some tendency towards it.

And frankly and quite sadly, I think the availability of child images, particularly on the Internet, has fueled an epidemic of pedophilia that was kind of probably in the background, people might not have even known that they suffered from it, and then come across these images. But nonetheless, it is a treatable disorder. So it's a disorder that has different origins.

And Mr. Irey talks about how the disorder manifested itself for him in his being provided with a very young—or very young prostitutes without asking for them initially; but then he found himself first repelled but then attracted to them, and that's that sort of natural biological disorder part of it that's different from the moral and ethical issues.

So for another person, if they had been in the same situation, they may have been repulsed and stayed repulsed by it and, you know, not—just said, "Don't ever do that again and I'm not interested;" but that led him into a spiral of interest in children sexually. So that's the way that it's manifested itself here.

The district court then remarked that "people accuse me of not knowing what I'm talking about when I say it's an illness, and maybe I don't. That's why I'm asking you." The court continued:

And I guess the question is, from a standpoint of criminology, is a person who acts out as a result of this condition acting totally of rational free will or is that person acting out as a result of something

21

that is in essence an illness that he at that point has no control over? Do you understand what I'm saying?

Dr. Shaw answered:

I do, Your Honor. I think that the fact that pedophilia is not an underlying element for competency or sanity – it is an Axis I, treatable disorder. Those of us who have been in the field – I've been in the sex offender field actually since 1976; and there were pioneers in the field before me, long before me. We have been treating pedophilia for decades.

It is—I think that the problem that a lot of lay people have is in distinguishing between people who are disordered, seriously disordered, and curability versus treatability. Pedophilia is very treatable, and there are many pedophiles in the community who are doing just fine and managing their behavior.

As I'm sure you know, probationers, U.S. probationers, are now subjected to an annual polygraph about whether they are following the rules of their probationer or whether they are re-offending. Pedophiles are capable of not re-offending, even if they have an urge, in the same way that compulsive dessert eaters can choose to not eat dessert.

They have different levels of struggling, and there are aids to that: Good supervision, good treatment, replacing those needs with healthy needs. A lot of treatment is helping people understand the origin of their disorder and then teaching them to, first of all, be aware of the danger signs, the risks to relapsing, but at the same time replacing the way that they were meeting the needs met with the disordered behavior, meet them in healthy ways; and that's something people can be taught. People like Mr. Irey, who's bright, who has been successful in business, he can certainly learn the techniques that we teach to prevent—be responsible himself for preventing a reoffense.

It's—I think because we like to say, "You can't be cured"—in

other words, the best long-term treatment is to be alert to the problem and to—that's not a cure. Cures, you can forget about it. Just go be around kids again and don't worry about it. That, we can't do.

But there are, you know, thousands of pedophiles and child molesters, different, out there, in my belief, who aren't re-offending, who are in recovery and doing just fine. The new treatments that we use are, I think, very effective.

On cross-examination, Dr. Shaw confirmed for the record that Irey was "a pedophile with a sexual interest in children younger than 13, prepubescent children." As for Irey's risk assessment, he conceded the study it relied on was not confined to pedophiles but also included other sex offenders. Dr. Shaw also acknowledged that he had not looked at any of the photographs of Irey's victims and did not know how many victims there were. When asked if it would surprise him to know that Irey had sexually molested "over 50 children," he responded that it wouldn't because Irey "did admit that he had become more and more obsessed and was returning to Asia more and more often."

Other than Dr. Shaw the only people who submitted statements for, or testified at, the sentence hearing did so as character witnesses for Irey. Although they had not been willing to fully participate in family therapy with him, all of Irey's immediate family did make statements on his behalf either by video (wife, daughter, and a son) or in person (two other sons) at the sentence hearing. In his short video statement, Irey's youngest son told about his father building a

23

clubhouse and dirt bike track. In her short video statement, Irey's daughter (age 16) described her father as "loving" and said that he "has taught me how to be strong, respectful, honorable, loyal, and the list can go on and on."

In her video statement Irey's wife of 25 years described him as "a loving and wonderful husband and father" who is "mindful of other people's feelings." She said that he was a member of the Rotary Club, the Masons, the United Way, the YMCA, the local theater, the Shriners, and a charity called "Give Kids the World." He was so good and kind that he had even rescued and taken in a stray dog. Indeed, she proclaimed that she had been "very blessed to have been part of Bill's life for so many years. He's taught me so many things." After watching her video statement, the district court stated: "I understand that Mr. Irey has been a good family man and has family support."

Irey's oldest son (age 24) testified that his father had taught him "so much about life and love" and called him "my hero, my star, our father." His middle son (age 20) testified that Irey had taught him "to stick up for the little guy because a lot of times nobody else will," and that Irey did things "to make this world what we all envision it could be." A friend of Irey's testified that Irey had used his contacts in China to help out the family of that man's wife in China. He also added that during his 32 years of law enforcement in New York City he had

seen "a lot of bad people and Billy Irey is not one of those people." Irey's brother testified about how Irey, when a senior in high school in 1976, had loaned his coat to an accident victim, which was typical of his "random acts of kindness," and how if someone was in need, you could count on him.

No one was more effusive in his praise of Irey than his nephew. He recounted how his uncle had helped get him a computer for college, had listened to him talk about his aspirations, and had helped others over the years. He proclaimed that Irey "had a way of touching people's lives in a way that I've never seen before," and "bring[ing] out the best in every single person that he meets." Irey is, in his view, "the most spirited and the most giving person" and "overall is just one of a kind." He even said that: "I like to think that when God created Uncle Bill, He took a step back and He said, 'I'm really going to like this one.'"

At the conclusion of the evidence, defense counsel argued that a sentence to the statutory maximum of 30 years would be "greater than necessary for Mr. Irey in light of the mitigation that's been presented." He assured the court that he was not trying to minimize "the gravity of the acts with which Mr. Irey is charged," but argued that they were "a compartmentalized area of his whole being that is a result of his pedophilia." He argued that Dr. Shaw's testimony and Dr. Berlin's

25

report established that "the behavior of a pedophile is not totally volitional, that is, it is dictated in some degree by the disease itself." He also argued that Irey had "lived, other than this disease and this addiction, an exemplary life." Counsel cited three decisions, two from this Court and one from the Eighth Circuit, which affirmed sentences below the guidelines range in cases involving defendants convicted of distributing child pornography over the internet.[9]

Counsel told the court that if Irey were sentenced to the 30-year guidelines range sentence he would be 81 years old when he got out.[10] Instead of that sentence, counsel asked the court to impose one of "between 15 and 20 years here with up to lifetime supervised release." Counsel asserted that a 15- or 20-year sentence "would make him 66 or 71 when he got out, if he served the entire

---

[9] The decisions cited were United States v. McBride, 511 F.3d 1293 (11th Cir. 2007), United States v. Gray, 453 F.3d 1323 (11th Cir. 2006), and United States v. White, 506 F.3d 635 (8th Cir. 2007). In none of those cases did the defendant actually produce the child pornography he distributed. And there is no indication that the acts depicted in the pornography involved in those three cases even came close to the depraved nature of the acts graphically depicted in Irey's pink wall series.

[10] That statement is not entirely accurate. Under 18 U.S.C. § 3624 federal inmates routinely receive 54 additional days credit toward the service of their sentence at the end of each year that they have served with good behavior (with the credit for the last year or part thereof being prorated and credited within the last six weeks of the imprisonment). Because of § 3624 Irey could complete a 30-year sentence in 26 years and 2 months, and he would be 76 years old when released, not 81. See 18 U.S.C. § 3624; 28 C.F.R. §§ 523.20, 541.13 (2005); see also Barber v. Thomas, 130 S.Ct. 2499 (2010).

26

sentence."[11]

After defense counsel made his argument, the court asked if Irey wanted to say anything. In brief remarks, Irey apologized to "the government agents that have had to get involved in my horrible deeds," to "the federal attorney's office," to the court, "to the children that I have harmed over the last several years of going to Cambodia," to his family, and to "my employees, that I've pretty much hurt them." He also said: "I've hurt a lot of people and I can't undo that, but I can learn from that and I'm willing to learn."

The AUSA then argued in favor of the advisory guidelines range sentence of 30 years. She reminded the court that Irey "is not being prosecuted for being a pedophile; he's being prosecuted for the acts that he committed." She argued that: "As an alcoholic does not have to drive a car, a pedophile doesn't have to put themselves in a brothel in Cambodia, which this defendant did for years and years and years, Your Honor."

The AUSA reminded the district court that the description of Irey's conduct in the Presentence Report included: "writing filth on children's bodies, inserting

_____

[11] The "if he served the entire sentence" condition is important, because Irey would not have to serve his entire sentence unless he behaved so badly in prison that he did not qualify for the § 3624 additional credit for good behavior. See supra note 10. Assuming good behavior, Irey would complete a 15-year sentence in 13 years and 1 month, and be released at age 63; he would complete a 20-year sentence in 17 years and 5 months, and be released at age 68. See 18 U.S.C. § 3624; 28 C.F.R. §§ 523.20, 541.13 (2005); see also Barber, 130 S.Ct. 2499.

objects into them, binding them up and tying them up, treating them—posing them as trophies, and having several of them engaging in acts with him and with other children at the same time, [and] this is not run-of-the-mill child pornography . . . if there is such a thing." She stressed that this is a production case, and "the defendant clearly had two different parts of his life going on; but in this one, he was the star, the writer, the director, and, at the end, a person who ruined, just absolutely and forever ruined over 50 children's lives."

During her argument, the AUSA showed the court photographs of about fifty of the children taken from Irey's pink wall series; none of those particular photos showed any obscene acts or revealed private parts; they did show some of the children's faces. She pleaded with the court to "look at these babies' faces," pointing out that "some of these children are four or five, six years old. They're babies, Your Honor." Referring to the child pornography that Irey produced involving these same children, she pointed out that "[t]heir pictures will forever be out there online. They will be victimized over and over again . . . . Their lives can never be the same."

The AUSA also informed the court that when Irey was caught and the cache of child pornography he had produced was found on his computer, the National Center for Missing and Exploited Children contacted law enforcement agencies,

28

which expressed astonishment that "you've found the person who produced the 'pink wall' series." The series "was infamous on the Internet, and is turning up even in cases now, that we're finding more and more of the pink wall series of these young children."

The AUSA also pointed out that "in some of the photographs, the defendant is smiling as he perpetrates this abuse." She asked: "How can we square this with the stories we've heard today? How can you treat a dog better than you treat a human being, a defenseless baby?" Answering her own question, she argued that "[i]t makes no sense other than there's something really, really bad about the defendant." She also asked the court to consider the offense and victimization, and argued that "[t]he message we send to people who would do this has to be considered." She pointed out that the defendant's conduct, according to his own admissions, was "not even just child rape and child molestation, but dealing with prostitutes, lying when he doesn't have to," and stealing. She characterized him as a person "who lies and steals and hurts other people."

Focusing on the 1,200 images in the collection of child pornography that Irey produced, the AUSA argued that there is no better word for it than "torture." She pointed out that what Irey did to the small children produced "some of the most egregious images that the agents have ever seen," and Irey had been doing it

29

for years and on many occasions and paying up to $1,500 for the rights to use particular children in any way he wanted.

The AUSA concluded her remarks by asking the court to impose a 30-year sentence, the maximum the law allowed, in order to do "justice for these children who cannot plead on their own behalf."

D. The Sentence Findings and Sentence

The court began its sentencing remarks by stating that sentencing was the hardest thing it had to do and was "particularly difficult in cases like this." The court noted the statutory minimum or floor was 15 years and the ceiling was 30 years, which was also what the court called "the guideline score." The court observed that while it was to take into account the guidelines score and consider that score as a benchmark throughout the analysis of the 18 U.S.C. § 3553(a) factors, the guidelines are not mandatory; while an important element of the sentencing calculus, the result of the guidelines calculation is only advisory. The court then stated that it needed to look at the other § 3553(a) factors on an individualized basis in order to determine an appropriate sentence for the case.

Because of the importance of the court's sentence findings and explanation, we set them out in full:

> The first thing I need to do is consider the nature and circumstances of the offense, and I cannot quarrel with Ms. Hawkins'

description of that.  The conduct here was horrific.  The victims were numerous and perhaps the most vulnerable of the world's society.  So I don't think there's any question but we're dealing with here with an offense that rises to the very top in terms of its seriousness and its effect on other human beings.

These young children were victims who may never, never overcome their abuse.  I recognize, of course, that Mr. Irey and his family and friends are also victims here; and society at large is a victim because, as Dr. Shaw indicated, with every new development in human history, there seems to come good and bad with it; and with all the good of the Internet, perhaps one of the bad features of it is that it has made possible what Dr. Shaw describes as an epidemic of child pornography.  And, unfortunately, we here in the court system witness that and have to deal with it; and our government, in an effort to deal with it, has imposed—has criminal penalties, very harsh sentences for conduct like this.

So in terms of the characteristics of the offense, the seriousness of it itself, the long-standing, long-term engagement in it certainly does not mitigate in favor of any leniency.

But next I need to look at the history and characteristics of the defendant.  By all accounts, Mr. Irey has been a good husband and father for his wife and children and a good friend to his friends and a good person to his community.  The lies and thefts, I think, referred to by Ms. Hawkins were essentially part of his effort to cover up his illness, because I think other than the acts of Mr. Irey, there's no indication that he has engaged in any other sort of criminal conduct or conduct representing poor character.

Also, in terms of the characteristics of the defendant, I think we're just beginning to learn what pedophilia is and how to deal with it.  I think if you look at the reports of the mental health people here and into the literature, which I have done, Mr. Irey's acts that bring him here today, I think it's safe to say, were not purely volitional.  I think they were due in substantial part to a recognized illness.  And while it does not excuse his conduct and he will still be held

31

accountable for it, I think it would be inappropriate to ignore that fact.

I also think it's appropriate to credit the opinion of the mental health professionals who indicate that Mr. Irey is pursuing treatment and is doing so apparently successfully and, in the view of the mental health professionals, is treatable and has a low risk of recidivism.

Of course, all of that is somewhat academic because by the time he gets out of prison, he'll be most likely at an age where recidivism would be unlikely, just from a physiological standpoint.

Mr. Irey obviously has a very loving family, and I know he's proud of his family and deserves whatever credit he should take for having produced these people who have come here today to speak for him. And I know it was difficult for the family, but I think that your support is important and says a lot, not only about your family, but about Mr. Irey himself.

Another aspect of the defendant's character, as I have alluded to, of course, not his character but his individual characteristics, is his age. As I indicated, even the minimum sentence here, he's going to be an old man. I guess that makes me an old man, but he will certainly be an older man when he gets out of prison; and that's, I think, a factor to take into account.

There are other aspects of the statute that essentially are subjective in nature. Of course, adequate deterrence to criminal conduct. I mean, a serious sentence is hopefully going to deter others from conducting similar affairs, although when we're dealing with an illness like this, I'm not sure that that rationally follows. But, nevertheless, deterrence is an appropriate consideration, and a stiff sentence is in keeping with the seriousness of this offense.

As far as protecting the public from further conduct of this defendant, for the reasons I've indicated, I think that militates against a 30-year sentence, given his age, given the fact that he apparently recognizes now, from everything I've seen, he recognizes the

condition that has led him to commit these acts and to put himself and his life and his family's life in the order that it is. He's taken the first step toward rehabilitation and appears to be amenable to treatment and also, according to the mental health professionals, is of low risk of recidivism. So I don't think society needs further protection from him, at least beyond the statutory minimum sentence.

As often happens in these cases, my judgment—and I am a fallible human being. So what I do is not necessarily right. I just do the best I can under the circumstances. It comes down to my view of what promotes respect for the law and provides just punishment. And here, as indicated, I think that a 30-year sentence, given the personal factors that I have touched upon, is greater than necessary to accomplish the statutory objectives.

On the other hand, in light of the seriousness of the crimes, I think a sentence above the mandatory minimum is called for.

So having said all that, it's the judgment of the Court that the defendant, William Irey, is committed to the custody of the Bureau of Prisons to be imprisoned for a term of 210 months.

Upon release from imprisonment, Mr. Irey, you'll be placed on supervised release for a term of life. The mandatory drug testing requirements of the Violent Crime Control Act are imposed. While on supervised release, you must comply with the standard conditions adopted by this court.

In addition, I'm going to require you to participate in a substance abuse program and to follow your probation officer's instructions in that regard. You must also participate in a mental health program specializing in sex offender treatment and follow your probation officer's instructions in that regard as well.

You must register, as appropriate, with any state offender registration agency and cooperate with your probation officer with respect to complying with that directive.

I'll impose the standard terms concerning risk control, that is, no direct contact with minors under 18 without the written approval of your probation officer, prohibition for possessing, subscribing to, viewing any video or magazines, literature otherwise depicting children in the nude or sexually explicit positions. You shall not possess or use a computer with access to any online service without written approval of your probation officer.

Also, I'm going to impose a search requirement, that you submit to a search of your person, residence, place of business or any other area under your control at a reasonable time and in a reasonable manner based on any reasonable suspicion by your probation officer of contraband or evidence violating these terms of supervised release.

You must cooperate with the collection of DNA.

I'm not going to impose a fine. You are ordered, however, to pay a special assessment of $100, which shall be due immediately.

It's ordered that you shall forfeit to the United States those assets identified in your Plea Agreement that are subject to forfeiture.

As indicated, the Court has imposed a sentence below the applicable guideline sentence for the reasons indicated.

The defendant had no objection to any aspect of the sentence, including the 210-month (17 ½-year) term of imprisonment. On behalf of the United States, the AUSA objected to the downward variance of 150 months (12 ½ years) as unreasonable "based on the factors adduced in this record, particularly the seriousness and long-term nature of the offense." She characterized the variance as being "almost half." The court responded that the sentence was "more like 60 percent of the guideline, not half."

34

Actually, the sentence of 210 months amounts to 58 percent of the advisory guidelines sentence of 360 months, or a downward variance of 42 percent from the guidelines sentence. But, of course, the court could not sentence below the statutory minimum of 15 years in any event. In light of that, it is also accurate to say that within the statutorily prescribed range of 15 to 30 years (a spread of 15 years or 180 months), the court imposed a sentence that was 83 percent from the maximum and only 17 percent above the minimum. As Judge Hill put it, the district court had "move[d] so far downward from the maximum upper sentencing limit that he nearly reache[d] the minimum limit." United States v. Irey, 563 F.3d 1223, 1227 (11th Cir. 2009) (Hill, J., concurring), vacated, 579 F.3d 1207 (11th Cir. 2009) (en banc).

## IV. Our Review of the Reasonableness of the Sentence

The United States appealed, contending that in view of the facts and circumstances the sentence was unreasonably light, amounting to an abuse of discretion. A panel of this Court disagreed and affirmed the sentence. Id. After voting to rehear the case en banc, we directed the parties to brief and argue this issue: "Is the sentence imposed in this case unreasonable and thereby an abuse of the district court's sentencing discretion?"

### A. The Scope, Standard, and Importance of Appellate Review

35

## 1.  The Pre-Booker Era

Our review of a sentence that is challenged on substantive grounds is deferential but still important, as the history of substantive review of federal sentences indicates.  Before the Sentencing Reform Act was enacted in 1984, there was practically no appellate review of federal sentences, except to ensure that they did not stray outside of the statutory minimum and maximum.  So long as sentencing judges stayed within the statutory boundaries, they had unbridled discretion to arrive at any sentence they pleased.  See Dorszynski v. United States, 418 U.S. 424, 431–32, 94 S. Ct. 3042, 3047 (1974) ("[O]nce it is determined that a sentence is within the limitations set forth in the statute under which it is imposed, appellate review is at an end."); United States v. Tucker, 404 U.S. 443, 447, 92 S. Ct. 589, 591 (1972) ("[A] sentence imposed by a federal district judge, if within statutory limits, is generally not subject to review.").  The result, predictably, was widespread disparity in sentences, a problem that gave rise to a lot of criticism.  See, e.g., S. Rep. No. 98-225, at 38–39 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3221–22 (complaining of the "unjustifiably wide range of sentences" different judges imposed on similarly situated defendants).

One of the leading champions of change was Marvin Frankel, who was himself a district judge.  Frankel described federal sentencing as it then existed as

"a non-system in which every judge is a law unto himself or herself and the sentence a defendant gets depends on the judge he or she gets." Marvin E. Frankel, Jail Sentence Reform, N.Y. Times, Jan. 15, 1978, at E21. He proposed a number of reforms, some of which were similar to what would become the sentencing guidelines system. See Marvin Frankel, Criminal Sentences: Law Without Order 113–14 (1972). One of Judge Frankel's key proposals was that federal sentences be subject to at least a limited degree of appellate review. See id. at 75–85. The standard he recommended was abuse of discretion, see id. at 82–84, which he described in these terms:

> Correctly understood, the "discretion" of judicial officers in our system is not a blank check for arbitrary fiat. It is an authority, within the law, to weigh and appraise diverse factors (lawfully knowable factors) and make a responsible judgment, undoubtedly with a measure of latitude and finality varying according to the nature and scope of the discretion conferred. But "discretionary" does not mean "unappealable." Discretion may be abused, and discretionary decisions may be reversed for abuse.

Id. at 84. The goal of the new system, Frankel explained, was "[s]entencing [that] would be more just. Like cases would tend to be treated alike," because "[t]he most fundamental of our legal principles—'equal justice under law'—demands that this be so." Frankel, Jail Sentence Reform, at E21; see also Martin v. Franklin Capital Corp., 546 U.S. 132, 139, 126 S. Ct. 704, 710 (2005) ("Discretion is not whim, and limiting discretion according to legal standards

37

helps promote the basic principle of justice that like cases should be decided alike."). Frankel and other reformers won the debate, although it took a number of years to enact the necessary legislation and put the new sentencing system in place.

The legislation was the Sentencing Reform Act of 1984, whose primary purpose was to channel district courts' sentencing discretion and reduce disparity in sentencing. See Sentencing Reform Act of 1984, Pub. L. No. 98-473, 98 Stat. 1987 (codified as amended at 18 U.S.C. §§ 3551–3586 (1988) and 28 U.S.C. §§ 991–998 (1988)); Mistretta v. United States, 488 U.S. 361, 364–69, 109 S. Ct. 647, 651–53 (1989) (discussing background to the Sentencing Reform Act and the guidelines). The Act, which became effective on November 1, 1987, created the Sentencing Commission and gave it the responsibility to develop a system of sentencing guidelines.

The sentencing guidelines were binding, and district courts were required to state reasons for imposing a particular sentence. 18 U.S.C. § 3553(b)–(c). A court could impose a sentence outside the applicable guidelines range only if it found the existence of an aggravating or mitigating circumstance "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." Id. § 3553(b)(1). In making such a finding, a

sentencing court could consider only the guidelines themselves and the policy statements and official commentaries of the Sentencing Commission.  Id.  As the Supreme Court later noted, departures on this basis were rarely available because "[i]n most cases, as a matter of law, the Commission will have adequately taken all relevant factors into account, and no departure will be legally permissible." United States v. Booker, 543 U.S. 220, 234, 125 S. Ct. 738, 750 (2005).

Restraints on the exercise of discretion by district courts are enforced through appellate review, and the Sentencing Reform Act of 1984 provided for it. 18 U.S.C. § 3742.  Under the Act, a sentence could be appealed on the ground that:  (1) it was imposed in violation of the law; (2) it was imposed as a result of an incorrect application of the guidelines; (3) the term of imprisonment, fine, or supervised release was greater than the maximum or less than the minimum established in the guidelines range; or (4) it was imposed for an offense for which there is no sentencing guideline and was "plainly unreasonable."  Id. § 3742(a)–(b).

Departures from the guidelines range were reviewed under the third of the statutorily listed grounds for appeal, see id. at § 3742(a)(3), (b)(3), and the resulting sentence was vacated if the appellate court determined that it was "unreasonable" in light of the factors to be considered in imposing a sentence

39

under § 3553(a) and the district court's stated reasons for the sentence. See Booker, 543 U.S. at 261, 125 S. Ct. at 765 (quoting the pre-2003 version of 18 U.S.C. § 3742(e)(3) (1994 ed.)). In conducting its review, the court of appeals accepted the district court's findings of fact unless they were clearly erroneous, which was decided only after giving due regard to that court's opportunity to judge the credibility of witnesses. 18 U.S.C. § 3742(e) (1994 ed.). The reviewing court also gave "due deference" to the district court's application of the guidelines to the facts. Id.

The district court's decision to depart from the guidelines was reviewed for abuse of discretion in a three-step process. See Koon v. United States, 518 U.S. 81, 98–100, 116 S. Ct. 2035, 2047–48 (1996). First, the court of appeals deferentially reviewed the district court's determination of whether the facts of the case took it outside the "heartland" of the applicable guideline. United States v. Hoffer, 129 F.3d 1196, 1201 (11th Cir. 1997). A case was outside the heartland only if there was something unusual, either about the defendant or the circumstances surrounding the crime, that warranted a different sentence. See United States v. Miller, 146 F.3d 1281, 1284 (11th Cir. 1998). That determination was made by comparing the facts of the case to the facts of other cases falling within the heartland of the guidelines. Id. As the second step in reviewing

40

departure decisions the court of appeals determined for itself whether the departure factor used by the district court "has been categorically proscribed, is encouraged, encouraged but taken into consideration within the applicable guideline, discouraged, or not addressed by the [Sentencing] Commission." Hoffer, 129 F.3d at 1201. In the third step the appeals court reviewed with deference the district court's finding that the factor on which the departure was based did exist. Id.

In 2003 Congress amended the sentencing statute to provide for closer review of sentences that were outside the guidelines. Under the amendments a sentence could be vacated if the departure from the guidelines range was based on a factor that: (1) did not advance the objectives of sentencing set forth in § 3553(a)(2); (2) was not authorized under § 3552(b); or (3) was not "justified by the facts of the case." 18 U.S.C. § 3742(e)(3)(B); Pub. L. 108-21, § 401(d)(1), 117 Stat. 670. The court of appeals made each of those determinations de novo. Id. § 3742(e); see also United States v. Pressley, 345 F.3d 1205, 1209 n.1 (11th Cir. 2003). The 2003 amendments also specified that a sentence must be vacated if it departed "to an unreasonable degree" from the guidelines range, in light of the § 3553(a) factors and of the district court's stated reasons for imposing the particular sentence. Id. § 3742(e)(3)(C). The result was that an outside-the-

guidelines sentence could be vacated if it was based on an impermissible factor or if the degree of departure was unreasonable. A sentence within a correctly calculated guidelines range, however, was essentially unreviewable as long as the district court considered the § 3553(a) factors and explained its reasoning. See id. § 3553(c).

The 2003 amendments restricted even further the ability of a district court to depart downward from the guidelines in cases involving sex crimes against children. In that type of case a court could depart downward only if it found two things: (1) the existence of a mitigating circumstance that had been "affirmatively and specifically identified as a permissible ground of downward departure" by the sentencing guidelines or policy statements, taking into account any amendments by Congress; and (2) that mitigating circumstance had not been taken into consideration by the Sentencing Commission in formulating the guidelines range for that offense. Id. § 3553(b)(2).

The guidelines themselves also sharply limit the permissible grounds for downward departure in cases of sexual abuse of children, specifically disallowing departures based on diminished capacity (U.S.S.G. § 5K2.13), aberrant behavior (id. § 5K2.20), substance abuse (id. § 5K2.22), or family responsibilities and community ties (id. § 5H1.6). They provide that generally an offender's age and

health are not relevant, except in rare cases where the offender is so elderly and infirm that home confinement would be an effective alternative to prison. Id. §§ 5H1.1, 5H1.4. The guidelines also provide that charitable contributions and a defendant's mental and emotional condition generally are not appropriate grounds for departure. Id. §§ 5H1.11, 5H1.3.

## 2. The Booker Era

Then came the Booker decision in 2005. In it the Supreme Court held the sentencing statute unconstitutional insofar as the guidelines were mandatory and to the extent that they allowed the upper limits of the sentence to depend on facts that had not been established by a plea of guilty or proven to a jury beyond a reasonable doubt. Booker, 543 U.S. at 244, 125 S. Ct. at 756. Instead of striking down the entire guidelines system, the Court salvaged much of it by making the guidelines advisory rather than mandatory. Id. at 245, 125 S. Ct. at 756–57. The salvage work required the Court to sever and excise two provisions of the Act: (1) § 3553(b)(1), which had required the district court to impose a sentence within the guidelines range; and (2) § 3742(e), which had set forth the scope and standard of review of sentences. Id. at 259, 125 S. Ct. at 764. The excision of § 3742(e) left a gap: § 3742 still created appellate jurisdiction for sentencing review, but with subsection (e) gone it no longer specified the standard of review.

The Supreme Court filled that gap by inferring a standard of review from "related statutory language, the structure of the statute, and the sound administration of justice." Id. at 260–61, 125 S. Ct. at 765 (quotation marks omitted). Those considerations, as well as "the past two decades of appellate practice in cases involving departures," implied "a practical standard of review already familiar to appellate courts: review for unreasonableness." Id. (brackets omitted); see 18 U.S.C. § 3472(e)(3) (1994 ed.).[12] The Court reasoned that appellate courts had ample experience applying the "reasonableness" standard to sentences outside the guidelines range before the 2003 amendments and to sentences for offenses not addressed by the guidelines. Booker, 543 U.S. at 262, 125 S. Ct. at 766. The Booker Court saw appellate review of sentences as important to the new system, because it "would tend to iron out sentencing differences," avoiding undue disparity. Id. at 263, 125 S. Ct. at 767.

Section 3553(a) plays a critical role in appellate review of sentences, just as it does in the initial sentencing decision. Booker instructs us that not only must district courts apply the § 3553(a) factors in making their sentencing decisions,

---

[12] The "related statutory language" and the "two decades of appellate practice" the Supreme Court drew from did not include provisions added by the 2003 amendments or experience under them. Because the purpose and effect of those amendments had been "to make Guidelines sentencing even more mandatory than it had been," the amendments were tossed onto the legislation scrap pile with the comment that "the reasons for [them] have ceased to be relevant." Booker, 543 U.S. at 261, 125 S. Ct. at 765.

44

but courts of appeals also must apply those same factors in determining whether a sentence is reasonable.  Id. at 261, 125 S. Ct. at 766 ("Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable."); accord United States v. Pugh, 515 F.3d 1179, 1188 (11th Cir. 2008) ("Booker further held that in performing this review, we must measure 'reasonableness' against the factors outlined by Congress in 18 U.S.C. § 3553(a)."); United States v. Talley, 431 F.3d 784, 788 (11th Cir. 2005) (per curiam) ("We must evaluate whether the sentence imposed by the district court fails to achieve the purposes of sentencing as stated in section 3553(a).").[13]

---

[13] Section 3553(a) reads in its entirety:

(a) Factors to be considered in imposing a sentence.--The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

45

Read in light of earlier decisions, the "reasonableness" standard <u>Booker</u>

adopted entails review for abuse of discretion that accords "substantial deference"

to the district court's sentencing decisions.  <u>Koon</u>, 518 U.S. at 97–99, 116 S. Ct. at

---

(4) the kinds of sentence and the sentencing range established for—

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—

(i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

(ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or

(B) in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);

(5) any pertinent policy statement—

(A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

(B) that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

46

2046–47. Pre-Booker decisional law, of course, only applied the reasonableness standard to sentences that departed from the guidelines range or to sentences for offenses not addressed in the guidelines. See id. at 98–99, 116 S. Ct. at 2046–47. After Booker, the abuse of discretion standard outlined in Koon applies more broadly to the district judge's sentence decision, whether the sentence is within or without the guidelines range. See Rita, 551 U.S. at 364, 127 S. Ct. at 2472 (Stevens, J., concurring).

Two years after Booker, the Supreme Court addressed in greater detail the sentence review function of a court of appeals, leaving no doubt about the importance of that function. See Rita, 551 U.S. 338, 127 S. Ct. 2456. As we pointed out at the beginning of this opinion, the opening line of the Rita opinion categorically states that courts of appeals are to "review federal sentences and set aside those they find 'unreasonable.'" Id. at 341, 127 S. Ct. at 2459. And later in the Rita opinion the Supreme Court explains that, in the world according to Booker, courts of appeals exist to correct substantively unreasonable sentences imposed by the district courts. Id. at 354, 127 S. Ct. at 2466–67.

The specific holding of Rita is that a court of appeals may presume that a sentence within the guidelines range is reasonable. Id. at 347, 127 S. Ct. at 2462. The Supreme Court believed that such a presumption simply reflects the fact that

when both the sentencing judge and the Sentencing Commission have reached the same conclusion as to the proper sentence, it "significantly increases" the likelihood that the sentence is reasonable. Id., 127 S. Ct. at 2463. After all, the Court explained, Congress directed both the Sentencing Commission and the sentencing judge to carry out the same basic § 3553(a) objectives; the guidelines themselves reflect application of the § 3553(a) factors, and so should the district court's sentencing decision. Id. at 347–48, 127 S. Ct. at 2463. It follows that when a particular sentence is consistent with the guidelines' application of the § 3553(a) factors in the "mine run" of cases, it is "probable" that the sentence is reasonable. Id. at 351, 127 S. Ct. at 2465. If the sentence is not consistent with the guidelines that same probability does not exist, although the reviewing court may not presume a sentence that is outside the guidelines is unreasonable, id. at 354–55, 127 S. Ct. at 2467.

The decision in Gall v. United States, 552 U.S. 38, 128 S. Ct. 586 (2007), illustrates the importance of all the facts and circumstances to the reasonableness of the sentence. As a sophomore in college Gall had participated in a conspiracy to distribute ecstasy. Id. at 41, 128 S. Ct. at 591–92. His role was limited to delivering drugs between conspirators. Id., 128 S. Ct. at 592. Later Gall voluntarily stopped using drugs himself, and seven months after joining the

48

conspiracy he withdrew from it and told the others he was quitting.  Id.  Drug free,

Gall graduated from college and became a master carpenter.  Id. at 41–42, 128 S.

Ct. at 592.  Two years after withdrawing from the conspiracy, Gall was questioned

by federal agents and admitted his participation.  Id.  Three and a half years after

he had withdrawn from the conspiracy and turned his life around, Gall was

indicted for conspiracy to distribute illegal drugs.  Id.  He pleaded guilty.  Id.  His

co-conspirators, who had not withdrawn from the conspiracy, received sentences

ranging from 30 to 36 months.  Id. at 54–55, 128 S. Ct. at 599–600.

Gall's guidelines range was 30 to 37 months.  Id. at 43, 128 S. Ct. at 593.

The district court varied downward from that range to a sentence of probation,

largely because Gall had been young and immature when he committed the crime,

he had withdrawn from the conspiracy years before the charges were filed, and he

had made something of himself.  Id. at 43–44, 128 S. Ct. at 593.  When the

government argued for a guidelines range sentence on the ground that the three

co-conspirators had received sentences in that range, the district court noted that,

unlike Gall, the other conspirators had continued with the conspiracy.  Id. at

54–55, 128 S. Ct. at 599–600.

The court of appeals vacated the probationary sentence as unreasonable,

concluding that the district court had erred by giving too much weight to Gall's

voluntary withdrawal, his age at the time of the offense, and his post-offense rehabilitation, and too little consideration to the need to avoid unwarranted sentence disparities. Id. at 45, 128 S. Ct. at 594. The Supreme Court reversed that decision after discussing at some length "the unique facts of Gall's situation." Id. at 54, 128 S. Ct. at 599.

In doing so, the Court reiterated that all sentences, whether within or without the guidelines, are to be reviewed only for reasonableness under an abuse of discretion standard. Id. at 46, 128 S. Ct. at 594. It rejected any requirement that an outside-the-guidelines sentence must be justified by "extraordinary" circumstances, and rejected any "rigid mathematical formula" that uses the percentage of departure as the standard for determining the strength of justification required for a specific sentence. Id. at 47, 128 S. Ct. at 595. At the same time, however, the Court said that the sentencing court must give "serious consideration" to the extent of any departure from the guidelines, and must offer "sufficient justifications" for its conclusion that an unusually harsh or light sentence is appropriate. Id. at 46, 128 S. Ct. at 594. That means, the Court explained, that the justification for the deviation from the guidelines range must be "sufficiently compelling to support the degree of the variance." Id. at 50, 128 S. Ct. at 597.

About appellate review, the Supreme Court held in Gall that "[i]n reviewing the reasonableness of a sentence outside the Guidelines range, appellate courts may therefore take the degree of variance into account and consider the extent of a deviation from the Guidelines," in addition to the sentencing court's justifications. Id. at 47, 128 S. Ct. at 594–95. While rigid mathematical formulas and proportionality tests cannot be used, the Court concluded that "the extent of the difference between a particular sentence and the recommended Guidelines range is surely relevant," id. at 41, 128 S. Ct. at 591, and that "a major departure should be supported by a more significant justification than a minor one." Id. at 50, 128 S. Ct. at 597.[14] In other words, the justification for the variance must be "sufficiently compelling to support the degree of the variance." Id. Checking to see that the justification is sufficiently compelling remains the duty of the court of appeals. At the same time, the appellate court may not presume that a sentence outside the guidelines is unreasonable and must give "due deference to the district

---

[14] The difficulty of the distinction that the Supreme Court drew in this regard has not gone unnoticed. See, e.g., United States v. Levinson, 543 F.3d 190, 197 n.6 (3d Cir. 2008) (noting "[a]s an example of the challenge" in post-Booker sentence review the "somewhat mixed messages that can be drawn" from Gall's statement ruling out proportionality but embracing the requirement of a greater justification for major variances); see also United States v. Feemster, 572 F.3d 455, 467 (8th Cir. 2009) (Colloton, J., concurring) (after Gall, "one searches in vain for a principled basis on which to conduct a consistent and coherent appellate review for reasonableness"); United States v. Evans, 526 F.3d 155, 168 (4th Cir. 2008) (Gregory, J., concurring) ("I must conclude that the Court has left the specifics of how appellate courts are to conduct substantive reasonableness review, charitably speaking, unclear.").

court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance." Id. at 51, 128 S. Ct. at 597. The fact that the court of appeals "might reasonably have concluded that a different sentence was appropriate" is not sufficient to justify reversal. Id.; see also Talley, 431 F.3d at 788 ("A district court may impose a sentence that is either more severe or lenient than the sentence we would have imposed, but that sentence must still be reasonable.").

In Gall's case the court of appeals erred by giving "virtually no deference" to the district court's decision that a significant variance from the guidelines was justified. Gall, 552 U.S. at 56, 128 S. Ct. at 600. The Supreme Court decided that it was entirely reasonable for the district court to give substantial weight to Gall's voluntary withdrawal. Unlike all his co-defendants and "the vast majority of defendants convicted of conspiracy in federal court," Gall's efforts at self-rehabilitation began long before he got caught, which gave the district court "greater justification for believing Gall's turnaround was genuine." Id. at 56–57, 128 S. Ct. at 600–01. It was also reasonable for the district court to conclude that a guidelines range sentence for Gall would have created unwarranted sentencing disparities, because his co-conspirators who were sentenced within the guidelines had not voluntarily withdrawn from the conspiracy and had not shown any comparable rehabilitation. Id. at 55–56, 128 S. Ct. at 600; see also Lyes v. City of

52

Riviera Beach, 166 F.3d 1332, 1342 (11th Cir. 1999) (en banc) ("[I]t is worth noting that equal treatment consists not only of treating like things alike, but also of treating unlike things differently according to their differences."). The district court reasonably concluded that under the unusual facts of that case the § 3553(a) factors "on the whole" justified the below-the-guidelines sentence it imposed on Gall. Gall, 552 U.S. at 59–60, 128 S. Ct. at 602.

The same day that Gall was released the Supreme Court also issued its decision in Kimbrough v. United States, 552 U.S. 85, 128 S. Ct. 558 (2007), which involved sentencing for an "unremarkable drug-trafficking offense" and an unremarkable firearm possession offense, id. at 110, 128 S. Ct. at 575. Thanks in large part to the much-criticized 100 to 1 crack/powder cocaine disparity in the guidelines, the bottom of the advisory range for the combined charges was 19 years. Id. at 92, 128 S. Ct. at 565. After considering all of the § 3553(a) factors and the strong upward influence of the crack/powder disparity on the guidelines range, the district court concluded that a 19-year sentence would have been greater than necessary to accomplish the purposes of sentencing set forth in § 3553(a). Id. at 92–93, 128 S. Ct. at 565. For that reason, it varied downward to a sentence of 15 years. Id. at 93, 128 S. Ct. at 565.

The government appealed the sentence and the Fourth Circuit reversed

solely because of its view that a variance based on disagreement with the crack/powder ratio in the guidelines was per se unreasonable. Id. After the Supreme Court granted review, the government argued against the variance on that same ground. Id. at 101–07, 128 S. Ct. at 570–74. It asserted that while the guidelines are usually only advisory, the 100 to 1 crack/powder ratio guidelines were an exception because Congress had directed sentencing courts to follow that ratio. Id. at 101–02, 128 S. Ct. at 570. The government's position, in essence, was that the crack/powder ratio in the offense level part of the guidelines was a little pocket of mandatoriness in an otherwise advisory system.

The Supreme Court rejected that position, disagreeing with all of the government's arguments that Congress had required the Sentencing Commission and sentencing courts to follow the 100 to 1 ratio in every case. Id. at 102–11, 128 S. Ct. at 570–76. The government did not contend that the below-the-guidelines sentence was unreasonable for any other reason, and the Court found that it was reasonable. Id. at 110–11, 128 S. Ct. at 575–76; see also Spears v. United States, — U.S. —, 129 S. Ct. 840, 843–44 (2009) (per curiam) (clarifying that Kimbrough means "district courts are entitled to reject and vary categorically from the crack-cocaine Guidelines based on a policy disagreement with those Guidelines").

The Kimbrough decision involved a specific part of the guidelines, the one involving the peculiar crack/powder disparity, which the Sentencing Commission itself had consistently and emphatically criticized as at odds with the goals behind § 3553(a). See Kimbrough, 552 U.S. at 111, 128 S. Ct. at 576; see also Pugh, 515 F.3d at 1189 n.7 ("Kimbrough primarily involved issues related to the guidelines for crack cocaine offenses."). The Supreme Court's opinion in that case, however, also contains a number of observations of broader application. For example, the Court discussed "the discrete institutional strengths" of sentencing courts and the Sentencing Commission, and how those different strengths affect the amount of respect due a court's decision to vary from the guidelines range. Kimbrough, 552 U.S. at 109, 128 S. Ct. at 574–75. It said that decisions to vary "may attract greatest respect when the sentencing judge finds a particular case outside the heartland to which the Commission intends individual Guidelines to apply." Id. at 109, 128 S. Ct. at 574–75 (quotation marks omitted). By contrast, "closer review may be in order when the sentencing judge varies from the Guidelines based solely on the judge's view that the Guidelines range fails properly to reflect § 3553(a) considerations even in a mine-run case." Id., 128 S. Ct. at 575 (quotation marks omitted). The Court in Kimbrough also reiterated the importance of appellate review of sentences for substantive reasonableness. See id. at 107–08,

128 S. Ct. at 573–74 (explaining that appellate review along with the ongoing revision of the guidelines "will help to avoid excessive sentencing disparities" and variations among district courts).

### 3. The Abuse of Discretion Standard

Since the Supreme Court's Booker decision it has been "pellucidly clear that the familiar abuse-of-discretion standard of review now applies to appellate review of sentencing decisions." Gall, 552 U.S. at 46, 128 S. Ct. at 594; see also Pugh, 515 F.3d at 1191 (explaining that the Supreme Court's teachings "leave no doubt that an appellate court may still overturn a substantively unreasonable sentence, albeit only after examining it through the prism of abuse of discretion, and that appellate review has not been extinguished"). That familiar standard "allows a range of choice for the district court, so long as that choice does not constitute a clear error of judgment." United States v. Frazier, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc) (quotation marks omitted) (quoting Rasbury v. I.R.S., 24 F.3d 159, 168 (11th Cir. 1994)). As we have explained, "under the abuse of discretion standard of review there will be occasions in which we affirm the district court even though we would have gone the other way had it been our call. That is how an abuse of discretion standard differs from a de novo standard of review." Id. (quoting Rasbury, 24 F.3d at 168); see also, e.g., Ledford v.

56

Peeples, 605 F.3d 871, 922 (11th Cir. 2010) ("[T]he relevant question [when reviewing for abuse of discretion] is not whether we would have come to the same decision if deciding the issue in the first instance. The relevant inquiry, rather, is whether the district court's decision was tenable, or, we might say, 'in the ballpark' of permissible outcomes.").

"A district court abuses its discretion when it (1) fails to afford consideration to relevant factors that were due significant weight, (2) gives significant weight to an improper or irrelevant factor, or (3) commits a clear error of judgment in considering the proper factors." United States v. Campa, 459 F.3d 1121, 1174 (11th Cir. 2006) (en banc). As for the third way that discretion can be abused, a district court commits a clear error of judgment when it considers the proper factors but balances them unreasonably. See Ameritas Variable Life Ins. Co. v. Roach, 411 F.3d 1328, 1330 (11th Cir. 2005) ("[A]n abuse of discretion can occur . . . when all proper factors, and no improper ones, are considered, but the court, in weighing those factors, commits a clear error of judgment." (emphasis added) (quotation marks omitted)). The principle that discretion can be abused by unreasonably balancing proper factors is solidly established in Supreme Court precedent and our circuit law. See, e.g., Piper Aircraft Co. v. Reyno, 454 U.S. 235, 257, 102 S. Ct. 252, 266 (1981) ("The forum non conveniens determination

57

is committed to the sound discretion of the trial court. It may be reversed only when there has been a clear abuse of discretion; where the court has considered all relevant public and private interest factors, <u>and where its balancing of these factors is reasonable</u>, its decision deserves substantial deference." (emphasis added)); <u>Ford v. Brown</u>, 319 F.3d 1302, 1308 (11th Cir. 2003) ("We conclude that the district court overlooked some highly relevant factors, and that it ultimately struck a balance that was an abuse of discretion.").

In the context of sentencing, the proper factors are set out in 18 U.S.C. § 3553(a), and a district court commits a clear error in judgment when it weighs those factors unreasonably, arriving at a sentence that does not "achieve the purposes of sentencing as stated in § 3553(a)." <u>Pugh</u>, 515 F.3d at 1191 (quoting <u>Talley</u>, 431 F.3d at 788 (quotation marks omitted)). In order to determine whether that has occurred, we are "required to make the [sentencing] calculus ourselves" and to review each step the district court took in making it. <u>Id.</u>; <u>see also</u> <u>Booker</u>, 543 U.S. at 261, 125 S. Ct. at 766 ("Those [§ 3553(a)] factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable."); <u>Pugh</u>, 515 F.3d at 1194 ("Indeed, we could not begin to review the reasonableness of a sentence without examining all of the relevant factors embodied in Section 3553(a).").

In reviewing the reasonableness of a sentence, we must, as the Supreme Court has instructed us, consider the totality of the facts and circumstances. Pugh, 515 F.3d at 1192 (unreasonableness of sentence depends "on an examination of the 'totality of the circumstances'" (quoting Gall, 552 U.S. at 51, 128 S. Ct. at 597)). To the extent that the district court has found facts, we accept them unless they are clearly erroneous. Id. At the same time we can and should consider "additional salient facts that were elicited, and uncontroverted." Id. The difference is between contradicting a factfinding, on the one hand, and ignoring uncontroverted facts that the district court failed to mention on the other. That difference is important because a district court cannot write out of the record undisputed facts by simply ignoring them. The failure to mention facts may well reflect the district court's judgment that those facts are not important, but the importance of facts in light of the § 3553(a) factors is not itself a question of fact but instead is an issue of law. See United States v. Taylor, 487 U.S. 326, 337, 108 S. Ct. 2413, 2419–20 (1988) ("Factual findings of a district court are, of course, entitled to substantial deference and will be reversed only for clear error. A judgment that must be arrived at by considering and applying statutory criteria, however, constitutes the application of law to fact and requires the reviewing court to undertake more substantive scrutiny to ensure that the judgment is

supported in terms of the factors identified in the statute." (citations omitted)).[15]

After performing the required analysis, we are to vacate the sentence if, but only if, we "are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." Pugh, 515 F.3d at 1191 (quotation marks omitted); accord United States v. Shaw, 560 F.3d 1230, 1238 (11th Cir. 2009); United States v. McBride, 511 F.3d 1293, 1297–98 (11th Cir. 2007); United States v. Clay, 483 F.3d 739, 743 (11th Cir. 2007). We are not often "left with [that] definite and firm conviction" because, as we have explained, our examination of the sentence is made "through the prism of abuse of discretion." Pugh, 515 F.3d at 1191. But

_____

[15] Judge Tjoflat's separate opinion asserts that it is "deconstructing" the abuse of discretion standard. Concurring and Dissenting Op. of Tjoflat, J. (hereafter "Separate Op. of Tjoflat, J."), at 193; see also id. at 188. It is deconstruction with a wrecking ball. According to that opinion, the weight given to each piece of evidence is a factfinding, id. at 189; the degree of seriousness of an offense is a factfinding, id. at 189 n.59; the importance given to each factor is a factfinding, id. at 190 n.61; the sentence necessary to satisfy each § 3553(a)(2) purpose is a factfinding, id. at 189; in other words, everything that goes into a sentence is a factfinding subject only to clearly erroneous review. To the contrary, the Supreme Court has applied the abuse of discretion standard to the weight the sentencing court has given to the evidence and the importance it has given to the § 3553(a) factors. See Gall, 552 U.S. at 57, 128 S. Ct. at 600. Many of the "factfindings" Judge Tjoflat's separate opinion identifies are actually applications of statutory law to facts, resulting in a determination that we review for abuse of discretion when considering whether "the § 3553(a) factors, on the whole, justif[y] the sentence" a district court has imposed. Id. at 60, 128 S. Ct. at 602. A sentencing decision is a classic "judgment that must be arrived at by considering and applying statutory criteria," which "requires the reviewing court to undertake more substantive scrutiny to ensure that the judgment is supported in terms of the factors identified in the statute." Taylor, 487 U.S. at 337, 108 S. Ct. 2413, at 2419–20. And, contrary to Judge Tjoflat's opinion, our recognition of the fact that statutory criteria are at play does not mean that we are reviewing de novo the district court's balancing of those criteria.

60

sometimes we are. See United States v. Livesay, 587 F.3d 1274, 1278–79 (11th Cir. 2009) (vacating as "patently unreasonable" a sentence of probation for participant in billion-dollar fraud scheme and holding that only a "meaningful period of incarceration" would fulfill the goals of sentencing under § 3553(a)); Pugh, 515 F.3d at 1188–94 (vacating as substantively unreasonable a sentence of probation for receiving and distributing child pornography); United States v. Martin, 455 F.3d 1227, 1238–39 (11th Cir. 2006) (vacating a seven-day sentence for billion-dollar securities fraud as "shockingly short" and "wildly disproportionate" to the seriousness of the offense, even though the defendant had rendered substantial assistance that was extraordinary); United States v. Crisp, 454 F.3d 1285, 1290 (11th Cir. 2006) (vacating as "outside the range of reasonableness" a sentence of five hours' imprisonment for bank fraud even though the defendant had provided substantial assistance that was crucial in the prosecution of his co-defendant). Out of the hundreds of sentences that we have reviewed up to this point in the five years since the Booker decision, those are the only four we have found to be substantively unreasonable.

Looking at sentencing decisions through the prism of discretion is not the same thing as turning a blind eye to unreasonable ones. And, as we said in Pugh, "the district court's choice of sentence is not unfettered." Id. The fetters on a

district court's sentencing discretion are the requirement of reasonableness and the existence of appellate review to enforce that requirement. While those fetters are loosened by the substantial discretion we afford district courts in sentencing, at the boundaries of reasonableness the fetters do fetter. See Frankel, Criminal Sentences 84 ("'[D]iscretionary' does not mean 'unappealable.' Discretion may be abused, and discretionary decisions may be reversed for abuse."); cf. Albemarle Paper Co. v. Moody, 422 U.S. 405, 416, 95 S. Ct. 2362, 2371 (1975) ("That the court's discretion is equitable in nature hardly means that it is unfettered by meaningful standards or shielded from thorough appellate review." (citation omitted)).[16]

We may not—it bears repeating—set aside a sentence merely because we would have decided that another one is more appropriate. Gall, 552 U.S. at 51, 128 S. Ct. at 597. See generally Frazier, 387 F.3d at 1259; Ledford, 605 F.3d at 922. A district court's sentence need not be the most appropriate one, it need only be a reasonable one. We may set aside a sentence only if we determine, after giving a full measure of deference to the sentencing judge, that the sentence

_____

[16] Although the burden of persuasion may not be decisive in many cases, it is on the party attacking the sentence as unreasonable. Pugh, 513 F.3d at 1189; Martin, 455 F.3d at 1237; Talley, 431 F.3d at 788. The burden being there tends to reinforce the discretionary zone in which the district court acts when it decides on an appropriate sentence, but that zone is neither limitless nor impervious to review.

imposed truly is unreasonable.[17]

Judge Edmondson's dissenting opinion argues that in reviewing a sentence for substantive reasonableness we may not decide whether the district court placed unreasonable weight on any of the § 3553(a) factors. See Dissenting Op. of Edmondson, J., at 241 ("[T]o grant something in the record more or less value than the District Judge did and so to conclude that the record overall weighs more heavily for a higher sentence . . . oversteps [appellate] authority."). We disagree for several reasons.

First, the only authority the dissenting opinion cites for that proposition is Gall, which actually contradicts it. The Supreme Court decided that Gall's sentence was reasonable only after reviewing the weight the district court had assigned to various factors as well as its decision that the § 3553(a) factors, as a whole, justified the sentence. See Gall, 552 U.S. at 56–60, 128 S. Ct. at 600–02. It stated that the district court "quite reasonably attached great weight to the fact that Gall voluntarily withdrew from the conspiracy after deciding, on his own

---

[17] Some of our colleagues take the position that by finding the sentence in this case unreasonable we are simply disagreeing with the district judge's decision and substituting our own view of a proper sentence for his. See Dissenting Op. of Barkett, J., at 254; Dissenting Op. of Edmondson, J., at 241, 249; Separate Op. of Tjoflat, J., at 217–21. Of course, the fact that we find the district court's sentence unreasonable necessarily means that we disagree with it. That is true in every instance in which an appellate court finds a sentence substantively unreasonable. If the appellate court agreed with a sentence it would not find the sentence unreasonable, so it is illogical to suggest that disagreement with a sentence somehow means that an appellate court is not properly carrying out its duty to review the reasonableness of the sentence.

initiative, to change his life," which "len[t] strong support to the District Court's conclusion that Gall is not going to return to criminal behavior and is not a danger to society." Id. at 57, 128 S. Ct. at 601. The Court also stated that the district court "quite reasonably attached great weight to Gall's self-motivated rehabilitation, which . . . lends strong support to the conclusion that imprisonment was not necessary to deter Gall from engaging in future criminal conduct or to protect the public from his future criminal acts." Id. at 59, 128 S. Ct. at 602.[18] If appellate review did not extend to the weight placed on a § 3553(a) factor—as Judge Edmondson's dissenting opinion contends—those statements in Gall would make no sense.[19]

---

[18] Judge Tjoflat's separate opinion argues that we are disregarding Gall, an argument that is based on his reading of that decision to mean that appellate review of the weight put on the various § 3553(a) factors by the sentencing court is necessarily akin to de novo review of sentencing, which we may not undertake. See Separate Op. of Tjoflat, J., at 218 (asserting that one reason for the Supreme Court's conclusion in Gall that the Eighth Circuit's analysis "more closely resembled de novo review" than abuse of discretion review was that the court of appeals decided that the sentencing court "gave too much weight to Gall's withdrawal from the conspiracy" (citation omitted)). That reading of Gall, however, is a misreading of the decision, which actually confirms that appellate courts, with the proper measure of deference, should review the reasonableness of the weight placed on a § 3553(a) factor by the sentencing court. See Gall, 552 U.S. 56–57, 128 S. Ct. at 600–01. The Eighth Circuit's mistake was not that it had reviewed the district court's weighing of the statutory factors, but that in doing so it had asked the wrong question—whether "in its view" the sentence was appropriate—instead of whether the district court's weighing and the resulting sentence were reasonable. Id. at 56, 128 S. Ct. at 600.

[19] If an appellate court could not review the reasonableness of the weight the district court placed on a factor—if all that mattered was correct factfindings and accurate recitation of the applicable law—many of the Supreme Court's other statements in its Booker-through-Kimbrough decisions also would have little or no purpose. See, e.g., Gall, 552 U.S. at 47, 128 S. Ct. at 594–95 ("In reviewing the reasonableness of a sentence outside the Guidelines range, appellate courts may therefore take the degree of variance into account and consider the extent of

Second, the position that Judge Edmondson's dissenting opinion takes is inconsistent with the familiar abuse of discretion standard that the Supreme Court has told us to apply. As we have already explained, a district court commits a clear error of judgment, abuses its discretion, when it considers the proper factors but balances them unreasonably. See Piper Aircraft Co., 454 U.S. at 257, 102 S. Ct. at 266; Campa, 459 F.3d at 1174; Ameritas Variable Life Ins., 411 F.3d at 1330; Ford, 319 F.3d at 1308. One purpose of reasonableness review is to correct those errors. If the weight given various factors could not be reviewed on appeal, there would be no way to serve that purpose. If appellate courts were limited to determining whether proper procedures were followed and whether factfindings are clearly erroneous, there would be no substantive review, only procedural review. See Gall, 552 U.S. at 51, 128 S. Ct. at 597 (defining procedural review to include a determination of whether the sentence was based on clearly erroneous facts). We would be back to "a non-system in which every judge is a law unto himself or herself." Frankel, Jail Sentence Reform, at E21.

Third, the position that the weight a sentencing court gives to the § 3553(a)

---

a deviation from the Guidelines."); Booker, 543 U.S. at 261, 125 S. Ct. at 766 ("Those [§ 3553(a)] factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable."); Kimbrough, 552 U.S. at 107–08, 128 S. Ct. at 573–74 (explaining that appellate review for reasonableness will help avoid excessive sentencing disparities). And there would have been no point at all in the Rita decision, which held that we may presume a sentence within the guidelines is reasonable. 551 U.S. at 347, 127 S. Ct. at 2462.

factors may not be reviewed has been rejected not only by this Court but also by all of our sister circuits that have addressed the issue. See United States v. Russell, 600 F.3d 631, 633 (D.C. Cir. 2010) ("Substantive reasonableness is the catch-all criterion under which the reviewing court monitors (deferentially—for abuse of discretion) whether the district court has given reasonable weight to all the factors required to be considered."); United States v. Ressam, 593 F.3d 1095, 1031–32 (9th Cir. 2010) ("[I]t appears that the district court abused its discretion in weighing the relevant factors by giving too much weight to [the defendant's] cooperation and not enough weight to the other relevant § 3553(a) factors, including the need to protect the public."); United States v. Camiscione, 591 F.3d 823, 834 (6th Cir. 2010) ("General deterrence is one of the key purposes of sentencing, and the district court abused its discretion when it failed to give that matter its proper weight." (quotation and other marks omitted)); United States v. Sayad, 589 F.3d 1110, 1118 (10th Cir. 2009) ("Unlike procedural reasonableness review, which focuses on the permissibility of relying on a particular factor, substantive reasonableness review broadly looks to whether the district court abused its discretion in weighing permissible § 3553(a) factors in light of the 'totality of the circumstances.'" (quotation marks omitted)); United States v. Cooks, 589 F.3d 173, 186 (5th Cir. 2009) (stating that a sentence is substantively

66

unreasonable if it "does not account for a factor that should receive significant weight, it gives significant weight to an irrelevant or improper factor, or it represents a clear error of judgment in balancing sentencing factors"); United States v. Moore, 565 F.3d 435, 438 (8th Cir. 2009) ("We may find an abuse of discretion where the sentencing court fails to consider a relevant factor that should have received significant weight, gives significant weight to an improper or irrelevant factor, or considers only the appropriate factors but commits a clear error of judgment in weighing those factors." (quotation marks omitted)); United States v. Cavera, 550 F.3d 180, 191 (2d Cir. 2008) (en banc) ("At the substantive stage of reasonableness review, an appellate court may consider whether a factor relied on by a sentencing court can bear the weight assigned to it."); United States v. Goff, 501 F.3d 250, 261 (3d Cir. 2007) ("[D]eterring the production of child pornography and protecting the children who are victimized by it are factors that should have been given significant weight at sentencing . . . ."); United States v. Hampton, 441 F.3d 284, 288–89 (4th Cir. 2006) (vacating sentence as substantively unreasonable because the district court gave "excessive weight" to one statutory factor and failed to account for others); see also Torres-Rivera v. O'Neill-Cancel, 524 F.3d 331, 335–36 (1st Cir. 2008) (stating that, in general, abuse of discretion may occur if the court "fails to consider a significant factor in

the decisional calculus, if it relies on an improper factor in working that calculus, or if it considers all the appropriate factors but makes a serious error in judgment as to their relative weight.").  We join those circuits in reaffirming that substantive review exists, in substantial part, to correct sentences that are based on unreasonable weighing decisions.  If we accepted the position set out in Judge Edmondson's dissenting opinion, we would be the only circuit to do so.[20]

## B.  The Adequacy of the Sentence Findings and Explanation

Judge Tjoflat's separate opinion criticizes the district court for not making more detailed sentence findings and not offering a better explanation for the sentence it imposed.  Separate Op. of Tjoflat, J., at 199, 212–14.  Irey's sentence, according to that separate opinion, is unreasonable because the district court failed to make "intelligible" and "specific" findings on the § 3553(a)(2)(A) factors, and because it did not "explicitly" weigh those factors.  Id. at 212–13.  About that criticism, we have four things to say.  First of all, the adequacy of a district court's findings and sentence explanation is a classic procedural issue, not a substantive

_____

[20] Each of the circuits we have cited has determined, at least implicitly, that the weight given each § 3553(a) factor may be reviewed in a principled fashion, and we agree.  Even though "the appropriate weight given to each of the [§ 3553(a)] factors cannot be calibrated with a slide rule," Pugh, 515 F.3d at 1203, that does not mean appellate review of that weight is impossible; it only reinforces the deferential nature of the review.  As we have emphasized, there is "a difference between deference and abdication."  Crisp, 454 F.3d at 1290.  If there were no difference, if we did not have a meaningful role to play, we would never have set aside any sentences as substantively unreasonable, but we have.

one.  See Gall, 552 U.S. at 51, 128 S. Ct. at 597 (explaining that "failing to consider the § 3553(a) factors, . . . or failing to adequately explain the chosen sentence," constitutes procedural error); United States v. Ellisor, 522 F.3d 1255, 1273 (11th Cir. 2008) (Tjoflat, J.).  And in this case no one has ever argued that the district court committed any procedural error in sentencing.  That possibility was not mentioned by either party in the district court, or in their briefs to the panel, or in the oral argument before the panel, or in the panel's opinion (which Judge Tjoflat joined), or in the en banc briefing instructions, or by the parties in their briefs to us, or at oral argument before us, or anywhere else at all until it emerged in Judge Tjoflat's separate opinion.  The issue in this appeal has never been procedural reasonableness, but instead substantive reasonableness.  Judge Tjoflat's opinion, although purporting to recognize that Irey's sentence cannot be vacated on procedural grounds, dresses up its own procedural objections to the sentence as substantive ones.  No amount of rhetorical couture, however, can cover up the fact that the opinion really is complaining about the procedural unreasonableness of the sentence, an issue that is not before us.

Second, even if that issue were before us, the district court was not required to make any more detailed findings or give a more thorough explanation than it did.  In Rita the Supreme Court upheld the adequacy of a "sentencing judge's

69

statement of reasons [which] was brief but legally sufficient." 551 U.S. at 358, 127 S. Ct. at 2469. It did so because the record showed that the judge listened to the evidence and arguments and was aware of the various factors the defendant put forward for a lesser sentence. Id. In sentencing the defendant the judge did not say much, and the Court acknowledged that he "might have said more," but it surmised that "[h]e must have believed that there was not much more to say." Id. Although the judge did not even state that he had considered the evidence and argument or why he rejected the arguments for a variance, it was enough that "the context and record" indicated the reasoning behind his conclusion. Id. at 359, 127 S. Ct. at 2469. No member of this Court has ever before indicated that a sentencing judge is required to articulate his findings and reasoning with great detail or in any detail for that matter. See, e.g., United States v. Sanchez, 586 F.3d 918, 935–36 (11th Cir. 2009) (Tjoflat, J.) ("In general, the district court is not required to state on the record that it has explicitly considered each of the § 3553(a) factors or to discuss each of the § 3553(a) factors. It is sufficient that the district court considers the defendant's arguments at sentencing and states that it has taken the § 3553(a) factors into account." (citation and quotation marks omitted)); United States v. Brown, 526 F.3d 691, 713 (11th Cir. 2008); Ellisor, 522 F.3d at 1278.

Judge Tjoflat's separate opinion now asserts, however, that he would have this Court sitting en banc overturn our precedent on the amount of specificity required of a sentencing judge. Separate Op. of Tjoflat, J., at 186 n.56. While we as an en banc court can overturn our own precedent, see, e.g., Main Drug, Inc. v. Aetna U.S. Healthcare, Inc., 475 F.3d 1228, 1230 (11th Cir. 2007), we cannot overturn Supreme Court precedent. And the Supreme Court has already laid out the requirements for a sentencing court's recitation of its reasoning on each of the § 3553(a) factors:

> [W]e cannot read the statute (or our precedent) as insisting upon a full opinion in every case. The appropriateness of brevity or length, conciseness or detail, when to write, what to say, depends upon circumstances. Sometimes a judicial opinion responds to every argument; sometimes it does not; sometimes a judge simply writes the word "granted," or "denied" on the face of a motion while relying upon context and the parties' prior arguments to make the reasons clear. The law leaves much, in this respect, to the judge's own professional judgment.

Rita, 551 U.S. at 356, 127 S. Ct. at 2468. The depth of detail that Judge Tjoflat's separate opinion would require exceeds the requirements of that precedent. See id.; see also id. at 359, 127 S. Ct. at 2469 ("Where a matter is as conceptually simple as in the case at hand and the record makes clear that the sentencing judge considered the evidence and arguments, we do not believe the law requires the judge to write more extensively.").

71

Third, the district court's sentence findings and explanation, which we have set out in full, see supra at 30–34, are far more specific and detailed than we have seen in the vast majority of other cases where we have reviewed the substantive reasonableness of sentences. In fact, we cannot recall seeing sentence findings and explanations that were more specific and detailed than those in this case, although the substantive reasonableness of the sentence is another matter. We have never required or expected district judges to compose a doctoral thesis to explain why they have imposed a particular sentence.

Fourth, the problem with the district court's sentence findings and explanation is not that they are unintelligible or lacking in specificity or effort; instead, the problem is that the sentence is substantively unreasonable. That unreasonableness is the underlying cause for the Tjoflat opinion's criticism of the findings and explanation as not "intelligible," for its pronouncement that they "cannot be reconciled" with the sentence, and for its conclusion that in light of them the sentence is "inconceivable." Separate Op. of Tjoflat, J., at 210–13. The reason that the sentence when viewed against the findings is inconceivable, irreconcilable, and unintelligible is not the fault of the findings but of the sentence itself. The Tjoflat opinion confuses the unreasonableness of the sentence with an absence of stated reasons for it, and the impossibility of giving a reasoned basis

72

for the sentence with a lack of effort on the part of the sentencing judge to do so.

We turn now to the task of explaining why, even under the deferential standard of review that applies, viewing the facts and circumstances of this case in light of the § 3553(a) factors leads to the conclusion that the downward deviation sentence the district court imposed in this case is substantively unreasonable.

## C. Substantive Unreasonableness

The statutory minimum sentence applicable to this case is 15 years and the maximum is 30 years. The advisory guidelines range is 30 years, top and bottom. The district court deviated downward 12 ½ years to a sentence of 17 ½ years, which is only 2 ½ years above the statutory minimum. The downward variance was 42 percent.[21] Whether considered in absolute or percentage terms, it is a "major" variance in the legal parlance of sentencing law. See United States v. Smith, 573 F.3d 639, 660–61 & n.5 (8th Cir. 2009) (requested variance downward from a 360-month guidelines sentence to one of 240 months, a reduction of 33 percent, would have been "a major variance"); United States v. Abu Ali, 528 F.3d 210, 261 (4th Cir. 2008) (noting that a downward variance of 40 percent to a sentence of 30 years is "major"); see also United States v. Burns, 577 F.3d 887,

---

[21] As we have already noted, when viewed in terms of the statutorily permissible range of 15 to 30 years, the district court chose a sentence within that range (a spread of 15 years or 180 months) that was 83 percent below the maximum and only 17 percent above the minimum. See Irey, 563 F.3d at 1227 (Hill, J., concurring).

888–90, 896 (8th Cir. 2009) (a variance downward by 60 percent from a 360-month guidelines sentence to one of 144 months imprisonment is "beyond dispute" a major one).

Although there is no proportionality principle in sentencing, a major variance does require a more significant justification than a minor one—the requirement is that the justification be "sufficiently compelling to support the degree of the variance." Gall, 552 U.S. at 50, 128 S. Ct. at 597. The justifications the district court offered for its major variance downward in sentencing were not only insufficiently compelling to support the degree of the variance, but they were also insufficiently compelling to support any variance.

The district court's clear error in judgment becomes apparent when all of the facts and circumstances are considered in light of the § 3553(a) factors. What § 3553(a) requires is "a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)" of that subsection. Throughout his separate opinion (nineteen times by our count), Judge Tjoflat refers to the § 3553(a) requirement that a sentence be adequate but not excessive for the purposes set out in § 3553(a)(2) as "the parsimony principle" or "the parsimony requirement." Separate Op. of Tjoflat, J., at 158 & n.21, 159–60, 164, 168, 174–75, 183, 197–98, 203, 209, 222 n.91, 232 n.100. It is a term that has

74

been used in a few other circuits.  See, e.g., United States v. Carrasco-De-Jesus,
589 F.3d 22, 29 (1st Cir. 2009) (noting that the appellant "posits that the sentence
violates the parsimony principle of 18 U.S.C. § 3553(a)"); United States v.
Martinez-Barragan, 545 F.3d 894, 904 (10th Cir. 2008) ("[T]he district court must
be guided by the 'parsimony principle'—that the sentence be 'sufficient, but not
greater than necessary, to comply with the purposes' of criminal punishment, as
expressed in § 3553(a)(2).").

The problem with the parsimony terminology is that the statutory command
has two components of equal standing, and it ignores one of them.  The
requirement is not merely that a sentencing court when handing down a sentence
be stingy enough to avoid one that is too long, but also that it be generous enough
to avoid one that is too short.  Calling the statutory requirement "the parsimony
principle" is as incomplete and inaccurate as it would be to call the requirement
"the severity principle."  The reason that defense counsel and those who argue for
shorter sentences, either generally or in specific cases, like the term "parsimony
principle" is that it tends to slant the discussion toward shorter sentences by
emphasizing only that part of the twin requirements.  But terminology that is less
than completely accurate should not be used to guide judicial decisions.[22]  A more

---

[22] The term "parsimony principle" is an example of what Holmes once referred to as an
"inadequate catch word[ ]," which could by its "very felicity, delay further analysis."  Oliver

accurate term, if one is needed, might be "the Goldilocks principle," because the

goal is to lock in a sentence that is not too short and not too long, but just right to

serve the purposes of § 3553(a).[23]  In this opinion, however, we will avoid using a

catchword and simply apply the provision as Congress wrote it.  We turn now to

the sentencing factors set out in § 3553(a).[24]

---

Wendell Holmes, Law in Science and Science in Law, 12 Harv. L. Rev. 443, 455 (1899).

Judge Tjoflat's separate opinion says that "[a]lthough the court quibbles with the label 'parsimony principle,' it does not disagree with the underlying concept."  Separate Op. of Tjoflat, J., at 158 n.21. To the contrary, we emphatically disagree with the "parsimony principle" terminology and the concept that underlies it, which is that one of the two § 3553(a) principles is to be given predominance over the other.  The term "parsimony principle" is an "inadequate catch word" that stacks the deck and we would prefer to deal with result-neutral terms.

[23] Research reveals that this thought has occurred to at least one other judge.  See United States v. Pruitt, 502 F.3d 1154, 1175 (10th Cir. 2007) (McConnell, J., concurring) ("The § 3553(a) factors tell judges, like Goldilocks, not to sentence too high and not to sentence too low."), vacated, 552 U.S. 1306, 128 S. Ct. 1869 (2008).

[24] Judge Tjoflat's opinion interprets the statutory language of § 3553(a) to require the sentencing judge to identify a single "driving purpose," and then "explain why the driving purpose subsumes the other purposes."  Id. at 173 n.37; see also id. at 191 ("[T]he (a)(2) purposes should not be weighed against each other; rather, the [district] court should identify the (a)(2) purpose that drives the sentence and fashion a sentence parsimonious to that purpose."); id. at 190–94 & n.63.  Under that novel approach, the driving purpose the sentencing judge chose would run over all of the other purposes listed in the statute.

The statute directs courts to "impose a sentence . . . [that] compl[ies]  with the purposes set forth" in § 3553(a)(2).  18 U.S.C. § 3553 (emphasis added).  The direction is that the sentence comply with the "purposes" plural; four of them are listed in § 3553(a)(2), and they are joined by the conjunctive "and," not by the disjunctive "or."  Id. at § 3553(a)(2)(A)–(D).  The Tjoflat opinion cites no authority for the proposition that courts should pick one "driving purpose" to speed ahead and flatten the other three.

Not only do we disagree with the approach in Judge Tjoflat's opinion, but so does the Supreme Court.  In explaining how § 3553(a)(6) directs sentencing courts to consider the need to avoid unwarranted sentencing disparities, the Court instructed us that "these disparities must be weighed against the other § 3553(a) factors."  Kimbrough, 552 U.S. at 108, 128 S.Ct. at 574

### 1. Section 3553(a)(1)

The first listed factor—it is actually two factors in one—that a district court must consider in sentencing, and that a court of appeals must consider in reviewing the sentence for substantive reasonableness, is "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). To a large extent "the nature and circumstances of the offense" component of this factor overlaps with the next listed consideration, which is "the need for the sentence imposed—to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," id. § 3553(a)(2)(A). For that reason, we will postpone some of our discussion of the nature and circumstances of the offense component of (a)(1) until we take up the (a)(2)(A) offense-related factor in the next section.

### a. The "Victim"

Most of the district court's reasons for the major variance it imposed relate to the "history and characteristics of the defendant" component of the § 3553(a)(1) factor, and it is here where most of the court's errors in judgment leading to the unreasonable sentence can be found. To begin with, the district court viewed Irey,

(emphasis added). The Court did not say that the § 3553(a)(6) sentencing disparity factor folds into the § 3553(a)(2) purposes, and that one of those purposes then becomes the driving purpose behind the sentence, but instead that all of the § 3553(a) factors are to be weighed against each other in order to determine the proper sentence.

who had raped, sodomized, and tortured fifty underage girls, as himself a victim. The court said exactly that: "I recognize, of course, that Mr. Irey and his family and friends are also victims here; and society at large is a victim because, as Dr. Shaw indicated . . . the Internet . . . has made possible an epidemic of child pornography." Dr. Shaw never said that Irey was a victim of the availability of child pornography on the internet. Nor did Dr. Berlin. Nor did defense counsel. Nor did Irey himself. The only one who saw Irey as a victim was the district court.

There are two problems with the district court's re-casting of the predator as prey: its factual premise and its legal premise. The problem factually is not with the court's explicit finding that the internet "has made possible an epidemic of child pornography." No one disputes that. Nor is the problem with the court's implicit finding that the availability of child pornography on the internet has caused some children to be sexually abused by pedophiles who would otherwise have restrained themselves. In discussing pedophilia generally, Dr. Shaw testified that the availability of child pornography on the internet "has fueled an epidemic of pedophilia that was kind of probably in the background, people might not have even known that they suffered from it, and then come across these images." So there is a basis in the record for finding that some pedophiles are excited to action

78

by the child pornography on the internet.  That is not the factual problem.

The factual problem is, instead, with the district court's implicit finding that child pornography on the internet caused Irey, the only defendant before the court, to sexually abuse children.  We know that it did not, and we know that from no less of an authority than Irey himself.  In a letter he wrote to the district court a week before sentencing, Irey stated that he did not start viewing child pornography on the internet until after he had begun having sex with the little girls in Cambodia.[25]  The government has insisted throughout this appeal, however, that it is not challenging any of the district court's factfindings, only the court's characterizations, its application of law to fact, the weight it assigned to various factors, and the overall reasonableness of the sentence it imposed.  For that reason, we will not disturb the district court's clearly erroneous finding that the existence of child pornography on the internet enticed Irey to sexually abuse children or was a contributing cause of his doing so, and we will instead accept that finding as a

---

[25] In his letter to the court, Irey stated:  "I visited these brothels many many times after that.  I knew that these girls were not 18.  But it was to[o] late, my sex addiction was now in full control of me.  After awhile I started to look for child porn on the internet" (emphasis added).  And Dr. Berlin's report stated that:  "Mr. Irey denied any sexual fantasies of children before he had the sexual experiences in the Cambodian brothels."

During oral argument before us, defense counsel conceded that Irey's own statements negated a finding that he saw child pornography on the internet that enticed him to travel to Cambodia and have sex with children.  Counsel acknowledged it was "correct" that Irey "went to Cambodia and visited the child brothels first and then after a while he started looking for it on the internet."

given in our analysis.

The more fundamental problem with the district court's recasting of Irey-the-criminal as Irey-the-victim is the legal premise behind it, one that suggests the criminal is like his victims. Irey is the wrongdoer, the predator, the victimizer. The little girls in Cambodia are the wronged, the prey, the victims. The district court should have kept the two separate and not commingled them in its thinking. Child molesters and the children who are their victims do not occupy the same moral plane or position or anything resembling it. A man who sexually violates little children is no more entitled to be considered a victim of child pornography on the internet than a defendant who rapes an adult woman is entitled to be considered a victim of sexually provocative images on television. The victims in this case are the underage girls, some as young as four years old, whom Irey violated for his own perverse pleasure, filming that violation for distribution worldwide. Suggesting that Irey, like those little children, was a victim is absurd. Even defense counsel refused to defend it before us.[26]

---

[26] During oral argument, defense counsel was asked these questions and gave these answers:
  Q. What about his factfinding that Irey himself was a victim? What supports that?
  A. Judge, I think that his statement in that regard is unfortunate and I think it was in direct response to Dr. Sh—
  Q. You don't defend that statement do you?
  A. I do not.
The first quoted question in that exchange labeled the district court's statement a factfinding, but it was not. Calling Irey a victim is a characterization, not a finding of fact.

80

The district court's view of Irey as a victim permeated its reasoning and tainted its weighing of the § 3553(a) factors, including (a)(1), which is "the nature and circumstances of the offense and the history and characteristics of the defendant." The nature of an offense would tend to seem less morally outrageous if the one who committed it were himself a victim. And if the characteristics of the defendant include being a victim, he is naturally more sympathetic than otherwise.

### b. The "Illness" of Pedophilia

Along these same lines, the district court insisted on describing Irey as suffering from the "illness" of pedophilia, while the two defense experts described it as a "treatable disorder."[27] The district court found that because he suffered from pedophilia: "Mr. Irey's acts that bring him here today, I think it's safe to say, were not purely volitional. I think they were due in substantial part to a recognized illness. And while it does not excuse his conduct and he will be held accountable for it, I think it would be inappropriate to ignore that fact."

The record does not support the district court's finding that because he is a pedophile Irey could not much help raping, sodomizing, and sexually torturing

---

[27] Under the DSM IV TR, pedophilia is a paraphilia and an Axis I disorder. Other examples of Axis I paraphilia disorders include voyeurism, exhibitionism, fetishism, frotteurism, transvestic fetishism, sexual masochism, and sexual sadism. DSM IV TR at 566–67.

81

little children, posing them as trophies, and smiling while he did it. The record actually contradicts that finding. Dr. Berlin reported: "Although it is not his fault that he has the disorder [of pedophilia], it is his responsibility to do something about it." It could not be Irey's responsibility to do something about his pedophilia if he lacked the volitional capacity to do something about it. One is responsible for doing something only if one has the ability to do something about it. Both experts agreed that pedophilia was treatable. What Irey could have done about his pedophilia is seek treatment for it. He never once sought treatment for his pedophilia, which was part of what he described as his "terrible dark side," during the four or five years he was sexually abusing little children "many many times." Like most criminals, Irey stopped only when he got caught.

Not only that, but as Dr. Berlin noted, "[e]ven without treatment, in the past, [Irey] had been able to refrain from any sexual contact with children within the United States." The undisputed fact is that Irey was perfectly capable of not sexually abusing children where the risk of detection and punishment was high, which is why he consciously chose to commit his crimes against children halfway around the globe in a third world country where there was little or no risk from law enforcement. Irey's self-restraint when it was in his own best interest not to indulge his lust for children proves that his volition was not impaired to any extent

82

worthy of weight in sentencing.

During the sentence hearing, the district court asked Dr. Shaw: "is a person who acts out as a result of this condition acting totally of rational free will or is that person acting out as a result of something that is in essence an illness that he at that point has no control over?" Dr. Shaw refused to endorse the court's pedophiles-can't-much-help-it theory. Instead, he gave his expert opinion that while pedophilia is not curable, it is treatable and pedophiles can and many do avoid molesting children. Dr. Shaw stressed that "Pedophilia is very treatable, and there are many pedophiles in the community who are doing just fine and managing their behavior." He later reiterated that there are "thousands of pedophiles and child molesters, different, out there, . . . who aren't re-offending, who are in recovery and are doing just fine." The "many pedophiles in the community" could not be doing "just fine" and the "thousands of pedophiles . . . out there" could not be avoiding commission of offenses if, as the district court believed, the "illness" of pedophilia rendered the criminal acts of those who molest children "not entirely volitional." See generally Bruce J. Winick, Sex Offender Law in the 1990s: A Therapeutic Jurisprudence Analysis, 4 Psychol. Pub. Pol'y & L. 505, 524 (1998) ("People diagnosed with pedophilia do not molest children in the presence of police officers or in other situations presenting

a high likelihood of apprehension. Rather, they act with stealth, deception, and premeditation in an effort to avoid detection. This is purposeful, planned, and goal-directed conduct, not spontaneous and uncontrollable action or action that is substantially beyond the individual's ability to avoid."); id. at 523–24 ("There is nothing in the diagnostic criteria for pedophilia or any of the other paraphilias that suggests that individuals diagnosed with these disorders suffer from any cognitive impairment that affects their ability to understand the wrongfulness of their conduct or that renders them irrational in any respect or unable to control their actions. . . . Moreover, there is nothing in the clinical literature that suggests that sex offenders are unable to exercise self-control.").

The district court refused to acknowledge the line that both of the defense experts drew between pedophilia and child molestation—a line, as the AUSA argued, that is similar to the one between alcoholism and driving under the influence. Dr. Shaw attempted to explain to the court metaphorically the difference between having the urge and acting on the urge: "Pedophiles are capable of not re-offending, even if they have an urge, in the same way that compulsive dessert eaters can choose to not eat dessert." The district court did not heed the metaphor or the experts' reports or the testimony of Dr. Shaw, but instead reasoned that because pedophiles have the urge they have diminished

volition when it comes to resisting the urge.

We would recognize this finding as clear error if the government had argued the point to us. Since it did not, we will accept as a fact, for this case only, the erroneous finding that when pedophiles molest children they are not acting in a "purely volitional" way but instead their crimes are "due in substantial part" to their pedophilia.[28]

That finding, which we assume correct for this case, is relevant to the § 3553(a)(1) factor concerning "the nature and circumstances of the offense and the history and characteristics of the defendant." But the assumed fact cannot reasonably carry much weight. Not "purely volitional" does not mean not volitional, and "due in substantial part" does not mean due, period. The district court did not find that Irey could not help committing the crimes that he committed "many many times" over a period of four or five years. Perhaps the reason the court stopped short of finding Irey could not help it at all is that Irey

---

[28] Judge Tjoflat's separate opinion accuses us of using the reports we have cited to hold that the district court clearly erred in finding that pedophiles are not acting in a "purely volitional" way when they sexually abuse children. Separate Op. of Tjoflat, J., at 223 & n.93. In doing so that opinion ignores the fact that Dr. Shaw, whom the opinion describes as Irey's "'star' witness," id. at 204, was himself careful to distinguish between pedophilia and child molestation, a distinction that the district court insisted on blurring. More fundamentally, Judge Tjoflat's separate opinion also disregards our clear statement, to which this footnote is attached, that because the government has not contested the point, we are accepting as a fact for purposes of this case the finding that when pedophiles molest children they are not acting in a "purely volitional" way but instead their crimes are "due in substantial part" to their pedophilia.

obviously did help it when doing so suited his purpose of not getting caught.

While in this country Irey refrained from committing any crimes against children,

never once touching an American child in an inappropriate way, and instead

consorted with adult prostitutes. It was while in Cambodia, where he could get

away with sexually violating children, that he did it so "many many times." And

he acted with cunning. As Judge Hill put it:

> I also disagree with the apparent weighty consideration that the
> sentencing judge gave to the notion that this defendant acted on
> account of some type of "sickness." The defendant acted
> deliberately, cunningly and with obvious delight. He ruined the lives
> of at least forty-three children (that we know of) and then published
> his triumphs on the internet for all the world to see, complete with
> scurrilous black marker writings tattooed on the nine-year-old girls'
> skin.

Irey, 563 F.3d at 1227 (Hill, J., concurring).

Moreover, the "history and characteristics of the defendant" component of

the § 3553(a)(1) factor is aimed at distinguishing among defendants who commit a

particular offense or type of offense. The theory of the district court's finding,

however, is one of non-distinction because it applies to virtually everyone who

commits this type of crime. According to the district court's theory,

pedophiles—not Irey in particular but pedophiles in general—share the

characteristic of having impaired volition when it comes to sexually abusing

children. They all have what the district court insisted on calling the "illness" of

86

pedophilia.  If the sexual molestation of children by pedophiles is not "entirely volitional," as the district court found and as we are assuming, then most sexual abuse of children is not "entirely volitional," because most of it is done by pedophiles.  See Ryan C.W. Hall & Richard C.W. Hall, A Profile of Pedophilia: Definition, Characteristics of Offenders, Recidivism, Treatment Outcomes, and Forensic Issues, 82 Mayo Clinic Proc. 457, 458 (2007) ("An estimated 88% of child molesters and 95% of molestations (one person, multiple acts) are committed by individuals who now or in the future will also meet criteria for pedophilia.  Pedophilic child molesters on average commit 10 times more sexual acts against children than nonpedophilic child molesters." (footnotes omitted)).

This point is important because it matters whether the reason for the variance is a fact that takes the present case outside the heartland of cases covered by the individual guideline.  The Supreme Court instructed us in Kimbrough that decisions to vary "may attract greatest respect when the sentencing judge finds a particular case outside the heartland to which the Commission intends individual Guidelines to apply."  Kimbrough, 552 U.S. at 109, 128 S. Ct. at 574–75 (quotation marks omitted); see also Rita, 551 U.S. at 351, 127 S. Ct. at 2465 (the guidelines themselves foresee that they are not to apply to cases outside the heartland of cases).  The Court stated that, by contrast, "closer review may be in

order when the sentencing judge varies from the Guidelines based solely on the judge's view that the Guidelines range fails properly to reflect § 3553(a) considerations even in a mine-run case." Kimbrough, 552 U.S. at 109, 128 S. Ct. at 575; see also Spears, 129 S. Ct. at 843 ("[Kimbrough's] implication was that an 'inside the heartland' departure (which is necessarily based on a policy disagreement with the Guidelines and necessarily disagrees on a 'categorical basis') may be entitled to less respect.").

The district court's reliance on the theory that pedophiles have reduced volition, applying as it does to virtually all crimes involving sexual abuse of children, does not take this case outside the heartland to which the Commission intended the guidelines relating to sexual offenses against children to apply. Instead, the pedophiles-are-ill variance is more properly seen as a variance based on the judge's view that the guidelines range for crimes involving the sexual abuse of children does not properly reflect § 3553(a) factors even in mine-run cases, i.e., in the vast majority of cases. For that reason, as Kimbrough teaches, the decision is not entitled to the "greatest respect" but instead should be subject to "closer review." Exercising that closer review, we reject as unreasonable and a clear error in judgment the district court's view that the guidelines involving sex crimes against children are too harsh in a mine-run case because pedophiles have

88

impaired volition. The reasons should be apparent but, if not, we refer the reader to our upcoming discussion about the devastating and permanent harm that this type of crime inflicts on its young victims. See infra at 98–102; see also Garcia v. Quarterman, 456 F.3d 463, 471–72 (5th Cir. 2006) (capital case) ("The second error in Garcia's argument is the suggestion that pedophilia may be considered 'mitigating' of a defendant's moral culpability. No case has so held. . . . There is no sense in which reasonable people could view Garcia's pedophilia as morally mitigating of guilt, any more than reasonable people would find a defendant's uncontrollable compulsion to commit incest or eat human flesh 'mitigating.'"), vacated on other grounds, 257 Fed. App'x 717 (5th Cir. 2007).

c. Husband, Father, and Member of the Community

While considering the "the history and characteristics of the defendant" component of § 3553(a)(1), the district court also weighed in Irey's favor his status as a family man and member of the community:

> By all accounts, Mr. Irey has been a good husband and father for his wife and children and a good friend to his friends and a good person to his community. The lies and thefts, I think, referred to by Ms. Hawkins were essentially part of his effort to cover up his illness, because I think other than the acts of Mr. Irey, there's no indication that he has engaged in any other sort of criminal conduct or conduct representing poor character.

That is unreasonable and a clear error in judgment on several different levels.

89

To begin with, the judge's reasoning is like saying that other than the fact he had an "illness" that made him want to kill young women, Ted Bundy was a pretty nice guy and a valuable member of his community.  That not only could have been said about Bundy, but something like it actually was said.  See Ann Rule, The Stranger Beside Me 33–34 (2000) (describing how the author worked beside Bundy at a crisis clinic with a suicide prevention line, where Bundy served the community well:  "If, as many people believe today, Ted Bundy took lives, he also saved lives.  I know he did, because I was there when he did.").  The district court's reasoning is also like saying that but for his taste for human flesh and how he satisfied it, Jeffrey Dahmer was not so bad.  See Lionel Dahmer, A Father's Story 47 (1994) (describing how Jeffrey Dahmer had helped rescue a baby bird that had fallen from the nest and had nursed it back to health).

By the simple expedient of assuming away or putting out of mind all the criminal acts that they have committed, one may describe many, if not most, criminals as good people without "any other sort of criminal conduct or conduct representing poor character."  Irey did not merely slip up and commit one criminal act.  He persistently flew halfway around the world on a regular basis for four or five years and "many many times" raped, sodomized, and sexually tortured helpless children.  And he recorded his sexual abuse and debasement of the little

90

children in photographs and videos for his own personal enjoyment and to share with others. No one who commits such heinous crimes has good character regardless of whether the criminal, while he was not raping, sodomizing, and torturing helpless children, was a good father, or husband, or member of his local community (as distinguished from the world community). It was unreasonable and a clear error in judgment to vary downward for Irey on the theory that he has good character. See Martin, 455 F.3d at 1239–40 (disapproving the sentencing court's emphasis on the defendant's lack of a criminal record and the aberrational nature of his crimes, which the guidelines had already taken into account, and pointing out that his criminal conduct spanned a period of years and caused much harm).

The Fourth Circuit had a somewhat similar situation before it in United States v. Abu Ali, 528 F.3d 210, 258–59 (4th Cir. 2008), where the sentencing court in a case involving attempted terrorism had varied downward from a guidelines range sentence of life to a sentence of 30 years after considering, among other things, the many letters it had received "describing Abu Ali's 'general decent reputation as a young man' and his overall 'good character.'" Id. at 268. Vacating the 30-year sentence as unreasonably lenient, the Fourth Circuit was "unmoved" by those letters, explaining:

91

> What person of "decent reputation" seeks to assassinate leaders of countries? What person of "good character" aims to destroy thousands of fellow human beings who are innocent of any transgressions against him? This is not good character as we understand it, and to allow letters of this sort to provide the basis for such a substantial variance would be to deprive "good character" of all its content.

Id. Likewise here. What person of good character commits the horrific crimes that Irey did against at least fifty different children and on "many many" occasions over a four- or five-year period, stopping only when he is finally caught? What the Fourth Circuit said applies as well to this case and what Irey did: "This is not good character as we understand it." If Irey is a person of good character, the term has no meaning worth mentioning.

The facts about Irey as a husband, father, and member of the community are not disputed, the question is how to weigh them for sentencing purposes. The uncontroverted facts are that as a husband Irey had been cheating on his wife with prostitutes for the past 15 years, which was three-fifths of the 25 years they had been married. See Pugh, 515 F.3d at 1192–93 (considering beyond the sentence findings "these additional salient facts that were elicited, and uncontroverted, at the sentencing hearings"); see also Gall, 552 U.S. at 51, 128 S. Ct. at 597 (the appellate court "will, of course, take into account the totality of the circumstances"). He did it on a weekly basis while he was in Orlando, his

hometown. Because of Irey's immoral conduct, he contracted a venereal disease and passed it on to his wife. He lied to his wife. As a result of Irey's depraved criminal misconduct his family lost their expensive house, their savings, and their second-generation family business. Irey admitted that because he had spent so much time over the years pursuing sex outside marriage, he spent less time with his children than he should have: "I was cheating my children out of things like taking them to the parks or a basketball game, because I had to go pick up a prostitute." In view of those uncontroverted facts, no significant weight can be given to Irey's having been "a good husband and father for his wife and children."

Irey lied not just to his wife but to others as well. As he put it, "I would lie to people even when I did not need to." He stole from the family business, which his father had started a half century before. His criminal conduct put the long-established company out of business, costing fifty members of the community their jobs. No number of civic club memberships can outweigh the harm that Irey caused his wife and family and the community.

It was, however, appropriate for the district court to find and consider that "Irey obviously has a very loving family" and "deserves whatever credit he should take for having produced these people" who spoke on his behalf at the sentence hearing. That is true even though the extremes Irey's family members went to in

93

expressing their affection for and devotion to him seem detached from the reality of the circumstances in which they were called upon to do it.  It is incongruous at best to describe the man who had sexually tortured so many little children as "loving," a "hero," a "star," and as one who taught others "so much about life and love," and who "had a way of touching people's lives."  Still, we are sympathetic, as the district court was, to the terrible emotional plight that Irey's family was in because of his crimes.  It is admirable that they chose to stand by him, but in deciding how that weighs in the sentencing calculus their statements have to be considered in context.

It may well be, as the government suggests, that some of the good things Irey's family members had to say about him are a testament to his ability to lead a double life and to evade detection even by those closest to him.  Their praise of Irey may prove that he knew how to keep his family and friends in the dark about his "terrible dark side," as he described it to the district court.[29]  Still, it was not unreasonable for the district court to conclude that Irey has a "very loving family" and "deserves whatever credit he should take for having produced these people."  We would find grossly unreasonable, however, any suggestion that the credit Irey

---

[29] We know from Dr. Shaw's report that, at least at the time of one of Irey's psychological evaluations, his wife was unaware of the severity of his crimes.  Dr. Shaw also testified that "I assume that people are going to minimize and leave some of the worst things out."

may be due for his family's feelings for him could even remotely approach the heavy weight stacked against him for the criminal acts he committed.

### d. Age

The district court also considered "[a]nother aspect of defendant's character" to be Irey's age and weighed in his favor the fact that with "even the minimum sentence here he's going to be an old man . . . when he gets out of prison." Irey was 43 or 44 years old when he started sexually abusing children, and he was 50 when he was sentenced. With the sentence the district court imposed, minus time off for good behavior under § 3624, Irey would be 65 years old when released. With the maximum sentence of 30 years, minus time off for good behavior, Irey would be 76 years old when released. 18 U.S.C. § 3624; 28 C.F.R. §§ 523.20, 541.13 (2005); see also Barber v. Thomas, 130 S.Ct. 2499 (2010).[30]

We fail to see how those facts show that Irey is different from any other person who commits horrendous crimes in middle age and faces a long prison sentence. Cf. United States v. Seljan, 547 F.3d 993, 997–98 (9th Cir. 2008) (en

---

[30] Judge Tjoflat's separate opinion takes the position that in performing our sentencing review we should not consider any statute, such as 18 U.S.C. § 3624, unless it was cited by or in the district court. See Separate Op. of Tjoflat, J., at 223 n.93, 224–25, 227. That is an odd position for that opinion to take since the opinion itself cites and discusses § 3624 in connection with sentencing "honesty." Id. at 153 n.13. We will not blind ourselves to the law, give a less than honest accounting of it, and ignore a relevant statute merely because it was not discussed in the district court.

banc) (87-year-old defendant sentenced to 20 years for sexually abusing children); United States v. Zastrow, 534 F.3d 854, 855 (8th Cir. 2008) (73-year-old man sentenced to 20 years for enticing or coercing an 8-year-old girl into sexually explicit conduct which he photographed). Besides, if Irey had not successfully evaded detection for four or five years he would be that much younger when he gets out of prison. In these circumstances rewarding Irey for being older rewards him for evading detection and it is unreasonable to do that.

### 2. Section 3553(a)(2)(A)

The second factor that a district court must consider in sentencing, and that a court of appeals must consider in reviewing the sentence for substantive reasonableness, is "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). This requirement extends beyond, but also overlaps to some extent with, the "nature and circumstances of the offense" component of §3553(a)(1).

The § 3553(a)(2)(A) consideration is the "just deserts" concept, which carries the need for retribution, the need to make the punishment fit the crime, and the need not just to punish but to punish justly. In Pugh we quoted from the Senate Report regarding this provision:

96

> This purpose—essentially the "just deserts" concept—should be reflected clearly in all sentences; it is another way of saying that the sentence should reflect the gravity of the defendant's conduct. From the public's standpoint, the sentence should be of a type and length that will adequately reflect, among other things, the harm done or threatened by the offense, and the public interest in preventing a recurrence of the offense. From the defendant's standpoint the sentence should not be unreasonably harsh under all the circumstances of the case and should not differ substantially from the sentence given to another similarly situated defendant convicted of a similar offense under similar circumstances.

515 F.3d at 1195 (quoting S. Rep. No. 98-225, at 75–76, 1984 U.S.C.CA.N. 3258–59); see also United States v. Lychock, 578 F.3d 214, 220 (3d Cir. 2009); United States v. White Face, 383 F.3d 733, 740 (8th Cir. 2004); United States v. Beasley, 12 F.3d 280, 283 (1st Cir. 1993).

Because the punishment should fit the crime, the more serious the criminal conduct is the greater the need for retribution and the longer the sentence should be. The seriousness of a crime varies directly with the harm it causes or threatens. It follows that the greater the harm the more serious the crime, and the longer the sentence should be for the punishment to fit the crime. As we have stated before, "[c]hild sex crimes are among the most egregious and despicable of societal and criminal offenses." United States v. Sarras, 575 F.3d 1191, 1220 (11th Cir. 2009) (affirming as reasonable a 100-year sentence for a first offender who sexually abused a single 13-year-old girl and took photos of it). And Irey's criminal

97

conduct, as we stated at the beginning, is virtually unparalleled in a "most egregious and despicable" field of crime. This circuit has seen few, if any, other criminals who have over such a long time span raped, sodomized, and tortured so many children, some of whom were very young, and all of whom were among the most helpless people in the world. Irey, a 200-pound man, subjected his helpless young victims not just to sexual intercourse but also to anal and oral sodomy and to sexual torture that went far beyond the heartland of depravity even for child molesters. Irey treated his child victims as objects, as his toys, which he bought and then did with as he pleased. He smiled as they cried out in pain. As if that were not enough, Irey also photographed and video recorded his debauchery and distributed it on the internet, thereby guaranteeing that the record of it would outlast him and all of us, inspiring other child molesters to commit crimes against children.

Much has been said to describe and emphasize the grave harm that sexual abuse of children inflicts on its victims. Some of the best and most recent descriptions of that harm can be found in Kennedy v. Louisiana, — U.S. —, 128 S. Ct. 2641 (2008). Although the Court by a 5 to 4 margin decided that capital punishment could not constitutionally be imposed for the rape of a child, all nine justices agreed that sexual abuse of children inflicts enormous harm on the

victims.  The majority acknowledged that:

> Here the victim's fright, the sense of betrayal, and the nature of her injuries caused more prolonged physical and mental suffering than, say, a sudden killing by an unseen assassin.  The attack was not just on her but on her childhood. . . .  Rape has a permanent psychological, emotional, and sometimes physical impact on the child. We cannot dismiss the years of long anguish that must be endured by the victim of child rape.

Id. at 2658 (citations omitted).

The four dissenting justices in Kennedy believed that child rape was such a serious crime that death could be imposed as punishment for it.  Id. at 2677–78 (Alito J., joined by Roberts, C.J., Scalia, and Thomas, JJ., dissenting).  They stressed the devastating, long-term effect that rape has on children.  See id. at 2677 ("The immaturity and vulnerability of a child, both physically and psychologically, adds a devastating dimension to rape that is not present when an adult is raped.  Long-term studies show that sexual abuse is grossly intrusive in the lives of children and is harmful to their normal psychological, emotional and sexual development in ways which no just or humane society can tolerate." (citations and quotation marks omitted)).  All nine justices agreed about that, and so do we.

Even before the Kennedy opinions, the Supreme Court had long recognized that childhood sexual abuse has devastating and long-lasting effects on its victims.

99

See New York v. Ferber, 458 U.S. 747, 758 n.9, 102 S. Ct. 3348, 3355 n.9 (1982) ("It has been found that sexually exploited children are unable to develop healthy affectionate relationships in later life, have sexual dysfunctions, and have a tendency to become sexual abusers as adults." (citing Schoettle, Child Exploitation: A Study of Child Pornography, 19 J. Am. Acad. Child Psychiatry 289, 296 (1980))).  The damage to children who are the victims of sexual abuse is not limited to psychological and emotional injury; serious physical injuries often result as well.  See, e.g., Kennedy, 128 S. Ct. at 2646; State v. Goodwin, 679 P.2d 231, 232 (Mont. 1984) (seven-year-old victim suffered "a severe laceration in the vaginal area extending all the way to the cervix.  Major surgery was required to repair the vaginal laceration."); id. at 234 (doctor testified that "[i]t was also too early to know whether normal sexual intercourse or childbearing would be possible" for the victim later in life); see also United States v. Eagle, 515 F.3d 794, 799 (8th Cir. 2008) ("After the assaults, [the 8-year-old victim] experienced mental, emotional, and physical problems.  For instance, he began feeling sad and unhappy and also experienced encopresis, or involuntary defecation." (footnote omitted)).  In this regard, it is worth remembering that Irey proudly imbedded in all capitals on one of the images he produced that:  "Big Cock Push Bug Deep Into 9 Yo Girl, She Hurt in Pane."

100

When child pornography is produced in conjunction with the sexual abuse of children, as it was here, the harm to the child victims is magnified and perpetuated.  See Ferber, 458 U.S. at 759, 102 S. Ct. at 3355 (stating that "the materials produced are a permanent record of the children's participation and the harm to the child is exacerbated by their circulation"); Pugh, 515 F.3d at 1197–98 & n.12 (citing extensive congressional findings about the harm caused by child pornography and recognizing that "[i]n light of these detailed legislative findings and numerous legislative enactments, we cannot help but underscore the seriousness of this crime"); see also Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, § 501(2)(D), 120 Stat. 587, 624 (2006) (codified at 18 U.S.C. § 2251 note) ("Every instance of viewing images of child pornography represents a renewed violation of the privacy of the victims and a repetition of their abuse.").

There is another aspect of the compounding harm that the production and distribution of child pornography inflicts.  It may incite or encourage others to sexually abuse children.  Indeed, the district court found in this case that child pornography did have that effect on at least some pedophiles, causing them to sexually abuse children who otherwise would not have been abused.  See supra at 31.  The district court, however, seems to have ignored what its own finding

means to the calculus of harm that Irey caused. He is, after all, the producer and distributor of one of the most graphic, depraved, and widely distributed series of child pornography on the internet, the infamous "pink wall series." So widely distributed is it that over a hundred law enforcement agencies had turned up child pornography from the series in their investigations. If child pornography is a cause of child sexual abuse, as Dr. Shaw testified and the district court found, then Irey not only sexually abused fifty or more little girls in Cambodia but he also multiplied the harm he did by inciting others to sexually abuse countless more children all over the world. The district court did not even mention that harm-multiplier aspect of Irey's crime in its findings.

To be sure, the district court did describe the crime as "horrific," the victims as "numerous," and "perhaps the most vulnerable of the world's society," and it did state that it was "an offense that rises to the very top in terms of its seriousness and its effect on other human beings" who "may never, never overcome their abuse." The court also, in an incredible understatement, said that "the characteristics of the offense, the seriousness of it itself, the long-standing, long-term engagement in it certainly <u>does not mitigate in favor of any leniency</u>" (emphasis added). But the court then proceeded to show leniency anyway, in this worst of the worst crimes, by varying downward from the guidelines range by 12

½ years to a sentence of 17 ½ years, which is only 2 ½ years above the statutory minimum. See Irey, 563 F.3d at 1227 (Hill, J., concurring) (noting how far the sentence was from the maximum and how close to the minimum).

The 17 ½-year sentence, if all of it were to be served, would amount to only 4 months and a week for each of the 50 distinguishable victims that Irey raped, sodomized, or sexually tortured. In light of 18 U.S.C. § 3624, Irey will likely serve only 15 years and 3 months of his sentence, which works out to less than four months for each of those 50 victims who can be distinguished from each other in the images that show some of Irey's crimes. And that calculation does not include any time for Irey's additional criminal behavior of producing and distributing the massive amount of extremely graphic child pornography. Four months per child raped, sodomized, or tortured is grossly unreasonable. In sentencing there should be no quantity discount for the sexual abuse of children. Cf. Crisp, 454 F.3d at 1291 ("The court gave Crisp five hours for a crime that caused $484,137.38 in harm. That equates to $96,827.48 per hour or $1,613.79 per minute served in custody. The sentence does not reflect the seriousness of the crime, promote respect for the law, and provide just punishment for the offense, as § 3553(a)(2)(A) requires, nor does it afford adequate deterrence to criminal conduct, as § 3553(a)(2)(B) requires.").

There is another way to gauge the reasonableness of Irey's sentence: by comparing what he did and the time he received above the statutory minimum to the minimum conduct required to violate the statute and receive the minimum sentence. This is an aspect of the "just deserts" concept. The less it takes to have the statutory minimum sentence imposed, the higher the sentence should be for someone who does much, much worse than the minimum amount of criminal behavior that would violate the statute. Irey was convicted of violating 18 U.S.C. § 2251(c), which prohibits using or enticing "any minor" to engage in, or assist any other person to engage in, "any sexually explicit conduct" outside the United States for the purpose of producing any visual depiction of that conduct. "Minor" is defined as any person under 18 years of age. 18 U.S.C. § 2256(1). A person who traveled to another country and took a single photograph of a 17-year-old engaging in an obscene pose by herself would be guilty of violating the same statute and be subject to a mandatory minimum sentence of 15 years in prison. See id. § 2256(2)(A)(v) ("sexually explicit conduct" defined to include "lascivious exhibition of the genitals or pubic area of any person"). That means Irey, for all of his years of sexual violation, torture, and humiliation of at least 50 children, received only 30 months more than if all he had done was on a single occasion snap a single photo of a single, teenage child in an obscene pose by herself. That

104

cannot be reasonable.[31]

We realize that 17 ½ years, even when reduced to 15 ¼ years to serve is, as the panel stated, "a substantial portion of a human life—and no serious person should regard it as a trifle." Irey, 563 F.3d at 1226. We do not regard it as a trifle, but we are required to review all challenged sentences for substantive reasonableness. See Gall, 552 U.S. at 41, 128 S. Ct. at 591 ("[C]ourts of appeal must review all sentences—whether inside, just outside, or significantly outside the Guidelines range."). And sentences even longer than 17 ½ years have been held to be unreasonably short in view of all the facts and circumstances including, of course, the crime. See Ressam, 593 F.3d at 1130–31 (a 22-year sentence); Abu Ali, 528 F.3d at 262 (a 30-year sentence). Irey, after all, sentenced the children he raped, sodomized, and sexually tortured to a lifetime of harm, and the egregious child pornography he created and distributed will, because he uploaded it to the internet, continue causing harm for far longer than 17 ½ years. Irey's pink wall series will last longer than his own lifetime or ours, inciting and encouraging the sexual abuse of multitudes of children yet unborn.

The district court did impose a lifetime of supervised release on Irey once

---

[31] It is also worth noting that if Irey had sexually abused a single one of his 50 victims in this country, he would have received a mandatory minimum 30-year sentence. See 18 U.S.C. § 2241(c).

he leaves prison, as the guidelines recommend for every offender who sexually abused children.  See U.S.S.G. § 5D1.2(b).  While it is true that someone on supervised release is not entirely free, it is equally true that he is not confined in a prison either.  As the Supreme Court has held, "[s]upervised release, in contrast to probation, is not a punishment in lieu of incarceration."  United States v. Granderson, 511 U.S. 39, 50, 114 S. Ct. 1259, 1266 (1994).  And "a term of supervised release does not replace a portion of the sentence of imprisonment, but rather is an order of supervision in addition to any term of imprisonment imposed by the court."  United States v. Goad, 44 F.3d 580, 585 n.13 (7th Cir. 1995).  If being on supervised release were the punitive equivalent of being in prison, if it served the just deserts function as well, there would be no need to put most criminals in prison; we could put them on supervised release instead.  If the punitive impact of the two were the same, convicted criminals would not ask for a longer term of supervised release in hopes of getting a shorter term of imprisonment.  Yet they do.  Irey's attorney, for example, pleaded with the district court not to impose the 30-year guidelines range sentence but instead to set the sentence at "between 15 and 20 years with up to [a] lifetime of supervised release."  Irey clearly views supervised release as being significantly less punitive than imprisonment.  And it is.

106

The same is true of the other restrictions the district court imposed, all of which are required or strongly recommended for all convicted sex offenders, such as participation in a substance abuse program and a mental health program specializing in sex offender treatment, compliance with any state sex offender registration law, being subject to search based upon reasonable suspicion, and "the standard terms concerning risk control." Those release terms may be inconvenient, annoying, and burdensome, but they are not the equivalent of being behind bars. If they were, no convicted sex offender would care whether he remained in prison or was released subject to those conditions.

In imposing a sentence below the advisory guidelines range, the district court unreasonably failed to give enough weight to "the nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1), and to the need for the sentence imposed "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," id. § 3553(a)(2)(A).

### 3. Section 3553(a)(2)(B)

The third factor that a district court must consider in sentencing, and that a court of appeals must consider in reviewing the sentence for substantive reasonableness, is "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct." Id. § 3553(a)(2)(B). The sentencing judge in this

case referred to this important sentencing purpose as one of the § 3553(a) factors that "essentially are subjective in nature." He did say that "a serious sentence is hopefully going to deter others from conducting similar affairs," but then expressed his view that "when we're dealing with an illness like this, I'm not sure that that rationally follows." Even though the judge said that "nevertheless, deterrence is an appropriate consideration," it is apparent that his idiosyncratic doubts about whether pedophiles could be deterred from committing crimes involving the sexual abuse of children and child pornography affected the weight he gave to this important § 3553(a) factor.

The sentencing judge's skepticism about deterring these types of crimes is not shared by Congress, the Sentencing Commission, the Supreme Court, this Court, or other courts of appeals. See, e.g., Ferber, 458 U.S. at 760, 102 S. Ct. at 3356 ("The most expeditious if not the only practical method of law enforcement may be to dry up the market for [child pornography] by imposing severe criminal penalties on persons selling, advertising, or otherwise promoting the product."); Osborne v. Ohio, 495 U.S. 103, 109–10, 110 S. Ct. 1691, 1696 (1990) ("It is also surely reasonable for the State to conclude that it will decrease the production of child pornography if it penalizes those who possess and view the product, thereby decreasing demand.").

Far from questioning the value of deterrence, in Pugh we held that the deterrence objective of sentencing is "particularly compelling in the child pornography context." 515 F.3d at 1194. We explained that imposing a lighter sentence on one convicted of a child pornography offense "tends to undermine the purpose of general deterrence, and in turn, tends to increase (in some palpable if unmeasurable way) the child pornography market." Id. The problem of a missed opportunity for deterrence, we observed, is compounded when the crime involves not just possession but also distribution of child pornography. Id. Other circuits agree. E.g., United States v. Goff, 501 F.3d 250, 261 (3d Cir. 2007) ("[D]eterring the production of child pornography and protecting the children who are victimized by it are factors that should have been given significant weight at sentencing . . . ."); United States v. Barevich, 445 F.3d 956, 959 (7th Cir. 2006) ("Transporting and receiving child pornography increases market demand. The greater concern under the Guidelines is for the welfare of these exploited children. The avenue Congress has chosen to weaken the child pornography industry is to punish those who traffic in it.").

United States v. Lychock, 578 F.3d 214 (3d Cir. 2009), involved a defendant who had been convicted of possessing child pornography. The guidelines range was 30 to 37 months but the district court varied down to a

sentence of probation and a fine.  Id. at 216.  That district court, like the one in this case, acknowledged that the crime "is a serious offense," but characterized the defendant as otherwise "law abiding" and was impressed with his "supportive family," and the fact that he had sought psychological help (after he was caught) and was benefitting from it.  Id. (quotation marks omitted).  The district court in Lychock, like the one in this case, was skeptical about whether pedophiles could be deterred.  The court there remarked:

> The only benefit I could see [to imprisonment would be] as a deterrent to others, and that is a factor. . . .  So other people would recognize that they cannot subscribe to these images with impunity.  I am not persuaded that a jail term for this defendant warrants, or is to be equated with that value.  The kind of psychological problem in persons who are drawn to this kind of material it seems to me is not going to be deterred by a jail term for an internet porno observer.

Id. at 217.  The Third Circuit rejected that reasoning and held the sentence substantively unreasonable.  Id. at 220–21.

As the Third Circuit noted, the district court's downplaying of deterrence where pedophiles are concerned reflects "a policy disagreement with the Guidelines recommendations, [and] such a disagreement is permissible only if a District Court provides 'sufficiently compelling' reasons to justify it."  Id. at 219–20 (citing Gall, 552 U.S. at 50, 128 S. Ct. at 597, and Kimbrough, 552 U.S. at 109, 128 S. Ct. at 575).  And "[t]he conclusory statement of personal belief

110

provided in this case does not suffice." Lychock, 578 F.3d at 220. The same is true here.[32]

The defendant in United States v. Goldberg, 491 F.3d 668 (7th Cir. 2007), had been convicted of possessing child pornography and the guidelines range was 63 to 78 months. Id. at 669. The district court varied downward to impose only a nominal prison sentence to be followed by a decade of supervised release. Id. at 669–70. The Seventh Circuit reversed the sentence as substantively unreasonable because the district judge, among other things, had based the sentence on her "idiosyncratic penological views," id. at 673, and had "neglected considerations of deterrence and desert," id. at 674. The court explained why deterrence was so important in crimes involving the sexual abuse of children, including child pornography crimes:

> Young children were raped in order to enable the production of the pornography that the defendant both downloaded and uploaded—both consumed himself and disseminated to others. The greater the customer demand for child pornography, the more that will be

_____

[32] In Pugh, we rejected the notion that Kimbrough-style policy disagreement could justify the district court's decision to impose a probation-only sentence in a child pornography case where the minimum guidelines sentence was 97 months. 515 F.3d at 1201 n.15. We concluded that the guidelines sentences for child pornography crimes, which reflect judgments by both Congress and the Sentencing Commission as to the seriousness of the offense and the risk of recidivism, "do not exhibit the deficiencies the Supreme Court identified [in the crack cocaine guidelines] in Kimbrough." Id. We do not rule out the possibility that a sentencing court could ever make a reasoned case for disagreeing with the policy judgments behind the child pornography guidelines. We hold simply that in this case (involving production of child pornography), as in Pugh (involving possession of child pornography), the district court did not come close to doing so.

> produced. Sentences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory sentencing factor. The logic of deterrence suggests that the lighter the punishment for downloading and uploading child pornography, the greater the customer demand for it and so the more will be produced.

Id. at 672. We would add that in this case not only were young children raped in the course of producing child pornography, but Irey is the one who actually did the raping.

The more serious the crime and the greater the defendant's role in it, the more important it is to send a strong and clear message that will deter others. In sentencing Irey the district court should not have under-weighed the § 3553(a)(2)(B) adequate deterrence factor based on a conclusory statement of its personal subjective views (what the Seventh Circuit would call "idiosyncratic penological views") questioning the value of deterrence in crimes involving the sexual abuse of children. Kimbrough allows a district court to vary from the guidelines based solely on its judgment that the policies behind the guidelines are wrong. See 552 U.S. at 109, 128 S. Ct. at 575. When a district court does so, however, "closer review" of its reasoning is warranted. Id. Exercising that review, we conclude that the district court made a clear error of judgment in downplaying the importance of deterring this type of crime.

*4. Section 3553(a)(2)(C)*

112

The fourth factor that a district court must consider in sentencing, and that a court of appeals must consider in reviewing the sentence for substantive reasonableness, is "the need for the sentence imposed . . . to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C). This is the specific deterrence or incapacitation factor.

Dr. Berlin, the defense psychiatrist, did not rate the risk of Irey committing more crimes against children as low or high, but instead gave his opinion that if Irey was "shown mercy and given the opportunity, he will be able to re-enter society as a safe and productive citizen." Dr. Shaw's report was more descriptive of the risk. It revealed that under one method of assessing risk, the Static-99 method, Irey's score placed him in "the Medium-Low risk category for sexually re-offending." According to Dr. Shaw, the research study he relied on indicated that people with Irey's score had recidivism rates of 12%, 14%, and 19% after five, ten, and fifteen years. The Shaw report did add that: "[t]he authors of the instrument, in reviewing development samples, found that few individuals recidivated beyond the age of sixty. Though this finding has mixed research support, in general as males age their sexual interest wanes." Irey's score on another instrument used to assess the risk of recidivism, the Minnesota Sex Offender Screening Tool-Revised, placed him in "the Moderate Risk Range." The

113

Shaw report concluded that all of the risk assessment factors "suggest a moderate to low moderate risk of a new charge," which could "be reduced through continued treatment and informed supervision upon his release."

At one point during the sentence hearing Dr. Shaw testified that Irey was "essentially in the medium low to medium or moderate risk categories, which is—which is below a threshold of likely." At a later point, he testified that "overall, I find him to be, as I said, a moderate risk, a low-moderate risk, low in psychopathy." He immediately added that Irey "does have—has deviant interests." In discussing whether the risk that Irey would sexually abuse children in the future could be reduced by using testosterone-reducing drugs, Dr. Shaw testified that they "come with a number of side-effects," that "they're not always useful," and that when and if Irey is released "he's going to have experienced a reduction naturally in testosterone and a reduction in sex drive." Dr. Shaw did not say that through any combination of factors and circumstances Irey would have a negligible risk of committing more crimes against children.

The district court credited the opinions of the two experts, which it re-characterized as Irey having "a low risk of recidivism." But then the court added: "Of course, all of that is somewhat academic because by the time he gets out of prison, he'll be most likely at an age where recidivism would be unlikely, just

114

from a physiological standpoint."

At the completion of the sentence that the district court imposed on him, with the § 3624 reductions considered, Irey would be 65 years old. There is no support in the record for a finding that a 65-year-old male with what Dr. Shaw called "deviant interests," who has a record of not just raping and abusing children but also of sexually torturing them, is too old to do it again, thereby rendering concern about recidivism "academic." That is not what Dr. Shaw said about the aging process. He said, when talking about whether he would advise drug therapy for Irey when he was released, that as they age men are "going to have experienced a reduction naturally in testosterone and a reduction in sex drive." That is different from saying that pedophiles in their sixties lose interest in sexually abusing children or are physically incapable of doing so. No one testified that the risk of recidivism is "academic" for a pedophile in his sixties or seventies, probably because that simply is not true.

One need look no further than the facts in published opinions to see that. For example, United States v. Seljan, 547 F.3d 993 (9th Cir. 2008) (en banc), involved a man in his mid-80s who was arrested on his way to the Philippines to "sexually educate" some children by engaging in sexual relations with them. Id. at 997–98. He had been to the Philippines 43 times during the previous 11 years,

115

when he was between the ages of approximately 74 and 85, in order to have sex with children there.  See id.  He told agents after he was arrested that he had been "sexually educating" children ages 8 to 13 for about 20 years, which means that he started when he was around 65 years old.  See id. at 998.  He had bragged about doing it and had a scrapbook and video collection of child pornography.  Id. at 997.  Even though he was 87 years old at the time of sentencing the district court imposed a 20-year sentence on him.  Id.  The Ninth Circuit rejected his attack on the sentence as unreasonable even though it was tantamount to a life sentence.  Id. at 1007; see also Zastrow, 534 F.3d at 855–57 (affirming conviction and 20-year sentence of a 73-year-old man who enticed or coerced an 8-year-old girl into sexually explicit conduct which he photographed); United States v. MacEwan, 445 F.3d 237, 240 (3d Cir. 2006) (defendant had repeatedly violated federal laws prohibiting the possession, distribution, and receipt of child pornography when he was between the ages of approximately 66 and 70); Weiler v. Purkett, 104 F.3d 149, 152 (8th Cir. 1997) (plaintiff, a state prison inmate, had sodomized and sexually abused a female child for 3 years, beginning when the girl was 7 and the defendant was approximately 70).  The facts of those cases show that the risk of a male sex offender sexually abusing children after he reaches the age of 65 is anything but "academic."

Studies and reports in this field are consistent with what judicial decisions show:  pedophiles who have sexually abused children are a threat to continue doing so, and age does not remove the threat.  See Mark Motivans & Tracey Kyckelhahn, Federal Prosecution of Child Sex Exploitation Offenders 2006, Bureau Just. Stat. Bull., Dec. 2007, at 1, 5 tbl.6 (reporting that 7.3% of offenders arrested for sexual exploitation of children, including sex abuse, child pornography, and sex transportation, are over the age of 60); see also Hall & Hall, supra, at 457–58 ("The course of pedophilia is usually long term.  In a study that examined the relationship between age and types of sexual crimes, Dickey et al found that up to 44% of pedophiles in their sample of 168 sex offenders were in the older adult age range (age 40-70 years).  When compared with rapists and sexual sadists, pedophiles comprise 60% of all older offenders, indicating that pedophiles offend in their later years at a greater rate than other sexual offenders." (footnotes omitted)).  Moreover, as the government points out, the photos and videos show that some of the worst of Irey's acts do not require sexual potency.  All of this is consistent with Dr. Shaw's testimony that:  "You can't be cured" of pedophilia, and "Cures, you can forget about it."

This Court has stated that the threat of recidivism by a pedophile who has sexually abused a child is "appalling."  Pugh, 515 F.3d at 1201 ("As Congress has

found and as we have discussed, child sex offenders have appalling rates of recidivism and their crimes are under-reported."); see also United States v. Allison, 447 F.3d 402, 405–06 (5th Cir. 2006) ("Congress explicitly recognized the high rate of recidivism in convicted sex offenders, especially child sex offenders."). The Supreme Court has also noted "grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a class," and has found that "[t]he risk of recidivism posed by sex offenders is frightening and high." Smith v. Doe, 538 U.S. 84, 103, 123 S. Ct. 1140, 1153 (2003) (quotation marks omitted). The Supreme Court has gone even further, finding that "[w]hen convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault." McKune v. Lile, 536 U.S. 24, 33, 122 S. Ct. 2017, 2024 (2002).[33]

Nor does the fact that Irey will be subject to restrictions and supervised release when he gets out of prison offer any guarantee that he will not commit any crimes. In 2003 alone, for example, 12.8% of all federal offenders on supervised

---

[33] Judge Tjoflat's separate opinion argues that we should not consider any of the decisions of the Supreme Court and this Court about the high recidivism rate of pedophiles and the special need for deterrence when punishing sexual crimes against children. Separate Op. of Tjoflat, J., at 225. The reason it gives for wanting us to pretend that those decisions do not exist is that they were not cited in the district court. Id. No member of this Court, certainly not the author of that opinion, has ever before suggested that in determining the law we ought to confine ourselves to the decisions that were cited in the district court. We, like all courts, have a duty to find and apply the correct law.

118

release committed new crimes.  Bureau of Justice Statistics, Dep't of Justice, Federal Criminal Justice Trends, 2003, at 37 tbl.29 (2006).  Sex offenders often fail to complete their treatment programs.  See Loretta J. Stalans, Adult Sex Offenders on Community Supervision: A Review of Recent Assessment Strategies and Treatment, 31 Crim. Just. & Behav. 564, 573 (2004) ("Sex offenders have high rates of either dropping out or being expelled from treatment. Termination rates in the United States outpatient treatment programs have ranged from one quarter to more than one half of adult sex offenders . . . .").  Supervised release is revoked for 37.7% of the sex offenders who, like Irey, have a high school diploma but not a college degree.  James L. Johnson, Sex Offenders on Federal Community Supervision: Factors that Influence Revocation, Fed. Probation, June 2006, at 18, 19.  And the experience of states which have had sex offenders on supervised release, such as probation or parole, shows that it often fails to prevent sex offender recidivism.  See Patrick A. Langan et al., Bureau of Justice Statistics, Recidivism of Sex Offenders Released from Prison in 1994, at 14 (2003) ("Of the 4,163 sex offenders rearrested for a new [state] crime, nearly 9 in 10 (87%) were on parole when taken into custody . . . .").

Those studies are informative, but even without them we know that supervised release is no guarantee that a criminal will not commit more crimes

119

when he gets out of prison.  Courts of appeals regularly see cases in which serious

crimes were committed by those on supervised release.  See, e.g., United States v.

Wilk, 572 F.3d 1229, 1232 (11th Cir. 2009) (possession of child pornography);

United States v. Williams, 322 Fed. App'x 846, 846 (11th Cir. 2009)

(unpublished) (aggravated child molestation and enticing a child for indecent

purposes);[34] United States v. Horsfall, 552 F.3d 1275, 1278 (11th Cir. 2008)

(viewing child pornography); United States v. Trobee, 551 F.3d 835, 836 (8th Cir.

2009) (possession of child pornography); United States v. Azure, 539 F.3d 904,

905–06 (8th Cir. 2008) (robbery); United States v. Defoor, 535 F.3d 763, 763–64

(8th Cir. 2008) (aggravated assault); United States v. Eirby, 515 F.3d 31, 34 (1st

Cir. 2008) (sexual abuse of a minor); United States v. Ralph, 480 F.3d 888,

888–89 (8th Cir. 2007) (child molestation); United States v. Spraglin, 418 F.3d

479, 480 (5th Cir. 2005) (murder); United States v. Martin, 382 F.3d 840, 841 (8th

Cir. 2004) (rape); United States v. Marshall, 371 F.3d 42, 44 (2d Cir. 2004)

---

[34] Unpublished opinions are not precedential, see 11th Cir. R. 36-2, and we do not cite Williams for any legal holding or point of law discussed in that opinion.  Instead, we cite it solely as a source of facts about the crime committed while the defendant was on supervised release.  See 11th Cir. R. 36-2, IOP 7 ("The court may cite to them . . . to establish the . . . facts of the case.").

By contrast, Judge Tjoflat's separate opinion cites as "precedent" on a point of law two unpublished opinions, Separate Op. of Tjoflat, J., at 219, which under our rules and our precedent cannot be precedent.  See 11th Cir. R. 36-2; see also United States ex rel. Atkins v. McInteer, 470 F.3d 1350, 1358 n.15 (11th Cir. 2006) (Tjoflat, J.).

(robbery); see also McNaught v. United States, 646 F. Supp. 2d 372, 380

(S.D.N.Y. 2009) (arson).

Part of the problem may be understaffing and the resulting high case loads

of those who have the responsibility of doing the supervising. For example, as of

September 30, 2009, there were 14,987 people under post-conviction supervision

in the federal probation system in this circuit alone, with 12,216 of them on

supervised release. Admin. Office of the United States Courts, 2009 Annual

Report of the Director: Judicial Business of the United States Courts, tbl. E-2

(forthcoming spring 2010). And that does not count all of those on pre-trial

supervision or the thousands of presentence investigation reports that the federal

officers in this circuit have to complete each year. The nationwide situation was

summed up by Dr. Berlin (the same one who evaluated Irey for purposes of this

case), when he testified before Congress that: "Many of these parole and

probation people are stretched very thin. I think we want to be able to have them

have smaller case loads." Protecting Our Nation's Children from Sexual

Predators and Violent Criminals: What Needs to Be Done?, Hearing Before the

Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the

Judiciary, 109th Cong. 30 (2005) (statement of Fred S. Berlin, M.D., Associate

Professor, Johns Hopkins University).

Regardless of why so many convicted criminals on supervised release, including sex offenders, commit new crimes, the fact is that they do. Supervised release is better than unsupervised release, but it does not offer society the level of protection from a convicted criminal that incarceration does. Despite that undeniable fact, the district court found that Irey, one of the worst sex offenders ever prosecuted in this circuit, had a low risk of recidivism, or would pose a low risk when released at the end of the reduced sentence it imposed on him.

The government, however, has never attacked that factfinding as clearly erroneous. Instead, it has insisted throughout this appeal that it is not challenging any of the factfindings. As a result, for purposes of this appeal we will assume that at the end of a 17 ½-year sentence—15 years and 3 months after it was imposed—Irey would present a low risk of recidivism.[35]

That does not mean, however, that the sentence the district court imposed will adequately "protect the public from further crimes of the defendant," as § 3553(a)(2)(C) requires. A low risk is not the same as no risk. Adequate

---

[35] This is another part of our opinion that Judge Tjoflat in his separate opinion has misread. His opinion operates under the erroneous assumption that we have rejected the district court's finding that when Irey is released from the sentence it imposed on him and goes on supervised release he will pose a low risk of recidivism. See Separate Op. of Tjoflat, J., at 225–27. Although we have pointed out for the benefit of sentencing courts in the future the reasons and decisions indicating that the district court's finding is wrong, because the government has not challenged the factfinding we have expressly accepted the low risk of recidivism finding for purposes of reviewing this sentence.

122

protection is a function of two variables: the level of risk that conduct will occur and the level of harm that will be inflicted if that conduct does occur. See United States v. Boyd, 475 F.3d 875, 877–78 (7th Cir. 2007) (upholding a sentencing determination that the defendant's acts created a substantial risk of bodily injury to another person in part because "[d]angerousness is a function of the magnitude of the harm that will occur if danger materializes and the probability that it will materialize"). With child sexual abuse of the kind that we know Irey is capable of and has committed, the harm is enormous and permanent. It can literally destroy lives. Accordingly, even with an assumed low risk of recidivism following release in 15 years and 3 months, imprisonment for that length of time does not afford adequate protection from further crimes by him. The district court imposed not one extra month over the statutory minimum for the purpose of protecting society and its children from further crimes by Irey, stating: "I don't think society needs further protection from him, at least beyond the statutory minimum sentence." Given the magnitude of the harm that will occur if Irey does commit more sexual crimes against children, that was a clear error in judgment.

### 5. Section 3553(a)(4) & (5)

District courts in sentencing, and courts of appeals in reviewing sentences, must also consider the guidelines range and any pertinent policy statements in the

123

guidelines. 18 U.S.C. § 3553(a)(4)–(5).[36] Of course, since <u>Booker</u> the guidelines have been advisory, but they are still to be given respectful consideration. We have not attempted to specify any particular weight that should be given to the guidelines range and will not do so now. Our best discussion of the subject came in <u>United States v. Hunt</u>, 459 F.3d 1180 (11th Cir. 2006), where we rejected "any across-the-board prescription regarding the appropriate deference to give the Guidelines." <u>Id.</u> at 1184. We decided instead that, subject to review for reasonableness, sentencing courts may "determine, on a case-by-case basis, the weight to give the Guidelines, so long as that determination is made with reference to the remaining section 3553(a) factors that the court must also consider in calculating the defendant's sentence." <u>Id.</u> at 1185. In doing so, we recognized that "<u>Booker</u> restored to district courts a measure of discretion that the mandatory Guidelines had removed," <u>id.</u> at 1184, but we added this important caveat: "This discretion is bounded, of course, by Congress's mandate to consider the factors in section 3553(a), one of which, subsection four, is the Sentencing Guidelines." <u>Id.</u>

---

[36] Section 3553(a)(2)(D) requires consideration of the need "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner," and § 3553(a)(3) requires consideration of "the kinds of sentences available." No one suggests that either of those two considerations is relevant to this appeal. Nor has anyone mentioned the § 3553(a)(7) factor, "the need to provide restitution to any victims of the offense."

We stressed in Hunt that consideration of the advisory guidelines range is important, because the guidelines "are an indispensable tool in helping courts achieve Congress's mandate to consider 'the need to avoid unwarranted sentence disparities' among similarly situated defendants," id., which is required by 18 U.S.C. § 3553(a)(6). Even though not bound by the guidelines, a sentencing court may not give them so little consideration that it amounts to "not giv[ing] any real weight to the Guidelines range in imposing the sentence." Pugh, 515 F.3d at 1200; see also Booker, 543 U.S. at 264, 125 S. Ct. at 767 ("The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing."). See generally Kimbrough, 552 U.S. at 107, 128 S. Ct. at 573–74 ("[I]t is unquestioned that uniformity remains an important goal of sentencing. As we explained in Booker, however, advisory Guidelines combined with appellate review for reasonableness and ongoing revision of the Guidelines in response to sentencing practices will help 'to avoid excessive sentencing disparities.'"); Rita, 551 U.S. at 348, 127 S. Ct. at 2463 ("The upshot is that the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives, the one, at retail, the other at wholesale."). In this case, the advisory guidelines range calculated out at life imprisonment and was lowered to thirty years only because

that is the statutory maximum based on the way the crime was charged. See supra at 12. In view of all of the facts and circumstances of this case, and given the weakness of the district court's explanation for deviating from the guidelines range, it effectively gave the guidelines range no real weight in imposing the sentence.

In addition to requiring consideration of the guidelines range, the Sentencing Reform Act also requires that district courts consider any pertinent policy statement issued by the Sentencing Commission. 18 U.S.C. § 3553(a)(5). The policy statements in the guidelines that are relevant to this case address when departures are appropriate in calculating the sentencing range. We are not dealing with a guidelines departure decision here, but a § 3553(a) variance decision. Still, even though the policy statements are in no way binding, § 3553(a)(5) requires that they be considered in making decisions about variances. All of the policy statements point in one direction in this case and that is away from a below-the-guidelines sentence.

The guidelines state as a matter of policy that age "is not ordinarily relevant in determining whether a departure is warranted," at least not unless "the defendant is elderly and infirm." U.S.S.G. § 5H1.1. In the present case the district court expressly considered Irey's age at sentencing (50 years) in his favor,

even though he was not elderly or infirm.

The guidelines state as a matter of policy that "civic, charitable, or public service . . . and similar prior good works are not ordinarily relevant in determining whether a departure is warranted." Id. § 5H1.11. Yet one of the reasons the district court gave for varying downward was Irey's civic work—that he had been "a good person to his community." The guidelines also advise, as a matter of policy, that aberrant behavior may be used to support a downward departure only if, among other things, "the defendant committed a single criminal occurrence or single criminal transaction" that was "without significant planning" and "was of limited duration." Id. § 5K2.20(b). This case does not fit any of those requirements, yet the district court used what amounted to an aberrant behavior theory as part of the justification for its downward variance, stating: "I think other than the acts of Mr. Irey, there's no indication that he has engaged in any other sort of criminal conduct or conduct representing poor character."[37]

The guidelines state as a matter of policy that "[m]ental and emotional conditions are not ordinarily relevant in determining whether a departure is warranted," except in circumstances not present here. Id. § 5H1.3. Yet in

---

[37] The district court either overlooked the fact that Irey, a married man, had patronized prostitutes on a weekly basis for 15 years, or it thought that doing so does not "represent[ ] poor character."

127

deciding to vary downward, the district court placed significant weight on Irey

having what it characterized as the "illness" of pedophilia. To the extent that the

district court relied on its belief that because he was a pedophile Irey had

diminished capacity to resist raping children, or that his criminal behavior was due

in substantial part to pedophilia, another policy statement is relevant. The

guidelines state that a court should not depart downward based on diminished

capacity where "the offense involved actual violence or a serious threat of

violence," or where the defendant has been convicted of an offense under Chapter

110 of Title 18, which Irey was. Id. § 5K2.13.

There are also guideline policy statements advising that an upward

departure would be appropriate in this case. While Irey's criminal conduct was so

extreme that the guideline calculations maxed out at life even without any upward

departures, § 3553(a)(2)(5) still expressly requires that those policy statements be

considered. As the Presentence Report in this case noted, the comment to § 2G2.1

advises that "[a]n upward departure may be warranted if the offense involved

more than 10 minors." Id. § 2G2.1 cmt. n.6.[38] Irey's criminal conduct involved at

---

[38] The cited comment to § 2G2.1 of the guidelines is technically not a policy statement, but the guidelines provide that it is to be treated as one. See U.S.S.G. § 1B1.7 ("Such commentary is to be treated as the legal equivalent of a policy statement."); see also United States v. Smith, 568 F.3d 923, 927 n.1 (11th Cir. 2009) ("The commentary and application notes of the Sentencing Guidelines are authoritative, unless they are plainly erroneous, inconsistent with the regulation they interpret, or contrary to the Constitution or federal law.").

least five times more than 10 minors, yet the district court varied downward. The guideline policy statements also call for an upward departure "[i]f the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim." Id. § 5K2.8. Everyone agrees that what Irey did fits within that description, yet the district court varied downward.

While not binding on the district court, the policy statements in the guidelines, which it was required by the Sentencing Reform Act to consider, all advise against a sentence below the guidelines range. The district court effectively ignored them all.[39]

### 6. Section 3553(a)(6)

Section 3553(a) requires that district courts in sentencing, and courts of appeals in reviewing sentences, "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). This factor is a particularly important one when reviewing the substantive reasonableness of a sentence because one of the primary purposes of appellate review of sentences is to iron out differences in order to avoid undue disparity. Booker, 543 U.S. at 264, 125 S. Ct.

---

[39] With one exception. The district court did impose a lifetime term of supervised release, as the policy statement in U.S.S.G. § 5D1.2(b) advises for all cases where the defendant was convicted of a sex offense against a minor.

at 767.

It is difficult to find a case involving sexual abuse of children that compares to this one. The number of Irey's victims (at least 50), the very young age (four, five, and six years old) of some of them, the extreme nature of the abuse and torture that he inflicted on them, the number of years it went on (four or five), and the massive amount of graphic child pornography that he single-handedly produced and distributed (at least 1,200 photographs or videos showing Irey himself sexually abusing the children) combine to make his criminal behavior the worst of the worst. Yet, the district court gave Irey a major downward variance, resulting in a sentence just above the statutory minimum and more than a decade below the guidelines range. That sentence is seriously out of line with sentences imposed on other defendants whose criminal behavior, while atrocious in some cases, was not as extreme as Irey's or did not involve as many victims. See, e.g., United States v. Frank, 599 F.3d 1221 (11th Cir. 2010) (40-year sentence for defendant who had twice traveled to Cambodia, where he paid three girls who were between the ages of approximately 11 and 15 to engage in sexual acts with him and to take sexually explicit pictures of those acts); United States v. Culver, 598 F.3d 740 (11th Cir. 2010) (60-year sentence for defendant who fell within criminal history category II, had used tranquilizers and a stun gun to render his

130

13-year-old stepdaughter unconscious, and had produced a pornographic videotape and four pictures depicting the unconscious girl); United States v. Huskey, 349 Fed. App'x 495 (11th Cir. 2009) (70-year sentence for defendant, who (like Irey) fell within criminal history category I, who engaged in anal, oral, and vaginal sex with his daughter and penetrated her vagina with objects, while she was between the ages of 6 and 9, recorded the abuse in photographs and on videotapes, and traded images of the abuse over the internet for other child pornography);[40] Sarras, 575 F.3d 1191 (100-year sentence for the defendant, who fell within criminal history category I, who engaged in oral and vaginal sex with his 13-year-old step-daughter approximately 23 times during a 4-month period and photographed it on three of those occasions);[41] United States v. Kapordelis, 569 F.3d 1291 (11th Cir. 2009) (35-year sentence for the defendant, who fell within criminal history category I, who over a span of at least 20 years: drugged two boys, aged 11 and 14, on three occasions before photographing their genitalia; traveled abroad, where he molested and took digital videos and pictures of three minors, some of whom he had drugged, and engaged in oral and anal sex with at

---

[40] We include a number of unpublished opinions in this list, citing each one not for any holding but solely for the facts about the crime and the sentence imposed by the district court. See supra at 120 n.34.

[41] The defendant in Sarras was sentenced in the same courthouse the same year as Irey but by a different district court judge.

least one 17-year-old; solicited sex from male prostitutes under the age of 18 while in foreign countries; drugged his 16-year-old second cousin and then videotaped himself having sex with the minor; and possessed approximately 10,580 images and 400 videos of child pornography, some of which featured victims he had personally molested); United States v. Wilcox, 324 Fed. App'x 805 (11th Cir. 2009) (45-year sentence for the defendant, a 50-year-old diabetic with no prior criminal history, who took and posted on the internet pornographic photographs of himself touching an 11-year-old girl, attempted to gain commercially from the photographs, and possessed approximately 120 child pornography images, including a sadistic picture of a 5-year-old girl wearing a dog collar while being vaginally penetrated by an unidentified male); United States v. Harris, 291 Fed. App'x 300 (11th Cir. 2008) (30-year sentence for defendant, who fell within criminal history category I, who filmed and photographed seven 15- and 16-year-old boys, two of whom were his godchildren, engaging in sexual acts with each other in his bedroom, shared videos and photographs depicting those occurrences with others, and on one occasion invited his friend over to watch two underage males engage in sexual activities and then filmed as his friend had sex with one of them); United States v. Carter, 292 Fed. App'x 16 (11th Cir. 2008) (45-year sentence for the defendant, with no specified

132

criminal history, who possessed approximately 4,800 image, text, and movie files depicting or describing the sexual exploitation, including bondage, of at least eleven different young girls, ages 7 to 14; some of those files were produced and distributed by the defendant himself and depicted him touching the genitalia of two young girls); United States v. Oliver, 281 Fed. App'x 898 (11th Cir. 2008) (130-year sentence for the defendant, with no criminal record that was mentioned, who produced images of himself molesting a single victim, his 6-year-old granddaughter, and distributed those images over the internet); United States v. Hodnett, 210 Fed. App'x 949 (11th Cir. 2006) (30-year sentence for the defendant, who fell within criminal history category I, who possessed at least 600 images of child pornography, some of which depicted prepubescent minors engaged in sexual activity, traded images of child pornography over the internet, and had in the past engaged in the following sexual activities with minors: kidnaping and raping a 6-year-old Vietnamese girl in 1969 while serving in Vietnam; molesting and engaging in sexual intercourse with his two step-daughters in the 1970s; and engaging in oral sex with a 6-year-old girl in 2004); United States v. Foster, 209 Fed. App'x 942 (11th Cir. 2006) (life imprisonment for the defendant who fell within criminal history category I, and who during a 4-year period engaged in oral and vaginal sex with a single victim who was less than

133

12 years old when the abuse began); United States v. Johnson, 451 F.3d 1239 (11th Cir. 2006) (140-year sentence for the defendant, who had two prior convictions for lewd acts in front of minors, who sexually abused and photographed three boys between the ages of 8 and 16 over an approximately 6-year period, produced at least 150 pornographic images of the victims, transmitted an unknown number of those images over the internet, and either possessed or transmitted at least 24 videos of children engaging in sexually explicit conduct); United States v. Hersh, 297 F.3d 1233 (11th Cir. 2002) (105-year sentence for the defendant, who fell within criminal history category I, and who traveled to third world countries during a period of 20 years and enticed at least eight boys, between 8 and 17 years old, to engage in sex with him, encouraged them to engage in sex with a fellow pedophile, convinced one Honduran family to allow their minor son to live with him illegally in the United States, and possessed at least 120 images of child pornography).

While the criminal conduct of all the defendants in the cited cases ranges from serious to truly depraved, none of it is worse than Irey's criminal conduct, yet he received a sentence far more lenient than they did. The lesser sentence the district court imposed on Irey by means of a major downward variance creates a substantial disparity. The disparity arises not because the defendants in the cited

cases were denied a downward variance they should have received and were sentenced too harshly, but because Irey was given a downward variance he should not have received and was sentenced too leniently. The unreasonableness is not in the sentences imposed in the cited cases but in the sentence imposed in this case.[42]

### 7. What "It Comes Down To"

The district court suggested that these factors weighed in Irey's favor: he was 50 years old; his family still loved him; when he was not consorting with prostitutes in this country or raping, sodomizing, and torturing little girls in Cambodia, he was not such a bad guy; the "illness" of pedophilia rendered his criminal acts "not purely volitional"; and he was a victim of child pornography on the internet. The court discounted the value of general deterrence for sexual crimes against children. It thought that Irey would present a low risk of

---

[42] Judge Barkett's dissenting opinion argues that we cannot assess whether Irey is similarly situated to any defendant convicted of sexually abusing children "without the benefit of the entirety of the sentencing records of all [those] defendants." Dissenting Op. of Barkett, J., at 254–55 n.1. The statutory command is to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). That information can be discerned from the appellate opinion in most cases, including those that we have cited. See also Kimbrough, 552 U.S. at 108, 128 S. Ct. at 574 (holding that the statute requires consideration of sentences of other courts in order to comply with § 3553(a)(6)'s instruction that the need to avoid unwarranted sentencing disparities be taken into account). Any requirement that the record in other cases be scoured before the sentences in those cases can be considered would render it impossible to comply with the statute, and we will not interpret the statute in a way that effectively renders it a nullity, see, e.g., Hibbs v. Winn, 542 U.S. 88, 101, 124 S. Ct. 2276, 2286 (2004), and ignores what the Supreme Court has said about it.

135

recidivism once released and, as a result, no time above the statutory minimum was needed to protect society from him. The result the court reached created an unwarranted sentence disparity among defendants who have committed comparable or less egregious offenses involving the sexual abuse of children. Along the way to its final sentencing decision the district court, as we have explained, committed a number of subsidiary errors in judgment, but even if we disregard all of them there remains one overriding clear error in judgment that renders the downward variance sentence substantively unreasonable.

After discussing the other factors, the district court said: "It comes down to my view of what promotes respect for the law and provides just punishment." The district court was right about the importance of the § 3553(a)(2)(A) factor, which requires consideration of the need for the sentence imposed "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." But the court was wrong, it committed a clear error in judgment, in deciding that those purposes could be served by a major downward variance to a point closer to the statutory minimum sentence than it is to the guidelines range. The district court's leap from the advisory guidelines sentence of 30 years down to a just-above-minimum sentence of 17 ½ years does not reflect the seriousness of and provide just punishment for Irey's rape, sodomy,

136

and sexual torture of at least fifty children, acts that he committed "many many times" over a four- or five-year period, and his production and distribution of one of the worst series of child pornography on the internet. Nor does it promote respect for the law.

For all of the reasons we have explained, no downward variance from the guidelines range is reasonable in this case. Nothing less than the advisory guidelines sentence of 30 years, which is the maximum available, will serve the sentencing purposes set out in § 3553(a). We are left with the definite and firm conviction that it was substantively unreasonable, a clear error in judgment, an abuse of discretion, for the district court to conclude to the contrary. Were we to hold otherwise, "we would come perilously close to holding that appellate review is limited to procedural irregularity," and that the Supreme Court has "eviscerated appellate review at the same time that it has mandated the appellate courts to continue to review sentences for reasonableness." Pugh, 515 F.3d at 1203–04. That paradoxical holding would throw us back a quarter of a century into the pre-Sentencing Reform Act era, with its "non-system in which every judge is a law unto himself or herself," Frankel, Jail Sentence Reform, at E21, an era that is gone for good.

In reaching this conclusion, we are not, as Judge Tjoflat asserts, usurping

137

the district court's sentencing role.[43]  Separate Op. of Tjoflat, J., at 215–17.

Instead, we are performing our sentence review role.  Again, the Supreme Court

has instructed us that "district judges at times make mistakes that are substantive"

and "impose sentences that are unreasonable," and we "exist to correct such

mistakes when they occur."  Rita, 551 U.S. at 354, 127 S. Ct. at 2466–67.  In the

course of reviewing this sentence, we have determined that, given the extreme

facts in the case, a downward deviation from the guidelines range is not

substantively reasonable.  We have made that decision after studying the record of

the sentence proceedings, which is complete; considering the district court's

findings and explanation, which are adequate for the purpose; granting the district

court's decision the full measure of deference that it is due; and considering all of

the arguments of the parties for and against the reasonableness of the sentence.

That is what appellate courts are supposed to do.[44]

---

[43] Nor are we, as Judge Tjoflat's opinion charges, taking a step toward creating, through judicial decisions, a system of mandatory sentencing ranges "that is identical in all relevant respects to [the pre-Booker] mandatory-Guidelines sentencing range[s]."  Separate Op. of Tjoflat, J., at 229 n.98.  We are simply doing our duty, as prescribed in Rita, to review the substantive reasonableness of the sentence imposed in this case.

[44] Judge Tjoflat's separate opinion goes to great lengths to accuse us of addressing arguments that were not raised and preserved in the district court.  See Separate Op. of Tjoflat, J., at 215–16, 221–27.  Much of that opinion's analysis is based on the faulty premise that the government made only a "simple objection" that Irey's sentence is "unreasonable."  Id. at 216.  As we have already explained, however, the government has been arguing for a 30-year sentence ever since it filed the sentencing memorandum in the district court.  See supra at 13–14.  That memorandum emphasized the sheer magnitude and utter depravity of Irey's criminal conduct and urged the court to respect Congress' findings that "departures should be extremely rare in

138

child sex crime cases" because of the seriousness of those crimes. The government specifically argued that a variance would not be justified even if Irey's risk of recidivism was low, his capacity was diminished, his behavior was aberrant, his family ties and responsibilities were significant, and his decisions were clouded by his pedophilia. Indeed, the government said that "any variance under 18 U.S.C. § 3553(a) would be unreasonable because there is nothing unusual about the nature or circumstances of this offense or the defendant's personal characteristics." The government argued in its sentencing memorandum that "[i]f this case is atypical, it is because of aggravating, not mitigating, factors." And it took the same position at the sentence hearing. See supra at 27–30.

The government's objection that Irey's sentence was substantively unreasonable was sufficient to preserve the specific grounds for the objection that it had already raised in its sentencing memorandum and in its arguments during the sentence proceeding. Especially given the context of the sentence proceedings, the government did not need to regurgitate its arguments in favor of a 30-year sentence after the court had pronounced the sentence; it is enough that the government objected to the downward variance sentence as unreasonable. See United States v. Maurice, 69 F.3d 1553, 1557 (11th Cir. 1995) (holding that a general objection after the sentence was announced is sufficient to preserve supporting arguments made before it was announced where the reasons for the objection are clear); see also United States v. Candelario, 240 F.3d 1300, 1304–05 (11th Cir. 2001) (Tjoflat, J.) (citing, with approval, a circuit court decision "reviewing the defendant's sentence under preserved error review where the defendant argued in his sentencing memorandum that the amount of drugs for which he was to be sentenced had to be pleaded in the indictment and found by the jury beyond a reasonable doubt" (emphasis added) (quotation marks omitted)); see also United States v. Bartlett, 567 F.3d 901, 910 (7th Cir. 2009); United States v. Guthrie, 557 F.3d 243, 255 (6th Cir. 2009); United States v. Curry, 461 F.3d 452, 459 (4th Cir. 2006) (concluding that the government, "by vigorously arguing for a sentence within the Guidelines range throughout the sentencing hearing," had preserved its objection to the sentence even though it did not object at the end of the sentencing colloquy); United States v. Shumard, 120 F.3d 339, 340 (2d Cir. 1997).

We have specifically recognized that so long as the government raises "the crux of its objection to the district court's sentence," it is not required to articulate all the details of its position. United States v. Smith, 39 F.3d 1143, 1146 (11th Cir. 1994); see also United States v. Livesay, 484 F.3d 1324, 1327–29 & 1330 n.7 (11th Cir. 2007) (concluding that the government's objection to the extent of the downward departure also preserved an objection "to the reasonableness of the overall sentence"), vacated on other grounds, 552 U.S. 1092, 128 S. Ct. 872 (2008); United States v. Arevalo-Juarez, 464 F.3d 1246, 1249–50 (11th Cir. 2006) (stating that even though the district court did not grant a departure the government's argument that a departure was unwarranted was enough to preserve the issue of whether the sentence was otherwise unreasonable); see also United States v. Carlson, 498 F.3d 761, 763 & n.2 (8th Cir. 2007); United States v. Pineiro, 470 F.3d 200, 204–05 (5th Cir. 2006) ("We have never required a party to express its objection in minute detail or ultra-precise terms.").

This is one of those unusual cases where the top and bottom of the

guidelines range are the same; both are 30 years. There can be no upward

variance because the statutory maximum is also 30 years. As a result, our holding

that no downward variance is reasonable under the totality of the facts and

circumstances of this case means that on remand the sentence must be 30 years.[45]

There is no other sentence left. When we vacate a district court's judgment and

remand, we routinely include in the bottom line of our decision that we are

---

On a similar point, Judge Tjoflat's opinion accuses us of implicitly overruling United States v. Jones, 899 F.2d 1097 (11th Cir. 1990), overruled on other grounds by United States v. Morrill, 984 F.2d 1136 (11th Cir. 1993) (en banc), by allowing an unexplained objection that a sentence is "substantively unreasonable" to trigger the equivalent of a new sentencing hearing on appeal. See Separate Op. of Tjoflat, J., at 221–22 & n.90. Our decision, however, is consistent with Jones and its progeny. In United States v. Weir, 51 F.3d 1031 (11th Cir. 1995), we explained that "[i]f the relevant objection is raised after the presentation of the [pre-sentence investigation] report, . . . but before the actual imposition of the sentence, Jones is satisfied." Id. at 1033. Specifically, in Weir, we held that Jones was satisfied because "[t]he district court clearly understood the Government's position and specifically rejected it." Id. Similarly, we held in Maurice that the rationales behind Jones "are served so long as the objection to be preserved and the grounds for the objection are clear to the sentencing court at the conclusion of the hearing." 69 F.3d at 1557. As a result, "a party is not required to reargue a general objection made after sentencing if the argument in support of that objection has previously been presented to the sentencing court and the reasons for the objection remain clear after the sentence is pronounced." Id. The government did enough to preserve all of the arguments in favor of a 30-year sentence here.

[45] Judge Tjoflat's separate opinion points out that in none of the other cases where we have vacated a sentence as unreasonable have we directed the district court to enter a particular sentence. Separate Op. of Tjoflat, J., at 227–28 & n.96. That is true, but in none of those four other cases did we have both extreme facts and circumstances rendering any downward variance unreasonable and a pinpoint guidelines range—one where the bottom and top were the same sentence. Because this is an unprecedented situation, it adds nothing to label our decision an "unprecedented step." Id. at 227. Whatever we do in a situation that has never been before us is, by definition, an unprecedented step one way or the other.

140

sending the case back for "proceedings consistent with this opinion." Because we have determined that a downward deviation from the guidelines range in this case is unreasonable, it follows that the only action on remand that will be consistent with this opinion is resentencing within the guidelines range, which necessarily means a sentence of 30 years.[46]

## V. CONCLUSION

Because of the substantial deference district courts are due in sentencing, we give their decisions about what is reasonable wide berth and almost always let them pass. There is a difference, though, between recognizing that another usually has the right of way and abandoning one's post. We will not quit the post that we have been ordered to hold in sentencing review and the responsibility that goes with it. The Supreme Court has instructed us that "[i]n sentencing, as in other areas, district judges at times make mistakes that are substantive," and that it is our duty "to correct such mistakes when they occur." Rita, 551 U.S. at 354, 127

---

[46] Having determined that no downward variance is reasonable, it would be senseless to remand with instructions that permit the district court to downwardly vary and resentence below the guidelines range again. If the district court on remand resentenced Irey to 20 years, we would have to vacate that sentence and send the case back. If the court then tried out a sentence of 22.5 years, we would have to vacate that sentence and send the case back again. And so on, back and forth the case would go in a pointless ping pong game. To borrow Judge Tjoflat's hyperbolic language, such proceedings would "gobble[ ] up judicial resources" that could be better spent elsewhere. Separate Op. of Tjoflat, J., at 236. Doing as he suggests would prevent the first appeal from a sentence from being "the main event" for determining whether a sentence is substantively reasonable and would instead send "the unmistakable message that [the first appeal of a sentence] is nothing but a tryout on the road." Id. at 231. That would be, to use his term, "shocking." Id. at 216.

S. Ct. at 2466–67.

In this case the district court made a substantive mistake, a clear error in judgment, by unreasonably varying downward from the advisory guidelines sentence when no sentence less than it is sufficient to fulfill the purposes set forth in the Sentencing Reform Act. To do our duty to correct that mistake, we vacate the sentence the district court imposed and remand with instructions that the defendant is to be resentenced within the guidelines range.

**VACATED AND REMANDED.**

HILL, Circuit Judge, concurring:

I concur in the opinion for the court and in the judgment reversing and remanding with instructions.

I do so in spite of the fact that I originally concurred in the now vacated panel opinion, United States v. Irey, 563 F.3d 1223(11th Cir.), vacated, 579 F.3d 1207 (11th Cir. 2009).

I should explain.

That original concurrence was based entirely on my perception of the extent of discretion due the trial judge. The sentence was not the right one, in my opinion, but I stretched discretion to cover it. I tend, properly I think, to be reluctant to limit the discretion of a trial judge who is closer to a case than its record can bring me.

Since our panel opinion was vacated, I have persisted in putting one question to counsel and colleagues: "If this case does not demand the maximum sentence authorized by Congress for violation of 18 U.S.C. § 2251(c), what case would?" No one has persuaded me that any is likely to be encountered.

That case, more aggravated than this, remained elusive.

After oral argument and the court's conference, I finally realized that I had been putting a question that has no answer because it is predicated upon the wrong

143

assumption. It asks that this case be assumed <u>not</u> to demand the maximum

sentence. But I now realize that the elusive maximum sentence case, which I

sought, was right here before me.

<u>This case is the case demanding the maximum sentence</u>.

Therefore, the sentence imposed, remarkably reduced from what the

Congress authorized, does abuse discretion. And if it does, then I would abdicate

my duty should I vote to leave it intact.

So I vote to reverse.

TJOFLAT, Circuit Judge, specially concurring in part and dissenting in part:

I concur with the court's judgment that Irey's sentence must be vacated but dissent as to the instruction that the district court sentence Irey to 30 years' imprisonment. I write separately because in reaching this result, the court asks the wrong question and gives the wrong answer. Today's decision cements this circuit's approach to one of the most difficult questions posed by United States v. Booker, 543 U.S. 404, 125 S. Ct. 738 (2005): what is the proper role of the courts of appeals now that the once mandatory Guidelines are only advisory?

The court asks whether Irey's sentence achieves the purposes of 18 U.S.C. § 3553(a). After conducting its own § 3553(a) analysis, the court answers "no," then proceeds to decide what would be an appropriate sentence: 30 years' imprisonment. It orders the district court to impose this sentence on remand. It does so on the basis of new evidence and arguments that the Government never presented to the district court. In short, we have assumed the role of resentencer.

Resentencing defendants on appeal does immense harm to this court's institutional relationship with the district courts by transforming the district court's sentencing proceeding from the "main event" to a "tryout on the road." This, in turn, creates perverse incentives for the parties and the district court, misallocates judicial resources, and creates disrespect for the rule of law.

145

In my view, the right question for us to ask is whether the district court abused its discretion. The correct answer is "yes" because its factfindings as best I can understand them cannot be reconciled with the sentence it imposed. The correct disposition is to vacate and remand for resentencing. With this approach, we would preserve our traditional function as an appellate court and ensure that the district court is the forum for the main event, which is required by United States v. Booker, 543 U.S. 404, 125 S. Ct. 738 (2005).

To understand the roles Booker assigned to the district court, the Sentencing Commission, and the courts of appeals, it is necessary to see the evolution of these roles over time. This opinion is therefore organized as follows: part I describes the sentencing model before and under the Sentencing Reform Act (the "SRA")[1] before Booker, part II sets out the sentencing model after Booker, part III applies abuse of discretion review to the case at bar, and part IV surveys the court's approach and resulting institutional harm. Part V concludes.

## I. Pre-Booker

### A. Pre-SRA

Understanding the sentencing model I apply today requires understanding the deeply rooted purposes of sentencing and their evolution in American criminal

---

[1] Sentencing Reform Act of 1984, Pub. L. No. 88-473, 98 Stat. 1987 (codified, as amended, in scattered sections of 18 and 28 U.S.C.).

146

law.

> Prior to the American Revolution, colonial courts fashioned sentences with three basic purposes in mind: to punish the offender for his crime, thereby satisfying society's desire for retribution ("punishment"); to deter others from committing the same crime by demonstrating its disadvantageous consequences ("general deterrence"); and to incapacitate the wrongdoer, so as to protect society from further criminal activity ("specific deterrence" or "incapacitation").

United States v. Scroggins, 880 F.2d 1204, 1206 (11th Cir. 1989). In the 1800s, penological experts became "dissatisfied with the failure of prisons to rehabilitate inmates," and rehabilitation became a fourth basic purpose of sentencing. See Arthur W. Campbell, The Law of Sentencing § 1:2 (2009). The American tradition thus embraced four purposes of sentencing—punishment, general deterrence, specific deterrence, and rehabilitation;[2] this tradition has continued to the present day.

An early model of sentencing that combined these four purposes was the "medical model," so named because penological experts believed that proper measures taken during imprisonment could "cure" offenders, allowing them to reenter society as productive members. Accordingly, rehabilitation received more weight than the other three purposes of sentencing under the medical model. Under the medical model, sentencing responsibilities were divided between the

---

[2] See United States v. Brown, 381 U.S. 437, 458, 85 S. Ct. 1707, 1720 (1965).

147

district court and the Parole Board.[3]  District courts imposed indeterminate sentences that were monitored by a Parole Board, meaning that a judge would impose a sentence that had a minimum term of confinement and a maximum term of confinement, but "allow[ed for] the possibility of release sometime between the expiration of those terms[, with] the date and conditions of release before the maximum term" determined by the Parole Board.[4]  Campbell, supra, § 4:2.

District courts fashioned the minimum and maximum bounds of the sentence in accordance with the four traditional purposes of sentencing.  They could consider all facts they thought were relevant to these purposes, "conduct[ing] an inquiry broad in scope, largely unlimited either as to the kind of information . . . or the source from which it [could] come."  United States v. Tucker, 404 U.S. 443, 446, 92 S. Ct. 589, 591 (1972).[5]  Because they could

---

[3]  The system started with the U.S. Board of Parole.  It was redesignated the U.S. Parole Commission by the Parole Commission and Reorganization Act of 1976, Pub. L. No. 94-233, § 4202, 90 Stat. 219, 219 (1976).  For convenience, I refer to the Parole Commission as the Parole Board.

[4]  The Parole Board "monitor[ed] the offender's rehabilitative progress.  When it decide[d] that the offender [was] fully rehabilitated, the board release[d] the offender on parole.  Thus, rehabilitation [was] the dominant goal of the medical model; punishment, general deterrence, and incapacitation [were] achieved only incidentally to the offender's rehabilitative incarceration."  United States v. Scroggins, 880 F.2d 1204, 1207 (11th Cir. 1989).  For more on the model, see id. at 1207 n.7 (detailing the variety of sentencing options available to the district court).

[5]  For example, a court could consider the manner in which the offender committed the crime, which included any circumstances that aggravated or mitigated the offender's criminal blameworthiness, because the manner was relevant to the purpose of punishment.  Likewise, it could consider aspects of the defendant's background because they were relevant to specific

consider a broad array of facts, they enjoyed "wide discretion in determining what

sentence to impose." Id.[6]

Although the district court set the bounds of the sentence, the Parole Board

was given

> discretion to determine when a prisoner ha[d] reached that point in
> his rehabilitation process at which he should be released under
> supervision to begin his readjustment to life in the community. By
> [the district court's] keeping the minimum low, the prisoner [was]
> encouraged "to earn favorable consideration for parole in accord with
> the public policy embodied in the parole statutes."[7]

Garafola v. Benson, 505 F.2d 1212, 1217 (7th Cir. 1974) (internal citations

omitted). The Parole Board therefore determined how much of the sentence

would be served beyond the minimum term. Thus, although the Parole Board

could not review the parameters the district court set on the offender's sentence, it

could re-sentence the offender within the parameters. Because the parameters

were often wide—the district court could not accurately predict how long the

offender would need for rehabilitation, the model's driving factor—the Parole

---

deterrence and rehabilitation.

[6] See also Wasman v. United States, 468 U.S. 559, 563, 104 S. Ct. 3217, 3220 (1984) ("It is now well established that a judge or other sentencing authority is to be accorded very wide discretion in determining an appropriate sentence.").

[7] See also Morrissey v. Brewer, 408 U.S. 471, 477–478, 92 S. Ct. 2593, 2598 (1972) (explaining that the purpose of releasing offenders on parole was "to help individuals reintegrate into society as constructive individuals as soon as they are able, without being confined for the full term of the sentence imposed").

Board was a powerful actor in the medical model.

The courts of appeals, on the other hand, had virtually no role under the medical model. So long as the sentence was within statutory limits, it "was, for all practical purposes, not reviewable on appeal." Koon v. United States, 518 U.S. 81, 96, 116 S. Ct. 2035, 2045 (1996).[8] Because sentences were not subject to appellate review, judges rarely explained the reasoning behind the sentences imposed, and there is little direct evidence from the pre-SRA era of how judges made sentencing decisions. Marc Miller, Purposes at Sentencing, 66 S. Cal. L. Rev. 413, 451–52 (1992). So while a judge sentencing an offender to prison implied that imprisonment was needed for punishment, general and specific deterrence, and rehabilitation, there was little evidence of the relative weights the judge assigned to those purposes.

Therefore, prior to the SRA, district judges had wide discretion in imposing sentences, but the Parole Board ultimately had control over how much of the sentence would be served. The courts of appeals played a very limited role.

### B. SRA

---

[8] Prior to the SRA, Fed. R. Crim. P. 35(a) allowed the "court to correct an illegal sentence at any time." An illegal sentence was not "within the limitations set forth in the statute under which it [was] imposed." Dorszynski v. United States, 418 U.S. 424, 431, 94 S. Ct. 3042, 3047 (1974).

By the 1970s, the medical model was falling out of favor.[9] Congress had come to reject the medical model's core premise—that prison sentences could rehabilitate offenders—as well as its unfair results. Offenders who committed the same crime served wildly different sentences because of the district courts' unfettered discretion and because the Parole Board determined how much of a sentence would actually be served.[10] See S. Rep. No. 98-225, at 38 (1984), reprinted in 1984 U.S.C.C.A.N. 3182, 3221.

To address the vices of the medical model—mainly unwarranted sentencing disparity—Congress enacted the SRA, which codified the traditional purposes of sentencing as the

> need for the sentence imposed—
> (A) to reflect the seriousness of the offense, to promote respect for
> the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational
> training, medical care, or other correctional treatment in the most
> effective manner.

18 U.S.C. § 3553(a)(2).[11] These factors mapped onto punishment, general

---

[9] See Michael Vitiello, Reconsidering Rehabilitation, 65 Tul. L. Rev. 1011, 1018–26 (1991), for an explanation of some of the critiques of the medical model in the 1970s.

[10] This was especially unfair because the length of the sentences offenders served, based on the Parole Board's release decisions, did not correlate with their likelihood to recidivate.

[11] By codifying these purposes, Congress defined the factors relevant to the traditional purposes of sentencing in ways that sometimes differed from the common law. Whereas

deterrence, specific deterrence, and rehabilitation, respectively. Unlike under the medical model, however, rehabilitation was no longer the dominant concern; in fact, while rehabilitation could be a relevant factor in sentencing, it could not drive a prison sentence. 18 U.S.C. § 3582(a) (directing that the court, when considering a prison sentence, recognize that "imprisonment is not an appropriate means of promoting correction and rehabilitation"). Congress feared that allowing the district court to fashion a sentence based on these purposes in each individual case would perpetuate the unwarranted sentencing disparity that plagued the medical model. Congress therefore created the United States Sentencing Commission (the "Commission") and tasked it with devising sentencing guidelines that would dictate offenders' sentences.

The new model had three main goals: (1) honesty, (2) fairness, and (3) proportionality. See United States Sentencing Commission, Guidelines Manual, § 1A1.1(3) (Nov. 1, 2009) (hereinafter "U.S.S.G."); United States v. Booker, 543 U.S. 220, 264, 125 S. Ct. 738, 767 (2005).[12] To achieve honesty, Congress

_____

punishment historically was driven by retribution, see Scroggins, 880 F.2d at 1206, 18 U.S.C. § 3553(a)(2)(A) defined it as encompassing the above considerations.

[12] Because, prior to the SRA, the sentence the judge imposed was not the sentence the offender served, neither the public nor the offender perceived the judge's sentence as "honest." See Stephen Breyer, The Federal Sentencing Guidelines and the Key Compromises upon Which They Rest, 17 Hofstra L. Rev. 1, 4 (1988); see also U.S.S.G. Ch.1, Pt.A, intr. comment. Furthermore, because of "the wide disparity in sentences imposed for similar criminal offenses committed by similar offenders," sentences were not "fair." U.S.S.G. Ch.1, Pt.A, intr. comment. Lastly, because the system did not "impose[] appropriately different sentences for criminal

152

abolished parole and replaced indeterminate with determinate sentencing. Judges

sentenced offenders to fixed terms and offenders served the full prison sentence

imposed.[13] To achieve fairness, Congress severely curtailed the district court's

discretion to fashion a sentence by requiring that, in typical cases, the court

impose a sentence within the range identified by sentencing guidelines. To

achieve proportionality, Congress replaced the theory that sentences should be

imposed primarily to rehabilitate offenders with the theory that sentences should

be no harsher than necessary to serve the four traditional purposes of sentencing.

The Sentencing Commission's Guidelines and the courts' role in sentencing were

to reflect these goals.

The rest of this subpart explains how the SRA divided the roles in

sentencing between the Commission, the district courts, and the courts of appeals,

respectively.

---

conduct of differing severity," sentences were not "proportional." Id.

[13] An offender could still serve less than the full sentence, however, if awarded credit for satisfactory behavior while incarcerated. 18 U.S.C. § 3624(b) provides:

> a prisoner who is serving a term of imprisonment of more than 1 year other than a term of imprisonment for the duration of the prisoner's life, may receive credit toward the service of the prisoner's sentence, beyond the time served, of up to 54 days at the end of each year of the prisoner's term of imprisonment, beginning at the end of the first year of the term, subject to determination by the Bureau of Prisons that, during that year, the prisoner has displayed exemplary compliance with institutional disciplinary regulations.

Hence, offenders served the sentence imposed less good time.

## 1. The Sentencing Commission's Role

The SRA charged the Commission with designing guidelines that would direct the district courts how to fashion sentences to fulfill § 3553(a)(2)'s sentencing purposes in a way that ensured honesty, proportionality, and fairness. See 28 U.S.C. § 991(b)(1); id. § 994(f). Assembled in a Guidelines manual, the Guidelines resembled a computer program. To impose a sentence, all a district judge had to do was to input information requested by the manual and the manual would generate a sentencing range.

Every sentence had an offense- and an offender-based component. United States v. Mogel, 956 F.2d 1555, 1558 (11th Cir. 1992); see 28 U.S.C. § 994(b) (instructing that the Commission "establish a sentencing range" for "each category of offense involving each category of defendant"). The offense-based component correlated mostly to the sentencing purposes of punishment and general deterrence; the offender-based component correlated mostly to the purposes of specific deterrence and rehabilitation. See Mogel, 956 F.2d at 1559. The district court found the sentence it was to impose by consulting a table in the Guidelines manual: the table's Y axis specified offense levels; its X axis specified categories of offenders. See U.S.S.G. § 1B1.1; id. Ch.5, Pt.A ("Sentencing Table") The table listed an appropriate sentencing range for each combination of offense level

154

and category of offender.

## a. The Offense Level

Roughly speaking, the offense level was the Guidelines' proxy for the need

for the sentence "to reflect the seriousness of the offense, to promote respect for

the law, and to provide just punishment for the offense," as well as to "afford

adequate deterrence to criminal conduct," 18 U.S.C. § 3553(a)(2)(A)–(B). See

Scroggins, 880 F.2d at 1208. As an initial matter, the Commission had to

determine what type of conduct would factor into the offense level, namely

> whether to base sentences upon the actual conduct in which the
> defendant engaged regardless of the charges for which he was
> indicted or convicted ("real offense" sentencing), or upon the conduct
> that constitutes the elements of the offense for which the defendant
> was charged and of which he was convicted ("charge offense"
> sentencing).

U.S.S.G. § 1A1.1 (initial policy statement).[14]

It settled on a hybrid approach, devising an offense level with three

components: (1) a "base offense level," (2) "specific offense characteristics," and

---

[14] The Commission explained the differences between a real offense and charged offense sentencing model:

> A bank robber, for example, might have used a gun, frightened bystanders, taken $50,000, injured a teller, refused to stop when ordered, and raced away damaging property during his escape. A pure real offense system would sentence on the basis of all identifiable conduct. A pure charge offense system would overlook some of the harms that did not constitute statutory elements of the offenses of which the defendant was convicted.

U.S.S.G. § 1A1.4(a).

(3) "adjustments." Scroggins, 880 F.2d at 1209–10.[15] The base offense level reflected the charged conduct. Rather than draft a guideline for each offense in the United States Code, the Guidelines grouped offenses and specified an offense level that reflected the average seriousness of the group.[16] Id. at 1209. The specific offense characteristics were tailored to each category of offense[17] and captured some of the offender's real conduct in committing the offense of conviction. The adjustments applied to all offenses regardless of their category. Some but not all of the adjustments related to the charged offense. Id. at 1209–10.[18]

---

[15] The jury found or the guilty plea established the charged offense conduct, and the district court found the facts relevant to the specific offense characteristics or the adjustments. See infra note 24.

[16] As instructed by 28 U.S.C. § 994(b), the Commission classified each federal crime according to its severity, then placed it together with the crimes similarly classified in a "category of offenses." Because all of the crimes in a category were of like severity, all had the same base offense level. For example, the base offense level for approximately 130 different theft offenses in the United States Code is the same, established by U.S.S.G. § 2B1.1 (Larceny, Embezzlement and Other Forms of Theft).

[17] The specific characteristics for robbery, for example, include whether property was taken from a financial institution or post office, whether and how a firearm was used, whether people were injured, whether a carjacking occurred, and the dollar value of the loss. U.S.S.G. § 2B3.1.

[18] The Commission rejected a pure charge offense system because it could have achieved only unfair uniformity: it would have treated unlike offenders alike given that the criminal code is not written to take account of the manner in which the offenses are committed. See Stephen Breyer, supra note 12 at 9–10. The Commission rejected a pure real offense system that would have considered all possible real conduct, not only selected specific offense characteristics or adjustments—because it would have been administratively unwieldy: innumerable factual permutations might have a bearing on the need for punishment and general deterrence. Id. at 10–12. The hybrid model was a compromise to avoid the primary pitfalls of both.

## b. The Offender Characteristics

The category of offender was the Commission's proxy primarily of the need for the sentence "to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C); see also Mogel, 956 F.2d at 1558–59. The Commission categorized offenders almost exclusively by criminal history as determined by prior convictions.[19] See U.S.S.G. § 4A1.1; see also Mogel 956 F.2d at 1560 (noting that the "offender-based component almost entirely relies on the offender's criminal history"). The Commission settled on criminal history because it was a workable way to achieve sentencing uniformity. See Stephen Breyer, The Federal Sentencing Guidelines and the Key Compromises upon Which They Rest, 17 Hofstra L. Rev. 1, 19–20 (1988). Criminal history based on convictions could be neatly categorized and taken into account by the Guidelines matrix. The myriad other factors that might help predict recidivism were difficult to categorize and even more difficult to quantify—age, for example, might cut differently in different cases—and including them would make the sentencing table unworkable.[20] See id.

---

[19] The Guidelines did allow for a departure if "reliable information indicates that the defendant's criminal history category substantially [over or] under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." U.S.S.G. § 4A1.3.

[20] In so focusing, the Commission ignored a number of factors that Congress had suggested and the Commission had conceded were relevant to predicting recidivism. See

157

## 2. The District Court's Role

### a. The Statutory Considerations

The SRA tasked the district courts with sentencing individual offenders in accordance with several statutory factors, but, at the same time, eliminated most of the district court's discretion in carrying out that task. In nearly all cases, the court's job was ministerial, to follow the Commission's instructions. The scheme played out this way.

The district courts were required to sentence pursuant to 18 U.S.C. § 3553. Section 3553(a) directed the courts to tailor their sentences to the particular circumstances of the offense and the offender consistent with what I refer to as the parsimony[21] principle: a sentence must be "<u>sufficient, but not greater than necessary</u>" to achieve the four traditional purposes of sentencing. (emphasis added).[22] Section 3353(b)(1), however, instructed that "the court shall impose a

---

U.S.S.G. Ch.4, Pt.A, intr. comment (recognizing that "empirical research has shown that other factors are correlated highly with the likelihood of recidivism, <u>e.g.</u>, age and drug abuse, [but] for policy reasons they were not included here at this time"). Other factors disregarded included education, vocational skills, employment record, and family ties and responsibilities. <u>See</u> 28 U.S.C. § 994(d).

[21] "Parsimony" is defined as "economy in the use of means to an end." <u>Merriam-Webster's Collegiate Dictionary</u> 846 (10th ed. 1999). In this context, parsimony translates to using the least harsh sentence (the means) needed to satisfy the traditional purposes of sentencing (the end). Although the court quibbles with the label "parsimony principle," it does not disagree with the underlying concept.

[22] In fashioning a sentence, the district courts were to take account of other factors, including: (1) the nature and circumstances of the offense and the history and characteristics of

sentence of the kind, and within the range" prescribed by the Guidelines, unless "there exist[ed] an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines" or there was no "applicable sentencing guideline." 18 U.S.C. § 3553(b)(1). "In the absence of an applicable sentencing guideline, the court [had to] impose an appropriate sentence, having due regard for the purposes set forth in subsection (a)(2)"—the four traditional purposes of sentencing. Id. The court also had to consider "sentences prescribed by guidelines applicable to similar offenses and offenders" and "the applicable policy statements of the Sentencing Commission." Id.

Because the district court was obligated to follow the Guidelines in all but the rarest cases, the district court only followed the parsimony principle to the extent that the Commission did in creating the Guidelines. Congress instructed the Commission to establish sentencing guidelines to meet the § 3553(a)(2) purposes, but did not mention the parsimony principle that appears in § 3553(a). See 28 U.S.C. § 991(b)(1)(A).[23] It is thus not clear that the Guidelines took into

the offender, (2) the kinds of sentences available, (3) the Commission's guidelines and policy statements, (4) the need to avoid unwarranted disparity, and (5) the need to provide restitution. 18 U.S.C. § 3553(a).

[23] Compare 18 U.S.C. § 3553(a) ("The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection.") with 28 U.S.C. § 991(b) ("The purposes of the United States Sentencing

account the parsimony principle, and the way they operated frequently created tension with the parsimony principle.

In sum, while Congress instructed district judges to consider the § 3553(a)(2) purposes, district judges—to ensure uniformity—almost always had to impose Guidelines sentences. They only conducted an independent analysis of the 3553(a)(2) purposes and parsimony principle in the rare event that aggravating or mitigating circumstances existed or no guideline applied.

### b. The Sentencing Proceeding

Under the SRA, district courts fashioned sentences using an adversary process, in which "a confrontation between the parties [occurred] similar to that which occurs at a civil bench trial." United States v. Scroggins, 880 F.2d 1204, 1209 (11th Cir. 1989). The process began with a pretrial investigation conducted by the court's probation officer and the issuance of a presentence investigation report ("PSI"). Id. at 1209 n.11. The PSI identified the guidelines applicable to the offense of conviction, recited the facts related to the base offense level, the specific offense characteristics and adjustments, determined the offense level, and, after reciting the defendant's criminal history, determined the defendant's criminal

---

Commission are to (1) establish sentencing policies and practices for the Federal criminal justice system that (A) assure the meeting of the purposes of sentencing as set forth in section [18 U.S.C. §] 3553(a)(2).").

160

history category.  The PSI then specified the sentencing range for the offense and the kinds of sentences available.  See 18 U.S.C. § 3552; Fed. R. Crim. P. 32(c)–(d); Scroggins, 880 F.2d at 1209 & n.11.  After considering the parties' objections to the PSI's factual recitations and Guidelines determinations, the probation officer summarized any unresolved objections in an addendum to the PSI.  Scroggins, 880 F.2d at 1209 & n.11.  The PSI thus "serve[d] the purpose of a pretrial stipulation in a civil case."  Id.  The addendum framed the issues to be litigated at the sentencing hearing.

The sentencing hearing followed.  There, the district court resolved any remaining factual and legal issues regarding the correct application of the Guidelines.  See Scroggins, 880 F.2d at 1209, 1211 & n.18.  Determining the circumstances of the offense and the offender's criminal history presented factual questions; the correct application of the Guidelines to those facts[24] presented mixed questions.  After hearing from the parties, the district court announced and "state[d] in open court the reasons for its imposition of the particular sentence."

---

[24] Because the jury conviction or the guilty plea established the charged offense conduct (the base offense level) and the defendant's criminal history would have been established (in most cases) as a matter of record, the district judge was responsible for making findings related to specific offense characteristics and adjustments.  The government bore the burden of proving by a preponderance of the evidence any specific offense characteristics and adjustments (not established via jury verdict or guilty plea) that would enhance the defendant's offense level, and any facts that would support an increase of the defendant's category of offender.  The defendant bore the same burden regarding adjustments that would reduce the offense level or the category of offender.  United States v. Wilson, 884 F.2d 1355, 1356 (11th Cir. 1989).

161

18 U.S.C. § 3553(c). If the court imposed a within-Guidelines sentence and the Guidelines range exceeded 24 months, the court had to also state "the reasons for imposing a sentence at a particular point within the range." Id. § 3553(c)(1). In the rare event that the court imposed a sentence "not of the kind, or . . . outside the [Guidelines] range," it had to state its reasons for doing so with specificity in a written order. Id. § 3553(c)(2).

Following its imposition of the sentence, the district court had to give the parties a chance to object to its findings of fact, its Guidelines applications or other legal rulings, or the manner in which the sentence was imposed. United States v. Jones, 899 F.2d 1097, 1102 (11th Cir. 1990), overruled on other grounds by United States v. Morrill, 984 F.2d 1136 (11th Cir. 1993) (en banc). Entertaining an objection at this stage of the proceeding gave the district court an opportunity to address the objection and correct any error it may have made.[25]

### 3. The Court of Appeal's Role

Lastly, Congress tasked the courts of appeals with policing the system by

---

[25] Allowing an objection to be made for the first time on appeal would give the objecting party an opportunity to blind side the district court's sentencing decision. The Jones objection rule precluded this and enabled the court of appeals to treat objections that could have been made but were not as waived.

The Jones "raise it or waive it" rule applied unless a party could demonstrate plain error, Jones, 899 F.2d at 1103, or the record disclosed that the district court was clearly aware of the objection in time to address it. See United States v. Weir, 51 F.3d 1031, 1033 (11th Cir. 1995) (declining to apply the waiver rule when the district court "clearly understood the [party's] position and specifically rejected it").

creating substantive grounds for appeal. In addition to the right to appeal an

"illegal" sentence, which had existed under the medical model, Congress created

three new grounds for appeal, see 18 U.S.C. § 3742, to assure that the district

court correctly applied the Guidelines. The first of these grounds was that the

sentence was the result of an "incorrect application" of the Guidelines. Id. §

3742(a)(2), (b)(2).[26] The second was that the sentence was "greater" or "less"

than the Guidelines sentencing range. Id. § 3742(a)(3), (b)(3).[27] The third was

that the sentence was imposed for an offense for which no guideline existed and

was "plainly unreasonable." Id. § 3742(a)(4), (b)(4).[28]

* * *

In sum, the SRA structurally divided responsibility for sentencing among

three entities: the Commission, the district courts, and the courts of appeals. The

Commission promulgated the mandatory Guidelines, which were the lynchpin of

---

[26] A district judge's determination of where to sentence a defendant within a correctly calculated Guidelines range, however, could not be appealed. United States v. Medina, 90 F.3d 459, 465 n.8 (11th Cir. 1996) ("The district court has the discretion to impose any sentence within the guideline range.").

[27] If the district court rejected a party's request for a sentence greater or less than the Guidelines sentencing range, the sentence was unreviewable unless the court erroneously believed it lacked the authority to depart from the sentencing range. See, e.g., United States v. Rudisill, 187 F.3d 1260, 1265 (11th Cir. 1999); United States v. Fossett, 881 F.2d 976, 979–80 (11th Cir. 1989).

[28] When no guideline existed, the findings of fact underpinning the sentence were reviewed for clear error. See 18 U.S.C. § 3742(e). Guidelines applications were reviewed de novo. See, e.g., United States v. Auguste, 392 F.3d 1266, 1267 (11th Cir. 2004).

163

the SRA. The Guidelines created sentences by considering offense and offender characteristics. In addition to a base offense level reflecting the charged offense conduct, the offense characteristics incorporated specific offense characteristics and more general adjustments, meaning that offenders were sentenced partly on the basis of uncharged conduct. The offender characteristic was based entirely on the offender's criminal history.

The district courts were statutorily charged with sentencing offenders consistent with the traditional purposes of sentencing and the parsimony principle. In nearly all cases, though, the district courts were required to impose a Guidelines sentence. Therefore, the district court rarely had to conduct an independent analysis of the four purposes driving sentencing—the Sentencing Commission had already done this work for them in devising the mandatory Guidelines. Likewise, the courts rarely had to grapple with the parsimony principle. In all, the district courts exercised very little discretion other than determining where within the applicable Guidelines range to sentence the offender. The courts of appeals' role was to ensure that the Guidelines were followed.

## II. The Post-SRA Model

### A. United States v. Booker

In United States v. Booker, 543 U.S. 220, 125 S. Ct. 738 (2005), a fractured

Supreme Court radically reformed and rearranged the roles the SRA had assigned

the district courts, the Commission, and the courts of appeals. At issue in Booker

was whether the SRA's mandatory Guidelines violated the Sixth Amendment.

The Supreme Court held they did and reaffirmed that "[a]ny fact (other than a

prior conviction) which is necessary to support a sentence exceeding the

maximum authorized by the facts established by a plea of guilty or a jury verdict

must be admitted by the defendant or proved to a jury beyond a reasonable

doubt."[29] Id. at 244, 125 S. Ct. at 756. Because the Guidelines sentencing range

_____

[29] The court defined the statutory maximum as the "'maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.'" United States v. Booker, 543 U.S. 220, 232, 125 S. Ct. 738, 749 (2005) (quoting Blakely v. Washington, 542 U.S. 296, 303, 124 S. Ct. 2531, 2537 (2004)). "In other words, the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts [beyond those found by the jury], but the maximum he may impose without any additional findings." Blakely, 542 U.S. at 303–04, 124 S. Ct. at 2537.

Although the Guidelines range fell between the statutory minimum and maximum, the requirement that the judge in most cases impose a Guidelines sentence posed a constitutional problem. Prior to the SRA, the jury found beyond a reasonable doubt that the offender had committed the charged offense conduct. This finding exposed the offender to any sentence within the full statutory range. Because the jury found the charged offense conduct beyond a reasonable doubt, this sentencing model posed no constitutional problem.

Under the SRA, the jury still made findings beyond a reasonable doubt as to the charged offense conduct. If the sentencing record contained only the jury's findings regarding the charged offense conduct, the maximum sentence the offender could receive under the statute would be the sentence called for by the base offense level plus only those specific offense characteristics and adjustments supported by the jury's findings (plus any increase based on the offender's criminal history). But the SRA allowed the judge to make additional factual findings—to support specific offense characteristics and adjustments beyond those supported by the jury's findings—that would increase the offender's sentence beyond the maximum sentence he could receive based solely on the jury's findings. Thus, the SRA violated the Sixth Amendment because the judge's factual findings would permit a sentence beyond the maximum

165

was often determined by facts established by the district court by a mere preponderance of the evidence, the mandatory Guidelines violated the Sixth Amendment.  Id. at 232–34, 244, 125 S. Ct. at 749–50, 756.

To solve this Sixth Amendment problem, the Court discussed two possible remedies: (1) transform the Guidelines from mandatory to advisory,[30] or (2) require that every fact that would determine the Guidelines range be admitted by the defendant or proved to a jury beyond a reasonable doubt.  Citing administrative concerns, the Booker remedial majority[31] opted for the first choice.

Accordingly, the Supreme Court severed and excised two provisions of the SRA.  First, the Court struck 18 U.S.C. § 3553(b)(1), which had mandated the imposition of a Guidelines sentence.  543 U.S. at 259, 125 S. Ct. at 764.  Second, the Court struck 18 U.S.C. § 3742(e), which set out standards of appellate review,

---

sentence that would be allowed by statute based on the facts found by the jury.

[30]  The Supreme Court recognized that there would be no Sixth Amendment problem if the Guidelines "could be read as merely advisory provisions."  Booker, 543 U.S. at 233, 125 S. Ct. at 750.  The SRA allowed for departure from the Guidelines in rare circumstances, but that did not render the Guidelines advisory.  Id. at 234, 125 S. Ct. at 750.  The clear import of this reasoning is that the Booker problem could be cured (and ultimately was cured) by transforming the Guidelines into recommendations, but the Guidelines had to be genuinely advisory.  See Gall v. United States, 552 U.S. 38, 47, 128 S. Ct. 586, 595 (2007) ("We reject, however, an appellate rule that requires 'extraordinary' circumstances to justify a sentence outside the Guidelines range.").

[31]  Two different opinions in Booker garnered a five-vote majority.  The first opinion, often called the "Constitutional opinion," held that portions of the SRA violated the Sixth Amendment.  The second opinion, called the "remedial opinion," remedied the Constitutional problem by excising parts of the SRA.

because it contained "critical cross-references" to § 3553(b).  Id. at 260–61, 125 S.

Ct. at 765.  To fill the gap, the Court held that the statute "impli[ed]" that

sentences should be "review[ed] for 'unreasonable[ness]'"  Id. (citing 18 U.S.C. §

3742(e)(3)) (final alteration in original).[32]  The Court later clarified that "review

for unreasonableness" meant review for abuse of discretion.  Gall, 552 U.S. at 46,

128 S. Ct. at 594.  Aside from these changes, the Court left the remainder of the

SRA intact, concluding that it functioned independently.  Booker, 543 U.S. at 259,

125 S. Ct. at 764.

Booker redistributed the roles in sentencing offenders between the

Commission, the district courts, and the courts of appeals.  The Commission no

longer framed the district courts' sentencing discretion with mandatory guidelines;

instead, it would inform the district courts' sentencing discretion with advisory

guidelines.[33]  The district courts once again bore the responsibility of

---

[32]  The Court explained:

[A]s we have previously held, a statute that does not explicitly set forth a standard
of review may nonetheless do so implicitly. . . . [I]n this instance . . . the past two
decades of appellate practice in cases involving departures[] imply a practical
standard of review already familiar to appellate courts: review for
"unreasonable[ness]."

Booker, 543 U.S. at 260–61, 125 S. Ct. at 765 (citing 18 U.S.C. § 3742(e)(3)) (final alteration in
original).

[33]  Except for Booker's requirement that the district courts consider the Guidelines in
exercising their sentencing discretion, post-Booker sentencing resembles the sentencing the
district court performed pre-Booker in imposing a sentence for an offense for which no guideline

independently crafting sentences.  See United States v. Rodriguez, 406 F.3d 1261, 1287–89 (11th Cir. 2005) (Tjoflat, J., dissenting from the denial of rehearing en banc).  Thus, § 3553(a), which embodies the parsimony principle and the four traditional purposes of sentencing, moved to the forefront,  providing the bases for the construction of a sentence.  The courts of appeals bore the responsibility of reviewing the district courts' sentences, but under the abuse of discretion standard of review.  Such review, it was thought, would preserve some of the uniformity in sentencing the SRA sought to achieve.

Because the primary responsibility for sentencing post-Booker lies with the district courts, I explain what fashioning a sentence in accordance with § 3553(a) involves, how the sentencing hearing should be conducted, and the explanation the district courts must give for the sentences they impose.  Only then can the abuse of discretion standard of appellate review be meaningfully discussed.

B. The Key Inquiry—§ 3553(a)

Section 3553(a) sets out seven factors that a district court must "consider"

---

existed.  When no guideline existed, the court had to "hav[e] due regard" for "the purposes set forth in [§ 3553](a)(2)[,] . . . sentences prescribed by guidelines applicable to similar offenses and offenders, and [] the applicable policy statements of the Sentencing Commission."  18 U.S.C. § 3553(b)(1).  In that situation, the district court was in effect doing the Commission's work; because the court was not constrained by an offense category, it had to make an individualized sentencing determination.

168

before imposing a sentence.[34] At the end of the day, however, the statute requires

[34] 18 U.S.C. § 3553(a) provides:

(a) Factors to be considered in imposing a sentence.—The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—
    (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
    (2) the need for the sentence imposed—
        (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
        (B) to afford adequate deterrence to criminal conduct;
        (C) to protect the public from further crimes of the defendant; and
        (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
    (3) the kinds of sentences available;
    (4) the kinds of sentence and the sentencing range established for—
        (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—
            (i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and
            (ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or
        (B) in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);
    (5) any pertinent policy statement—
        (A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments

the district court to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)." 18 U.S.C. § 3553(a). Thus, although all of the sentencing factors identified in § 3553(a) must be considered, the heart of the inquiry is the district court's assessment of the four traditional purposes of sentencing § 3553(a)(2) has codified.

The first purpose, § 3553(a)(2)(A), requires the sentence be "sufficient, but not greater than necessary" to satisfy the need for punishment. Section 3553(a)(2)(A) actually involves three inquiries that exist in a dynamic relationship: the sentence must "reflect the seriousness of the offense, []promote respect for the law, and [] provide just punishment for the offense."[35] Section

---

issued under section 994(p) of title 28); and
(B) that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.

[35] Seriousness of the offense is easily understood. Promoting respect for the rule of law turns on perception of the punishment; respect for the rule of the law may be compromised if the offender or community believes that an offender's punishment was too harsh or lenient based on the facts of the case or if it leads to unwarranted sentencing disparity. Just punishment takes into account the offender's culpability.

Evidence will be relevant to the (a)(2)(A) inquiry to the extent that it is relevant to any of these inquiries. Importantly, the first and third inquiries are specific to "the offense." Moreover, the "offense" is the offense of conviction; therefore on these inquiries, the district court cannot consider conduct that does not bear on the offense of conviction, such as uncharged or unproven conduct.

Sometimes, all three factors militate in favor of a strong need for punishment: for example, severe punishment may be just for a serious offense, and any failure to impose such punishment could engender disrespect for the rule of law. Sometimes, the factors will be in tension: although a serious offense was committed, circumstances (such as the offender's

3553(a)(2)(B) focuses on the need for general deterrence—"the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct." The need for general deterrence involves an assessment of the seriousness of the offense and its relative incidence in the community. Section 3553(a)(2)(C) asks what sentence is needed to "protect the public from further crimes of the defendant." The basic task is to predict the likelihood that the offender will commit further offenses, assess the potential seriousness of those offenses, and determine the need to incapacitate the offender as a prophylactic measure. Finally, § 3553(a)(2)(D) focuses on the need for the sentence to rehabilitate the offender—"to provide . . . needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." Ordinarily, rehabilitation will play no role in determining the sentence. See 18 U.S.C. § 3582(a).[36]

---

motivation) may call for less punishment, and imposing a sentence without taking account of those circumstances may engender disrespect for the rule of law.

[36] "[I]mprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a); see also United States v. Shortt, 485 F.3d 243, 249 (4th Cir. 2007) ("Although still relevant, the fourth purpose, rehabilitation, was recognized by Congress and the Sentencing Commission to be insufficient, standing on its own, to justify a particular sentence."). Rehabilitation is clearly relevant, however, when sentencing an offender to a term of probation or supervised release. See, e.g., S. Rep. No. 98-225, at 76 ("Rehabilitation is a particularly important consideration in formulating conditions for persons placed on probation."). All of the (a)(2) factors are relevant to determining the conditions of probation or supervised release—probation and supervised release can certainly have punitive and deterrent aspects, for example. For simplicity, though, I limit my discussion in this opinion to the imprisonment component of sentences.

At first blush, it seems odd that Congress required consideration of seven factors but ultimately directed the district courts to impose sentences sufficient but not greater than necessary to comply with just one: § 3553(a)(2). On further examination, however, it is apparent that all of the other factors inform the analysis of the four purposes of sentencing. Section 3553(a)(1) requires consideration of "the nature and circumstances of the offense and the history and characteristics of the defendant." These considerations are directly relevant to all four purposes. Section 3553(a)(3) requires consideration of the "kinds of sentences available," which is crucial to any determination of what sentence would be no harsher than necessary to punish or deter. Sections 3553(a)(4), (5) and (6) require consideration of the Guidelines sentencing range, the Commission's policy statements, and the need to avoid unwarranted disparity, respectively. Unwarranted sentencing disparity breeds disrespect for the rule of law in contravention of § 3553(a)(2)(A) (whose purpose is, in part, to "promote respect for the law"), and a correctly calculated Guidelines sentencing range (which is calculated in part by considering the Commission's policy statements) is one tool for avoiding such disparity. Finally, § 3553(a)(7)'s command that the court consider the need to provide restitution to victims is directly relevant to just punishment.

My take on what transpires after the district court considers the seven §

3553(a) factors is that the district court should impose a sentence that satisfies the

four traditional sentencing purposes of § 3553(a)(2).  In most, if not all cases, one

of the purposes will drive the sentence.  If, for example, the punishment that

should be meted out is more than sufficient to meet the needs of general and

specific deterrence, then the need for punishment will "drive" the sentence.  If the

need for general deterrence is at the forefront (say in a tax evasion case) and the

defendant is a first-time offender, the sentence will be imposed to satisfy the need

for general deterrence—that is, the term of imprisonment for that purpose is

greater than the period of incarceration required for punishment or specific

deterrence.  Alternatively, consider the case of a repeat offender with a string of

convictions that harmed scores of victims.  The period of incarceration required to

protect the public from his future criminal behavior may exceed the term of

imprisonment needed for punishment and general deterrence, and specific

deterrence will drive the sentence.[37]

---

[37]  I say that a sentence is often driven by one of the (a)(2) purposes because of my
reading of the plain statutory language of § 3553.  Given the direction that a sentence must be
sufficient but not greater than necessary to comply with the 3553(a)(2) purposes, it logically
follows that a sentence should not be greater than is necessary to satisfy the (a)(2) purpose that
demands the longest sentence.  On the other hand, weighing the (a)(2) purposes against each
other does not follow logically from the statute—even if there is no need for specific deterrence,
for example, the sentence must still be sufficient to satisfy the driving (a)(2) purpose.  If the
driving purpose is punishment, a district court cannot play the lack of a need for specific
deterrence off of punishment—otherwise, the sentence would not be sufficiently long to satisfy

## C. Preparing For the Sentencing Hearing

As I explain in part I.B, <u>supra</u>, a district judge might not find the answer to what would constitute a parsimonious sentence by consulting the Guidelines because the Commission was not instructed to take the parsimony principle into account when fashioning the Guidelines. When the parties disagree about what would be a parsimonious sentence, the PSI is of limited use to the district court. As the Supreme Court anticipated in <u>Gall</u>, the PSI does not answer the question of which of the four § 3553(a)(2) purposes the Guidelines sentencing range primarily accommodates; nor does it recommend a sentence that would be sufficient, but not greater than necessary to achieve those purposes.[38] 552 U.S. at 49–50, 128 S. Ct. at 596. The PSI simply informs the district court of the range of sentences that, in the Commission's view, should be considered in cases with offense and offender characteristics similar to the case before the court.

The district court needs the parties' input to fashion a parsimonious

---

the need for punishment.

    In handing down the sentence, the district judge must explain why the driving purpose subsumes the other purposes—that is, the sentence necessary to satisfy the driving purpose is also sufficient to satisfy all of the other (a)(2) purposes. All of the (a)(2) purposes, therefore, are properly considered, and the court's characterization of the "driving purpose" as "speed[ing] ahead and flatten[ing] the other three" is inaccurate. <u>Ante</u> at 76 n.24. This explanation also enhances meaningful appellate review and the public perception that justice has been done.

    [38] The current PSI format is the same one used by the district courts' probation offices pre-<u>Booker</u>.

sentence. The sentencing hearing is an adversary proceeding[39] in which the

parties frame the controversy by requesting sentences that they believe will meet §

3553(a)'s parsimony requirement.[40] After the court has entertained the parties'

evidence and arguments in support of their requests, the district court determines

whether either sentence request is supported by the § 3553(a) factors. Id.

The obligations Gall has placed on the prosecutor and defense counsel to

present sentence requests to the district court is consistent with their adversarial

roles in the case.[41] The prosecutor must urge the court to impose a sentence that is

---

[39] Rita v. United States, 551 U.S. 338, 351, 127 S. Ct. 2456, 2465 (2007) ("[T]he sentencing court subjects the defendant's sentence to the thorough adversarial testing contemplated by federal sentencing procedure.").

[40] This assumes that the prosecutor and defense counsel are properly representing their respective clients, as indicated in the following text. Although they may at times agree, the prosecutor will generally argue for a harsher sentence, and defense counsel for a more lenient sentence. If the prosecutor and defense counsel are not prepared to advance their positions, the district court ought to continue the sentencing hearing and reconvene it when the parties are prepared.

[41] They assumed these obligations early in the case. The prosecutor's obligations are expressed in the Principles of Federal Prosecution ("Principles"), United States Attorneys' Manual, § 9-27.000 (1997), available at http://www.justice.gov/usao/eousa/foia_reading_room/usam/index.html, the defense counsel's in the Sixth Amendment.
The Principles were originally promulgated by the Attorney General on July 28, 1980 and were updated to describe the prosecutor's role in the sentencing process under the Guidelines. The Principles have not been updated to reflect the changes Booker and Gall have made to the prosecutor's obligations. As the Principles indicate, the prosecutor considers sentencing when presenting the case to the grand jury for indictment. Presumably acting on the prosecutor's recommendation, the grand jury indicts the defendant for the "the most serious offense that is consistent with the nature of the defendant's conduct, and that is likely to result in a sustainable conviction." Id. § 9-27.300 ("Selecting Charges—Charging Most Serious Offenses"). The "'most serious' offense" is "that which yields the highest range under the sentencing guidelines." Id.

"appropriate . . . under all the circumstances of the case." U.S. Dep't of Justice, United States Attorneys' Manual, § 9-27.320 (1997), available at http://www.justice.gov/usao/eousa/foia_reading_room/usam/index.html. To this end, the prosecutor must endeavor to "ensure that the relevant facts are brought to the court's attention fully and accurately." Id. § 9-27.710 ("Participation in Sentencing—Generally"). This includes "mak[ing] a factual presentation to the court when . . . [i]t is necessary to supplement or correct the [PSI]; [i]t is necessary in light of the defense presentation to the court; or [i]t is requested by the court." Id. § 9-27.720 ("Establishing Factual Basis for Sentence"). Finally, the prosecutor must "[b]e prepared to substantiate significant factual allegations disputed by the defense." Id. Defense counsel also has an obligation to prepare for the sentencing hearing; in fact, the Sixth Amendment requires that defense counsel provide the defendant with effective assistance in all phases of the case.

---

If the offense initially presented to the grand jury does not fully embrace the nature and extent of the criminal conduct involved, the prosecutor should recommend that the grand jury's indictment include charges that would do so. The prosecutor should seek additional charges when they

> 1. Are necessary to ensure that the . . . indictment:
>     a. Adequately reflects the nature and extent of the criminal conduct involved; and
>     b. Provides the basis for an appropriate sentence under all the circumstances of the case; or
> 2. Will significantly enhance the strength of the government's case against the defendant or a codefendant.

Id. § 9-27.320 ("Additional Charges").

This would include providing the district court with evidence favorable to the defendant as the court considers § 3553(a)(2)'s sentencing objectives.

The parties should present their sentence requests to the district court after the PSI, and any addendums to the PSI, are in final form and ready for submission to the court. Ideally, the requests should be presented well in advance of the sentencing hearing in sentencing memoranda akin to the pretrial briefs parties routinely present to the district court in advance of a civil bench trial. In their sentencing memoranda, the parties should consider presenting the district court with findings of fact and conclusions of law similar to the findings of fact and conclusions of law parties in a civil case present the court prior to or following a bench trial. The memoranda would indicate the Guidelines sentencing range,[42] the sentence the party requests, the primary § 3553(a)(2) purpose the sentence is to serve, and why the sentence would be sufficient, but not greater than necessary to comply with the § 3553(a)(2) purposes.[43]

---

[42] This is the sentencing range set out in the PSI or, if the party objects to the PSI Guidelines calculation, the Guidelines calculation and sentencing range the party will ask the district court to reach at the sentencing hearing.

[43] The Northern District of California Federal Public Defender provides a sample sentencing memorandum that explains that it is important to include this information because post-Booker, the court may no longer uncritically apply the Guidelines—it is counsel's responsibility to explain how all of the § 3553(a) factors are implicated in a given case, with an emphasis on (a)(2). N. Dist. Cal. Fed. Pub. Defender, Model Sentencing Memorandum, http://www.ndcalfpd.org/Briefbank/Booker/David%20McColgin%20Model%20Sentencing%20Memo%204.25.05.htm (last visited June 30, 2010).

In formulating their sentence requests, the parties should first evaluate how well the guidelines listed in the PSI serve as proxies for § 3553(a)(2)'s purposes. As explained, the Guidelines offense level for the offense of conviction is made up of the base offense level, specific offense characteristics, and adjustments. Some of the specific offense characteristics and adjustments may describe acts committed by the defendant in perpetrating the offense of conviction; the Commission treats such acts as part of the "real" offense conduct and properly includes them in the offense level as proxies for the § 3553(a)(2)(A)–(B) needs for punishment and general deterrence. Other specific offense characteristics and adjustments, however, may not fairly be said to have any bearing on the defendant's commission of the offense of conviction and thus on the (A) and (B) needs. Therefore, although the Commission treats them as proxies for (A) and (B) purposes, they may be irrelevant to whether the sentence a party proposes is sufficient, but not greater than necessary to satisfy the (A) and (B) needs in the case.[44] Accordingly, in determining the proxies for (A) and (B), the defendant

---

[44] For example, there is a 2-point upward adjustment for lying to the probation officer who is compiling the PSI, U.S.S.G. §3C1.1 & cmt. n.4(h), but that conduct usually has nothing to do with the charged offense. The Guidelines manual is littered with adjustments and specific offense characteristics that may or may not be relevant to § 3553(a)(2) in a given case, even if the offender performed the conduct in question. U.S.S.G. § 3B1.5, for example, adjusts the offense level upward if the offender used body armor during a drug offense, but the use of body armor during a simple drug transaction in which the offender does not anticipate any violence might have no bearing on the § 3553(a)(2) purposes. Other examples of potentially irrelevant adjustments include: U.S.S.G. § 3A1.1 (hate crime motivation); § 3A1.2 (whether the victim was

178

may urge the court to remove from the PSI's offense level the specific offense characteristics and adjustments that reflect conduct unrelated to the offense of conviction.[45]

The offense level may not fit the circumstances of the case even after irrelevant considerations are removed. As indicated, the Guidelines offense level applies to all cases involving the offense of conviction; that is, it does not speak to the unique circumstances of a particular case. Consequently, in its sentencing memorandum, a party may urge the court to deviate from the prescribed offense level to take into account one or more of the offense characteristics listed in 28 U.S.C. § 994(c) (which the Commission considered in determining the categories of offenses)[46] that render the instant case atypical. In doing so, the party would be

---

a government official); § 3A1.3 (whether the victim was restrained during the offense); § 3B1.3 (whether the offender abused a position of trust or used a special skill); § 3B1.4 (whether the offender used a minor to commit the crime); § 3C1.2 (whether the offender recklessly endangered people during flight); § 3C1.3 (whether the offender was on release when the crime was committed).

[45] The government will oppose the defendant's request if it believes that the specific offense characteristics and adjustment do bear on the offense of conviction.

[46] In 28 U.S.C. § 994(c), Congress specified the following offense factors:

(1) the grade of the offense;
(2) the circumstances under which the offense was committed which mitigate or aggravate the seriousness of the offense;
(3) the nature and degree of the harm caused by the offense, including whether it involved property, irreplaceable property, a person, a number of persons, or a breach of public trust;
(4) the community view of the gravity of the offense;
(5) the public concern generated by the offense;

positing a substitute offense level and using it to support the sentence it will be asking the court to impose.

The parties' sentencing memoranda will also address the prescribed criminal history category, which, coupled with the offense level, would inform the district court's sentencing discretion. If the criminal history category is I, and the government does not contend that the category should be increased on the ground that it "substantially under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes," U.S.S.G.§ 4A1.3(a)(1), the defendant's sentence will be driven solely by the offense level for the offense of conviction—that is, the sentence necessary to satisfy the need for punishment or general deterrence will be more than enough to satisfy any need for specific deterrence.

If the defendant's criminal history category is greater than I, the parties may dispute whether the defendant's punishment for the offense of conviction should be greater on account of his past criminal behavior, see 18 U.S.C. § 3553(a)(2)(A), or, if not, whether such behavior predicts future criminality and thus warrants an additional period of incarceration to protect the public, see id.18

---

(6) the deterrent effect a particular sentence may have on the commission of the offense by others; and
(7) the current incidence of the offense in the community and in the Nation as a whole.

U.S.C. § 3553(a)(2)(C). Regarding the latter, the parties may point to factors that bear on the defendant's likelihood to recidivate but that the Commission did not take into account for policy reasons, such as age and drug abuse.[47] In the end, each party will arrive at a criminal history category, which, coupled with the offense level it proposes, will presumably support the sentence it is requesting the district court to impose.

## D. The District Court Proceeding

The sentencing hearing is framed by the competing positions of the parties, as expressed in their sentencing memoranda. The government seeks the most severe sentence the facts and circumstances of the case will allow. The defendant seeks leniency. The manner in which the district court conducts the sentencing

---

[47] Although the Commission settled on criminal history as the only measure of offender characteristics in the Guidelines, Congress listed in 28 U.S.C. § 994(d) a number of other offender characteristics the Commission could consider in devising the Guidelines:

(1) age;
(2) education;
(3) vocational skills;
(4) mental and emotional condition to the extent that such condition mitigates the defendant's culpability or to the extent that such condition is otherwise plainly relevant;
(5) physical condition, including drug dependence;
(6) previous employment record;
(7) family ties and responsibilities;
(8) community ties;
(9) role in the offense;
(10) criminal history; and
(11) degree of dependence upon criminal activity for a livelihood.

181

hearing is relevant to the parties' and the public's perception of whether the sentence imposed is fair or not. Gall, 552 U.S. at 50, 128 S. Ct. at 597. To ensure that it is fair, and thus perceived as such, the sentence must be subjected to the "thorough adversarial testing contemplated by the federal sentencing procedure," Rita v. United States, 551 U.S. 338, 352, 127 S. Ct. 2456, 2468 (2007), and the reasons for its imposition must be explained, id. at 356, 127 S. Ct. at 2468 ("Confidence in a judge's use of reason underlies the public's trust in the judicial institution. A public statement of [the judges's] reasons [for the particular sentence imposed] helps provide the public with the assurance that creates that trust."). Moreover, the judge's statement of reasons "allow[s] for meaningful appellate review." Gall, 552 U.S. at 39, 128 S. Ct. at 590.

The adversarial process the Supreme Court mandates involves five steps. After listing them in order, I address them in some detail to indicate what might take place in a typical case in which the parties cannot agree that the Guidelines sentencing range correctly approximates the § 3553(a)(2) purposes. First, the district court determines the Guidelines sentencing range. Id. at 49, 128 S. Ct. at 597; 18 U.S.C. § 3553(a); Fed. R. Crim. P. 32.[48] Second, turning to the prosecutor then to defense counsel, the court asks the parties for their sentence requests and

---

[48] "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point." Gall, 552 U.S. at 49, 128 S. Ct. at 596.

182

affords them an opportunity to present evidence relevant to each of the four §

3553(a)(2) purposes. Gall, 552 U.S. at 49–50, 128 S. Ct. at 596–97.[49] Third, the

court entertains the parties' arguments in support of their sentence requests. Id.

Fourth, the court determines whether the sentence either party proposes satisfies

each of § 3553(a)(2)'s purposes and the parsimony principle. Id. Fifth, the court

fashions a sentence that is sufficient, but not greater than necessary to meet those

purposes, explains how the sentence does this, and if the sentence deviates from

the Guidelines range or the parties' requests, gives the reasons for the deviation.

Id.

The first step of the sentencing hearing is to determine whether the

Guidelines sentencing range fixed by the PSI is correctly calculated.[50] By

"correctly calculated," I mean calculated per the instructions in the Guidelines

manual. At this stage, the court will resolve any disputes regarding whether the

manual's instructions were properly followed.

In the second step, the district court will entertain the parties' sentencing

requests. The government and then the defense will present evidence to support

---

[49] The record would already contain the evidence adduced at trial or the facts the defendant admitted in pleading guilty. But the parties may wish to present additional evidence relating to, for example, the circumstances of the offense listed in 28 U.S.C. § 994(c), or relating to the offender characteristics in § 994(d) (and specifically his potential for recidivism).

[50] In doing this, the court will have to resolve any Guideline issues the addendum to the PSI may disclose.

their requested sentences, and this evidence will often show why the Guidelines

recommendation is or is not appropriate in the given case.[51]  A party might

challenge the offense level the court has set by contending that the Commission's

generalized treatment of the offense—for example, the weights accorded to

characteristics in the base offense level or specific offense characteristics—is

inappropriate in the present case.[52]  Aside from relying on the circumstances that

"mitigate or aggravate the seriousness of the offense," the party might proffer

evidence concerning the "community view of the gravity of the offense," or "the

current incidence of the offense in the community."  This evidence, the party

would contend, is relevant to the § 3553(a)(2)(A)–(B) inquiry regarding the needs

for punishment and general deterrence.  Or, a party might challenge the criminal

history category the court has set by proffering evidence on characteristics such as

gender, race and ethnicity, employment status, educational attainment, and marital

status that the Commission did not consider in establishing the categories of

---

[51]  Because the Guidelines "reflect a <u>rough</u> approximation of sentences that <u>might</u> achieve § 3553(a)'s objectives," a party may argue that "the Guidelines sentence should not apply." <u>Rita</u>, 551 U.S. at 350–51, 127 S. Ct. at 2465 (emphasis added).  Perhaps the PSI's Guidelines calculation "fails properly to reflect § 3553(a) considerations, or perhaps . . . the case warrants a different sentence regardless." <u>Id.</u> at 351, 127 S. Ct. at 2465 (citing Fed. R. Crim. Pro. 32(f)).

[52]  When the Guidelines were mandatory, "a party seeking a departure generally accepted his base offense level as a starting point and then attempted to show that the case was atypical." <u>United States v. Rodriguez</u>, 406 F.3d 1261, 1287 (11th Cir. 2005) (Tjoflat, J.,  dissenting from the denial of rehearing en banc).  "[U]nder the new model the defendant can also simply concede that his case is typical and challenge the wisdom of the Commission's judgment regarding the appropriate punishment in heartland cases." <u>Id.</u>

offenders.[53]

In the third step, the court entertains the parties' arguments in support of their sentence requests.

The court then turns to the fourth step of determining whether either party's proposal meets the four sentencing purposes of § 3553(a)(2) and is the sentence "sufficient, but not greater than necessary to comply with" those purposes. Gall, 552 U.S. at 50, 128 S. Ct. at 597 ("[T]he district judge should . . . consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.").

Finally, the court moves to the fifth step and fashions a sentence which, depending on its fourth-step determination, may mirror a party's request. If neither side prevailed in the fourth step, the sentence the court imposes may be less than the government requested or more than the defendant requested.[54] The

---

[53] A report issued by the Sentencing Commission found that these factors correlated with recidivism. U.S. Sentencing Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines 11–13 (2004). The SRA instructed the Commission to "assure that the guidelines and policy statements are entirely neutral as to the race, sex, national origin, creed, and socioeconomic status of offenders." 28 U.S.C. § 994(d). A question I do not purport to answer is whether this provision limits the ability of the district court to consider these offender characteristics in determining a defendant's potential for recidivism under § 3553(a)(2)(C).

[54] I omit from this discussion the possibilities that the record supported a more punitive sentence than the one the government requested or a less punitive sentence than the one defense counsel requested.

court supports the sentence by making factfindings regarding the (a)(2) purposes[55] and explaining how the sentence is parsimonious to the driving § 3553(a)(2) purpose.[56] In the process, the court must also explain the reasons for any deviation from a party's request or the PSI sentencing range as established in step one.

After pronouncing a sentence, the court elicits the parties' objections in accordance with United States v. Jones, 899 F.2d 1097 (11th Cir. 1996). The objections are important for appellate review. They also give the court an opportunity to correct any errors it may have made, which if corrected to the objecting party's satisfaction will render an appeal unlikely.

---

[55] These facts may come from the PSI, the trial transcript or guilty plea, or evidence presented by the parties at the sentencing hearing. To the extent that the court intends to take judicial notice of facts, it should notify the parties in advance.

[56] Requiring that district court judges make factfindings on each of the (a)(2) purposes, identify the driving purpose, and explain how the sentence is parsimonious to the driving purpose is more than is currently required of district court judges. As the court's opinion points out, I have authored opinions in which I stated that the district court need not discuss each of the (a)(2) purposes in detail. I did so in adherence to circuit precedent. As we are now sitting en banc, I would overturn that precedent, and, despite the court's concern, see ante at 71, doing so would be entirely consistent with the Supreme Court's statements in Rita.

In Rita, the Supreme Court opined that "we cannot read [§ 3553(c)] (or our precedent) as insisting upon a full opinion in every case. The appropriateness of brevity or length, conciseness or detail, when to write, what to say, depends upon circumstances." Rita, 551 U.S. at 356, 127 S. Ct. at 2468. I agree. Sometimes—perhaps when the parties disagree over only minor points or when both parties seek a sentence within the range recommended by the Guidelines—a relatively brief explanation by the district court will suffice to support its finding and to allow appellate review. Other times—perhaps if the parties seek vastly different sentences or fiercely contest the evidence—the district court will necessarily have to provide a more detailed explanation to respond to the parties' arguments, to support its sentence, and to allow meaningful appellate review.

E. Appellate Review

1. Abuse of Discretion Explained

It is axiomatic that the appellate review of a sentence is conducted under the abuse of discretion standard. Rita, 551 U.S. at 351, 127 S. Ct. at 2465 ("'[R]easonableness' review merely asks whether the trial court abused its discretion."); Gall, 552 U.S. at 46, 128 S. Ct. at 594 ("Our explanation of 'reasonableness' review in the Booker opinion made it pellucidly clear that the familiar abuse-of-discretion standard of review now applies to appellate review of sentencing decisions."). Under this "familiar" standard, Gall, 552 U.S. at 26, 128 S. Ct. at 594, a district court abuses its discretion when it follows improper procedures, bases its decision on an incorrect interpretation of law or clearly erroneous factfindings, or when the reviewing court is left with the definite and firm conviction that the court committed a clear error of judgment in making the ultimate decision entitled to deference. Klay v. Humana, Inc., 382 F.3d 1241, 1251 (11th Cir. 2004). When conducting this review, the court of appeals may only consider evidence, arguments, and objections presented to the district court. See United States v. Weir, 51 F.3d 1031, 1032 (11th Cir. 1995).

The abuse of discretion standard governs a broad array of appellate inquiries; although the same basic framework applies to all these inquiries, how

that framework works in practice depends very much on the nature of the decision being reviewed.[57] See Am. Hosp. Supply Corp. v. Hosp. Products, Inc., 780 F.2d 589, 594 (7th Cir. 1985) (Posner, J.) ("[T]his phrase [abuse of discretion] covers a family of review standards rather than a single standard, and a family whose members differ greatly in the actual stringency of review."). The Supreme Court has said that "[w]hether discretion has been abused depends, of course, on the bounds of that discretion and the principles that guide its exercise." United States v. Taylor, 487 U.S. 326, 336, 108 S. Ct. 2413, 2419 (1988). In other words, examining what the district court inquiry looks like reveals how and to what the court of appeals defers. As I explained in part II, the sentencing inquiry is primarily a factual inquiry—the district court derives the ultimate sentence from a series of factfindings based on circumstantial evidence, credibility determinations, and sometimes conflicting evidence. In light of the nature of the district court's sentencing inquiry, I deconstruct the abuse of discretion standard and identify how its component parts apply to the district court's sentencing determination. Once simplified this way, the appellate court's task in reviewing sentences for abuse of discretion becomes clear.

I begin with the statement that a district court can abuse its discretion by

---

[57] The court in this case fails to grapple with the abuse of discretion standard in any meaningful way.

188

making a clearly erroneous factfinding. It is well established that a finding of fact is clearly erroneous when "although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been committed. . . . Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson v. Bessemer City, 470 U.S. 564, 573–74, 105 S. Ct. 1504, 1511 (1985) (quotation omitted). The sentencing inquiry is driven in large part by factfindings: the underlying facts regarding the § 3553(a)(2) factors,[58] the weight given to each piece of evidence, the district court's determinations regarding each § 3553(a)(2) purpose,[59] and the sentence necessary to satisfy each § 3353(a)(2) purpose are all factfindings. As such, the appellate court accepts these findings unless they are clearly erroneous.

A district court can also abuse its discretion by misinterpreting the law, although the fact-intensive nature of sentencing means that there will be fewer instances in which the district court abuses its discretion in this way. Nonetheless, the district court might misinterpret the law in two key ways.[60] First, it would be a

---

[58] For example, the defendant's conduct in committing the offense, circumstances about the defendant's background that bear on the offense, evidence about the defendant's mental or psychological condition, or evidence about the defendant's likelihood to recidivate.

[59] For example, how serious the offense was or how great of a need there is for general deterrence.

[60] I do not mean that there only two ways in which the district court can make a mistake of law, but I expect these two ways to be the most common.

misinterpretation of the law for the district court to fail to follow the adversarial

procedure required by Gall, which in part requires the court to elicit and consider

sentencing requests from the parties and to explain the reasons for its sentence in a

way that allows for the parties to object to any perceived errors and for the court

of appeals to meaningfully review the sentence.  Second, the district court would

misinterpret the law if it follows the correct procedural steps but its explanation

reveals that it misunderstood the nature of the sentencing inquiry.  This would

occur, for example, if the district court weighs the § 3553(a)(2) purposes against

each other instead of determining the sentence parsimonious to the driving

purpose or if the district court erroneously believes that it cannot consider relevant

evidence.[61]

---

[61] As this explanation shows, abuse of discretion through a misinterpretation of the law generally refers to errors in procedure or in the way the district court conducts its inquiry.  This is so because most of the district court's determinations during the sentencing process are factual determinations—how important each (a)(2) factor is, for example.  Because the other § 3553(a) factors roll into the (a)(2) inquiry, there are relatively few issues of law for the court of appeals to consider.

For example, the need for a sentence to satisfy the § 3553(a)(2)(A) purpose is a factfinding based on three subsidiary factfindings—the need for the sentence "to reflect the seriousness of the offense, to promote respect for the rule of law, and to provide just punishment for the offense"—which in turn are based on underlying factfindings regarding the offense and the offender (facts such as the offender's criminal history, his ties to the community, his conduct during the offense, and so on).  All of these factfindings are reviewed for clear error, and a clearly erroneous factfinding at any point in the process could render the subsequent factfindings that are based on it clearly erroneous as well.  Likewise, a factfinding regarding the need to satisfy an (a)(2) purpose could be clearly erroneous if the underlying circumstantial facts on which it is based do not support the finding.

By contrast, if the district court considers these facts in an impermissible way—for example, by believing that the seriousness of the offense must always be given more weight than the need for just punishment or the need to respect the rule of law in determining the need for a

Lastly, the court of appeals will reverse the sentence if the district court committed a clear error of judgment. This term must be applied carefully when reviewing a sentence, which necessarily turns very heavily on the district court's assessment of the facts. It seems that when courts use the phrase "clear error of judgment" in this context, they are frequently saying that the court improperly weighed the § 3553(a) factors. See, e.g., United States v. Westry, 524 F.3d 1198, 1222 (11th Cir. 2008) ("A remand for resentencing due to the unreasonableness of a sentence occurs only 'if we are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case.'"). As I have explained, however, the § 3553(a) factors fold into the (a)(2) purposes, and the (a)(2) purposes should not be weighed against each other; rather, the court should identify the (a)(2) purpose that drives the sentence and fashion a sentence parsimonious to that purpose. Moreover, the need to satisfy each (a)(2) purpose and which purpose will drive the

sentence to satisfy (a)(2)(A)—the court will have misinterpreted the law. Similarly, the district court would commit a legal error if it considers patently irrelevant evidence.

The difference is important: by proceeding this way, the court of appeals defers to the district court's factfindings so long as the district court properly understood the inquiry it was performing. The court of appeals thereby ensures that it reviews the facts as found by the district court instead of substituting its own findings regarding the (a)(2) purposes. This makes sense given that Congress designated the district court as the forum for the "main event" in sentencing. See infra part IV.

191

sentence are both factfindings, the review of which I have already described.

Therefore, for "clear error of judgment" to do any work in appellate review of a sentence, it must refer to the situation in which the court has imposed a sentence that is more or less than necessary to satisfy the driving purpose. But importantly, the appellate court is not to substitute its own judgment for that of the district court; rather, it must determine whether the district court committed a clear error of judgment by imposing a sentence that cannot be reconciled with its correctly interpreted law and not-clearly-erroneous facts. In some regards, this inquiry is akin to the inquiry an appellate court performs when determining whether the evidence submitted to a jury is sufficient to support the jury's verdict. Cf. United States v. Wright, 392 F.3d 1269, 1273 (11th Cir. 2004) (noting that we "will not overturn a conviction on the grounds of insufficient evidence unless no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt"). In the sentencing context, though, the appellate court is limited to the facts set forth in the district court's sentencing explanation, which shows what evidence the court deemed relevant and probative and how that evidence informed the court's decision.[62] Thus, focusing on the district court's

_____

[62] The court of appeals must limit its inquiry to the facts set out in the district court's sentencing explanation for the abuse of discretion standard to have any force. Otherwise, the court would be free to search the entire record and make its own factual findings. This, of course, would be inconsistent with the notion that the court of appeals must defer to the district court's proper exercise of discretion. If the district court wholly ignores relevant evidence or a

192

sentencing explanation, the appellate court asks whether—in light of the district court's factfindings, its explanation for the sentence, and any deviation from the Guidelines sentencing range and the parties' requests—any rational judge could have concluded that the sentence was "sufficient but not greater than necessary" to achieve the § 3553(a)(2) purposes. If the sentence imposed cannot be reconciled with the § 3553(a)(2) factfindings, the sentence must be vacated.

Deconstructing the abuse of discretion standard shows that appellate review of a sentence should be a clearly delineated, straightforward process. If the district court followed the proper procedures, the court of appeals will have a sentencing explanation that clearly explains the facts found by the district court, how they relate to the (a)(2) purposes, the driving (a)(2) purpose, and how the sentence is parsimonious to that purpose. From the record (which will include the parties' objections and the court's responses), the court will be able to determine whether any factfindings were clearly erroneous in light of the evidence presented. It will also be readily evident whether the district court properly understood the nature of the sentencing inquiry. From there, the court asks whether there are sufficient facts in the record to support the sentence—that is, it must determine

party's argument (and the party objects), the court will have erred by misinterpreting the law, which requires that it respond to evidence presented and arguments made by the parties. Fed. R. Crim. P. 32(i)(3)(B).

whether any reasonable judge could find, based on the facts clearly found in the

record, that the sentence imposed is parsimonious to the driving purpose.[63] With

this framework in mind, I now explain how the court of appeals should review

_____

[63] Consistent with the Supreme Court's explanation of sentencing review in Gall, many of our cases incorporate a boilerplate statement of the standard of review as consisting of two steps: procedural and substantive reasonableness. Our cases routinely include a statement like this:

> "We review sentencing decisions only for abuse of discretion, and we use a two-step process." United States v. Shaw, 560 F.3d 1230, 1237 (11th Cir. 2009). First, we must "ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence-including an explanation for any deviation from the Guidelines range." Id. (quoting Gall v. United States, 552 U.S. 38, 51, 128 S. Ct. 586, 597, 169 L. Ed. 2d 445 (2007)). If we conclude that the sentence is procedurally sound, the second step is to review the "substantive reasonableness" of the sentence, taking into account the totality of the circumstances, "including the extent of any variance from the Guidelines range." Gall, 552 U.S. at 51, 128 S. Ct. at 597.

United States v. Alfaro-Moncada, __ F.3d __, 2010 WL 2103442 (11th Cir. 2010). Nothing I say here is inconsistent with this language. My goal is simply to peel back the boilerplate language and explain how the abuse of discretion standard addresses the procedural and substantive unreasonableness concerns described in Gall and in our cases.

When a district court hands down a procedurally unreasonable sentence, it has abused it discretion by either making a clearly erroneous factfinding or by misinterpreting the law. All of the errors labeled as procedural in Gall—"failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence," 552 U.S. at 51, 128 S. Ct. at 597—are instances in which a district court has abused its discretion by making a clearly erroneous factfinding or by misinterpreting the law. If the sentence is procedurally reasonable (that is, no clearly erroneous factfindings and proper interpretation of the law), Gall instructs the courts of appeals to turn to the substantive reasonableness of the sentence. Id. Because the appellate court is not to substitute its own judgment for the district court's, id., substantive review means ensuring that the record supports the district court's determination that the sentence imposed is the one sufficient but not greater than necessary to satisfy the driving sentencing purpose, which is the clear error of judgment inquiry.

each step of the sentencing hearing I set out in the previous section.

## 2. Reviewing the Sentencing Hearing

Having carefully examined the abuse of discretion standard in the sentencing context, I now show how appellate review under that standard identifies abuses of discretion at each step of the sentencing hearing.[64] I posit a case in which a party contends that the district court failed to follow the five-step process.[65] The party also contends, alternatively, that, if the court followed that process, its rulings in at least one of the steps were erroneous.[66] The court of appeals considers each challenge seriatim, under the abuse of discretion standard; that is, it examines for clear error the facts on which the district court based its ruling and the district court's application of the law de novo. If the district court abused its discretion at any step, the inquiry ends there. The sentence must be

_____

[64] As the Supreme Court has emphasized in Rita and Gall, the process the district court employs to reach its sentencing decision is vitally important to the perception that the sentence handed down is fair. If the process is tainted, it matters not whether the sentence might appear to be fair; the sentence is perceived as tainted as well. What Gall and our cases routinely refer to as "procedural" review encompasses what appears in my discussion as steps one through four and the district court's explanation of the sentence at step five. What Gall and our cases refer to as "substantive" review involves only the final inquiry at step five—whether the record supports the district court's decision.

[65] It is well settled that a district court's failure to follow the prescribed process constitutes an abuse of discretion. Klay, 382 F.3d at 1251. In the case I posit in the text, the appellant challenges the district court's ruling in all five steps of the sentencing process. Because these steps reflect the process required by the law, failing to follow them demonstrates that the district court abused its discretion by misunderstanding the law.

[66] I am assuming that these challenges were presented to the district court in the form of objections and were preserved for appeal in accordance with United States v. Jones.

vacated, and the case remanded for resentencing.[67] If there is no abuse of discretion in a step, the court proceeds to the next.

Step one required the district court to determine the Guidelines sentencing range for the case. This determination is vulnerable to attack on two fronts: the district court's factual findings and its application of the Guidelines to the facts. If the factfindings are clearly erroneous, the district court abused its discretion. If the factfindings survive clear error review, the question becomes whether the court erred in applying the Guidelines to the facts. If in doing so the court made an "identifiable legal mistake" in interpreting the Guidelines or if it "clear[ly] err[ed]" in applying them, the court abused its discretion and the sentence must be vacated and the case remanded. See United States v. White, 335 F.3d 1314, 1317–19 (11th Cir. 2003).

At step two, the district court was required to give the government, and then defendant, the opportunity to present their sentence requests and to provide a factual basis in support of their proposals.[68] If the court failed to afford the parties the opportunity to present their case, it abused its discretion (by misinterpreting

---

[67] The step-by-step appellate review I describe includes application of the harmless error doctrine. In most cases—especially the mine run cases where the dispute centers on where within the Guidelines sentencing range the sentence should have been imposed—the review will focus on fewer than the five steps the district court took in fashioning the sentence.

[68] Because the government initiated the criminal proceeding, it has the burden of first going forward with its sentencing proposal.

the law requiring it to provide such an opportunity) and the defendant's sentence must be vacated.

At step three, the court must have given the parties the opportunity to argue—in light of all of the evidence presented at step two—that the sentences they have requested are supported by the § 3553(a) factors and are "sufficient but not greater than necessary" to achieve § 3553(a)(2)'s purposes. If the court failed to do this, it abused its discretion (by misinterpreting the law), and the sentence must be vacated.

Step four asked the district court to determine whether either party's sentence proposal fulfilled § 3553(a)(2)'s sentencing purposes, was not inconsistent with the remaining § 3553(a) factors, and satisfied the statute's parsimony requirement. If the court failed to engage in this process, it abused its discretion (by misinterpreting the law) and the sentence must be vacated.

Step five required the district court to select and explain a sentence supported by § 3553(a)'s factors and, moreover, a sentence "sufficient, but not greater than necessary" to meet § 3553(a)(2)'s objectives. If the sentence deviated from the Guidelines sentencing range for the case, the court had to set forth the reasons for the deviation. The first question the court of appeals must answer is whether the district court's explanation for the sentence is sufficient to permit

197

meaningful appellate review. Rita, 551 U.S. at 357, 127 S. Ct. at 2469. If not, the sentence should be vacated and the case remanded for further proceedings on the ground that the district court misinterpreted the law requiring it to provide such an explanation. The court of appeals also determines whether any facts relied on in the sentencing explanation were clearly erroneous. If the explanation is sufficient and the facts not clearly erroneous, the question becomes whether the record reasonably supports the district court's explanation and therefore the sentence. If it does, the district court did not commit a clear error of judgment and did not abuse its discretion.

In sum, appellate scrutiny of a sentence is performed through the classic abuse of discretion lens. This is consistent with Gall's command that a district court's sentence is reviewed for abuse of discretion whether inside or outside the Guidelines sentencing range. Gall, 552 U.S. at 51, 128 S. Ct. at 597. It is also consistent with the district court's sentencing expertise. The district court is unquestionably the best judicial actor to apply the fact-heavy and open-ended inquiry demanded by § 3553(a) and to fashion a sentence in accordance with the parsimony principle. See id. ("The sentencing judge is in a superior position to find facts and judge their import under § 3553(a) in the individual case.") (quotation omitted).

## III. Applying the Sentencing Model

Irey's sentence must be vacated and the case remanded because the court failed to explain its deviation from the Guidelines sentencing range and its denial of the Government's request and because it failed to make intelligible findings on two of the four § 3553(a)(2) purposes.

## A. Irey's Sentence

The Government charged William Irey with one count of sexual exploitation of children under 18 U.S.C. § 2251(c). In relevant part, § 2251 proscribes "employ[ing] . . . any minor to engage in . . . any sexually explicit conduct outside of the United States . . . for the purpose of producing any visual depiction of such conduct," and "transport[ing] such visual depiction to the United States." Id.[69] The statute carries a mandatory minimum of 15 years' imprisonment and a maximum of 30 years' imprisonment. Irey pled guilty and was sentenced to 17.5 years' imprisonment.[70]

_____

[69] As stated in the text, § 2251(c) makes it a crime to employ a single minor in committing the offense. Irey's indictment, however, alleged that he employed "minors" in committing the offense.

[70] Irey was sentenced not only for committing the offense alleged in the indictment, but for committing several uncharged offenses as well. In imposing sentence, the district court adopted the following provision:

> Pursuant to U.S.S.G. § 2G2.1(d)(1), if the offense involved the exploitation of more than one minor, Chapter Three, Part D (Multiple Counts) shall be applied as if the exploitation of each minor had been contained in a separate count of conviction. There were at least forty minors exploited. The highest offense level

# 1. Guidelines Calculation

Irey's sentencing process began with the presentence investigation. The PSI set out Irey's conduct in eighteen paragraphs. Because the court has already detailed that conduct, I will not replicate it here. Suffice it to say that Irey flew to Cambodia on numerous occasions, hired child prostitutes, photographed and videotaped himself having sex with them, brought the images back to the United States, and traded them on child pornography websites. The PSI found that Irey had abused over forty children.

Section 2G2.1 of the Guidelines applied, which carried a base offense level of 32.[71] The PSI found four specific offense characteristics, which increased the

> allowable by the guidelines is a level 43. If the exploitation of each of the forty minors is scored as if it were contained in a separate count, the offense level would be well over the available maximum level of 43. Therefore, only two groups were utilized in determining the offense level.

As the court's opinion correctly states, the Guidelines sentencing range (according to the PSI, which the district court adopted) called for life imprisonment, see ante at 12, whereas the statutory maximum penalty for Irey's one-count conviction was 30 years' imprisonment. The Principles of Federal Prosecution instructs that prosecutors, in advising the grand jury, recommend that the grand jury indict the putative defendant "with the commission of additional offenses when additional charges . . . are necessary to ensure that the . . . indictment . . . provides the basis for an appropriate sentence under all the circumstances of the case." Principles § 9-27.320. See supra note 41. I assume that the prosecutor knew that Irey would have to be charged with additional § 2251(c) violations in order to "provide[ ] the additional basis for an appropriate sentence under all the circumstances of the case," i.e., a sentence that would be commensurate with the Commission's Guidelines determination of what would be appropriate. The prosecutor either presented the grand jury with additional charges but it refused to indict, or did not present them at all.

[71] Section 2G2.1 covers three crimes: 18 U.S.C. §§ 1591 (sex trafficking of children), 2251 (sexual exploitation of children), and 2260 (production of child pornography for

offense level by 12: 4 levels because the offense involved minors under age twelve; 2 levels because the offense involved sexual contact; 2 levels because the offense involved distribution of child pornography; and 4 levels because the offense portrayed sadistic or masochistic conduct. Two more levels were added under the Guidelines' "multiple counts" rules because, under § 2G2.1(d), "whether specifically cited in the count of conviction or not, each such minor shall be treated as if contained in a separate count of conviction."[72] U.S.S.G. § 2G2.1 cmt. n.5. Finally, the PSI reduced the offense level by 3 levels based on its finding that two adjustments applied: 2 levels because Irey accepted responsibility for the crime, and 1 level because he provided timely notification of the intent to plead guilty. All told, Irey's total offense level was 43.

Because Irey had no criminal convictions, he fell into criminal history category I. An offense level of 43 and a criminal history category I yielded a Guidelines sentencing range of life imprisonment, which well exceeded the statutory maximum. The Government did not object to this calculation. Irey objected to the use of the 2006 Guidelines, the PSI's representation of his ability

importation to the United States).

[72] The probation officer applied the multiple counts rules for only two counts of conviction because "[i]f the exploitation of each of the forty minors is scored as if it were contained in a separate count, the offense level would be well over the available maximum level of 43." See supra note 70.

201

to pay restitution, and the PSI's statement that there were no grounds for departing from the Guidelines on the grounds that "Irey's psychiatric condition and his lack of a criminal record support a sentence below the advisory guideline range." In support, Irey attached a report of Dr. Fred Berlin, which explained Irey's psychiatric condition. (Def.'s Objection to Presentence Investigation Report 2.)

## 2. Sentencing Memoranda

The parties filed sentencing memoranda in advance of the sentencing hearing. The Government filed its memorandum first, which totaled five pages. After a two-paragraph recitation of the facts, the Government asked for a Guidelines sentence. Anticipating Irey's case for an outside-Guidelines sentence, the Government argued that U.S.S.G. § 5K2.0(b) governs departures in child sex abuse cases; § 5K2.0(b) only permits departures on grounds authorized by the Commission; and the Commission had not authorized departures on the basis of diminished capacity, aberrant behavior, or family ties and responsibilities. Although the Government recognized that Booker invalidated § 5K2.0(b), it urged the court to defer to Congress's policy preferences and pointed out that doing so would be consistent with § 3553(a)(5)'s instruction to take into account the Commission's policy statements. Finally, the Government argued that if the "case is atypical, it is because of aggravating, not mitigating, factors," and that Irey's

202

conduct and characteristics clearly fell within the heartland of the Guidelines.

Accordingly, the Government asked for a Guidelines sentence.[73]

Irey's eleven-page sentencing memorandum was more substantial. Irey argued that in light of his acceptance of responsibility, pedophilia, history as a positive contributor to society, lack of criminal history, and low risk of recidivism, a sentence below 30 years' imprisonment was reasonable. (See Def.'s Sentencing Mem. 1.) That said, Irey "acknowledged" the "serious nature" of his conduct and "conceded" that a substantial term of imprisonment was appropriate. (Id.) Accordingly, Irey asked for a sentence of 15 to 20 years' imprisonment followed by a substantial term of supervised release. (Id. at 11.)

In arguing for a below-Guidelines sentence, Irey cited three child pornography cases where a district court's downward variance was affirmed on appeal. Irey then focused on the § 3553(a) factors and the parsimony principle and argued that less than 30 years' imprisonment would be appropriate because: (1) at 50 years old, Irey would be an old man when released from prison even if he served just the 15 year minimum sentence; (2) Irey's expert psychological reports

---

[73] The Government's memorandum did not address how the Guidelines calculation fit the particular facts of the case in light of § 3553(a). The Government did not propose any § 3553(a) findings or identify how its proposed sentence fulfilled the § 3553(a)(2) purposes. Its only reference to any § 3553(a) factor was to (a)(5), which requires consideration of the Commission's policy statements. The Government did not cite any evidence beyond what was in the record and the PSI; it focused its arguments on the Guidelines.

demonstrated that he is a pedophile who had a "limited ability to control the behavior supporting the offense of conviction" and presented a "low risk of recidivism"; and (3) that Irey still had the support of his family. (Id. at 9.) Irey also briefly criticized the Guidelines in light of § 3553(a), arguing that some of the specific offense characteristics were cumulative. (Id. at 10.) In terms of evidence, Irey submitted two expert witness reports and numerous character letters from his family and friends.

### 3. Sentencing Hearing

The district court did not follow the sentencing hearing procedure I have outlined.[74] The sentencing hearing began with the district court adopting the PSI's findings of fact and Guidelines applications. But rather than hear argument on how well the Guidelines approximated the § 3553(a) factors, the court turned to Irey and his plea for mitigation.

Irey put on nine witnesses, including himself. His "star" witness, however, was a psychiatrist, Dr. Shaw. On direct examination, Dr. Shaw essentially testified that Irey was a pedophile who presented a "moderate to low risk of recidivism" based on "empirically validated actuarials." Before permitting cross-examination, the court asked Dr. Shaw whether pedophilia is an illness and

---

[74] This is not entirely surprising given the courts of appeals' confusion regarding the proper way to review sentences. See infra note 84.

whether a pedophile who acts out does so out of "rational free will." This resulted in the exchange that the court details and criticizes at length. See ante at 83–87. On cross-examination, the Government did not impeach Dr. Shaw in any meaningful way.[75] After Dr. Shaw, Irey put on eight character witnesses. Finally, Irey briefly testified to apologize for his crimes. After entering this evidence, Irey's counsel made his argument, which rehashed with some embellishment the argument contained in his sentencing memorandum.[76] At the end of the day, Irey

_____

[75] The Government simply had Dr. Shaw admit: (1) Irey was a pedophile with interest in children younger than 13; (2) the actuarials used had control groups that included rapists and pedophiles who were interested in children above the age of 13; (3) that depression and alcoholism do not cause pedophilia; and asked a series of questions designed to elicit the depth of the expert's knowledge of Irey's crime. (Sentencing Hr'g Tr. 21–24.)

[76] Among other points, Irey's counsel argued:

[W]e submit, Your Honor, that a 360-month sentence here is greater than necessary for Mr. Irey in light of the mitigation that's been presented.

There is no way to minimize . . . the gravity of the acts with which Mr. Irey is charged. You've heard the mental health professionals tell you that this is a compartmentalized area of his whole being that is a result of his pedophilia, which is a diagnostic criteria for psychiatric care.

What I gathered from Dr. Shaw's testimony and the best I could from Dr. Berlin's report is that the behavior of a pedophile is not totally volitional, that is, it is dictated in some degree by the disease itself. . . .

. . . .

[Irey] understands that he needs to be punished. . . . But he asks the Court to give him some consideration for the rest of his life, separate and apart from the crime he has committed.

. . . .

argued that a sentence of between 15 and 20 years' imprisonment with up to a lifetime of supervised release would be sufficient but not greater than necessary to comply with § 3553(a).

Then came the Government's case. The prosecutor put on no witnesses and offered no evidence with the limited exception of a few sample images it showed the court during the course of the argument. The prosecutor began her argument with the observation that "the defendant is not being prosecuted for being a pedophile . . . . As an alcoholic doesn't have to drive a car, a pedophile doesn't have to put themselves in a brothel in Cambodia, which this defendant did for years and years . . . ." (Sentencing Hr'g Tr. 53–54.) She then emphasized that this was not a child pornography possession case, but a production case and that Irey "ruined, just absolutely and forever ruined over 50 children's lives," sometimes smiling while he did it. (Id. at 54–55.) Asking the court to look at the sample images, the prosecutor explained that the children were between 4 and 6 years old and that Irey's distribution of the images over the Internet had made the pictures infamous. She encouraged the court to consider the offense, the

_____

You've heard that he's treatable. You've heard that he's a low risk of recidivism. That would make him 66 or 71 when he got out, if he served the entire sentence. He would be an old man. We ask you to consider a sentence less than the guideline's recommended sentence.

(Sentencing Hr'g Tr. 49–52.)

206

victimization, and the "message we send to people who would do this." (Id. at 55–56.) In the end, the prosecutor focused on the "viciousness" of Irey's crime—over 1200 images of "torture" and some of the worst child pornography the agents had ever seen—and asked the court to impose a 30 year sentence. (Id. at 56–57.)

### 4. District Court's Findings

After hearing from both parties, the court made its findings on the record. The court first explained its task:

> I take into account the guideline score and consider that as a benchmark in terms of imposing an appropriate sentence in a given case, and that benchmark needs to be kept in mind throughout the analysis . . . . But what I need to do after determining the guideline score is to look at the other 3553(a) factors on an individualized basis in an effort to determine an appropriate sentence for this particular case.

(Id. at 57.)

Without saying anything more about the Guidelines, the court launched into an analysis of the § 3553(a) factors, beginning with § 3553(a)(1)—the nature and circumstances of the offense and the history and characteristics of the offender. The court characterized the offense as "horrific": "The victims were numerous and perhaps the most vulnerable of the world's society. So I don't think that there's any question but we're dealing with here with an offense that rises to the very top

207

in terms of <u>seriousness</u> and its effect on other human beings." (<u>Id.</u> at 58 (emphasis added.)) Summarizing, the court found that "the seriousness" of the offense "certainly does not mitigate in favor of any leniency." (<u>Id.</u>) Turning to Irey's history and characteristics, the court found that Irey had been a good family man and community member, the acts that brought him before the court were "not purely volitional" and "due in substantial part to a recognized illness," and he had a "low" risk of recidivism. The recidivism finding turned on two points: (1) the court credited the expert testimony, and (2) Irey's age—as the court put it, "by the time he gets out of prison he'll most likely be at an age where recidivism would be unlikely, just from a physiological standpoint." (<u>Id.</u> at 59–60).

The court then skipped § 3553(a)(2)(A), jumping to § 3553(a)(2)(B) and (C). Regarding general deterrence, the court found that a serious sentence would "hopefully" deter others, but that conclusion might not "rationally follow[]" because of the illness of pedophilia. (<u>Id.</u> at 60.) Turning to specific deterrence, the court referred to its findings on § 3553(a)(1), reiterated that the mental health professionals categorized Irey as presenting a low risk of recidivism, and therefore found that society did not need "further protection from him, at least beyond the statutory minimum sentence." (<u>Id.</u> at 61.)

Finally, the court seemed to return to § 3553(a)(2)(A), stating "[i]t comes

down to my view of what promotes respect for the law and provides just punishment." (Id.) Here is the entirety of its discussion: "as indicated, I think that a 30-year sentence, given the personal factors that I have touched upon, is greater than necessary to accomplish the statutory objectives. On the other hand, in light of the seriousness of the crimes, I think a sentence above the mandatory minimum is called for." (Id.)

### 5. Final Sentence and Objections

The court immediately—without hearing any argument on the application of the parsimony principle to its findings—announced the sentence. The court settled on 210 months' imprisonment (or 17.5 years), a special assessment of $100, forfeiture, and a lifetime term of supervised release (which included a mandatory substance abuse and mental health program specializing in sex offender treatment). (Id. at 61–62.)

In accordance with Jones, the court then asked whether there was any objection to the sentence or the manner in which it had been pronounced. The prosecutor objected to "the extent of the variance, which is almost half, and based on the factors adduced in this record, particularly the seriousness and long-term nature of the offense, [that] the extent of that variance would be unreasonable." The court merely responded that the sentence was "more like 60 percent of the

guideline, not half." (Sentencing Hr'g Tr. 65.)

## B. Why the Sentence Must be Vacated and Remanded

Irey's sentence must be vacated and the case remanded for resentencing.

As I explained in part II.E, supra, a district court abuses its discretion in imposing

a sentence when it follows improper procedures, bases its decision on an incorrect

interpretation of law or clearly erroneous factfindings, or when the reviewing

court is left with the definite and firm conviction that the court committed a clear

error of judgment in making its sentencing decision. The Government objected to

Irey's sentence on substantive reasonableness grounds, and I would vacate Irey's

sentence on those grounds: the sentence imposed cannot be reconciled with the

district judge's factfindings on § 3553(a)(2)(A).[77]

When making his findings on § 3553(a)(1), the judge remarked that when

---

[77] I would also find that the district court followed improper procedures and committed legal errors by not following the model that I set forth, had the Government objected on those grounds. This is the case for at least two reasons. First, the district court failed to follow the requisite adversarial procedure. Importantly, it did not adequately address either the Guidelines recommendation or the Government's request for a 30 year sentence—that is, it neglected to articulate the reasons why such a sentence was greater than necessary to satisfy the § 3553(a)(2) purposes. Gall clearly indicates that the failure to explain a deviation from the Guidelines range constitutes error. Gall, 552 U.S. at 51, 128 S. Ct. at 597 (explaining that the court must "adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range"). Here, the court made no effort to explain why it sentenced Irey to 17.5 years' imprisonment when the Guidelines called for 30 years' imprisonment. Second, it is impossible for this court to determine which § 3553(a)(2) purpose drove the sentence.

This is not to be overly critical of the district court. In this circuit, the law governing sentencing has been at sea. This circuit's precedent has not made clear the steps a district court must follow, nor has it clarified the importance of making findings regarding the (a)(2) purposes. The district judge followed the procedural and substantive law as best he could discern it.

210

considering the "nature and circumstances" of the offense, the crime "r[ose] to the top" in terms of seriousness and that the "seriousness of the offense . . . did not mitigate in favor of any leniency." On (a)(2), after explaining why the need for specific deterrence counseled a sentence of no more than 15 years' imprisonment based on Irey's pedophilia, age, and family ties, the court turned to the sentencing purpose of punishment, (a)(2)(A). The entirety of the court's discussion on (A) was as follows:

> It comes down to my view of what promotes respect for the law and what provides just punishment. I think that a 30-year sentence, given the personal factors that I have touched upon is greater than necessary to accomplish the statutory objectives. On the other hand, in light of the seriousness of the crimes, I think a sentence above the mandatory minimum is called for.

(Id. at 61.)[78]

---

[78] Given the context and content of this finding, it is unclear that the court understood the proper § 3553(a)(2)(A) inquiry. The court did not explain what it meant by "personal factors." It may have been referring to Irey's low risk of recidivism, which it had just found. If so, the court erred because a finding on specific deterrence has no bearing on (a)(2)(A). As I note in part II.B, supra, culpability does bear on the (a)(2)(A) need. For this reason, criminal history can be relevant to (a)(2)(A). U.S.S.G. Ch.4, Pt.A, intr. comment. Even though criminal history might be relevant to both (a)(2)(A) and (a)(2)(C), that does not mean that the court's finding regarding specific deterrence (which will be based on a number of factors, including criminal history) has any bearing on the (a)(2)(A) need.

Of course, the court may have simply been referring to the same personal factors it had drawn on for the § 3553(a)(2)(C) analysis to set up an independent § 3553(a)(2)(A) analysis. Generally, considering an offender's personal characteristics for their impact on the need for just punishment for the offense and the need to promote respect for the law is permissible. For example, it stands to reason that someone who acts under duress is less culpable and therefore should receive less punishment than an ordinary offender. It also stands to reason that the court's failure to take account of that difference would promote disrespect for the law. In such cases, however, the court must explain its reasoning.

211

The inquiry a court should conduct on (a)(2)(A) involves three steps: (1) making findings regarding the seriousness of the offense, the need to promote respect for the rule of law, and the need for just punishment; (2) weighing the three considerations against each other; and (3) making findings on the sentence needed to meet the § 3553(a)(2)(A) purpose.[79] The district court, in making its (a)(2)(A) findings, failed to follow these three steps. While it mentioned the need to "promote[] respect for the law" and "provide[] just punishment," it made no intelligible findings on these inquiries and gave no indication that it had considered facts crucial to any determination of the need for "just punishment" and the need "to promote respect for the law" (for example, the sentences other offenders received).[80] Similarly, although the court stated here that the seriousness of the offense "called for" "a sentence above the mandatory minimum," it made no specific findings on the seriousness of the offense when conducting the (a)(2)(A) inquiry. I do know, however, what the court would find on the seriousness of offense from what it said during the (a)(1) inquiry. There, it found that the offense was "horrific," "rises to the very top in terms of

---

[79] The court's narrow focus on Irey's personal characteristics belies that it was conducting this analysis.

[80] It is unclear why the court omitted the "seriousness of the offense" when it said "it comes down to my view of what promotes respect for the law and what provides just punishment." It may have been because the court thought it had settled the issue of the seriousness of the offense during the § 3553(a)(1) inquiry.

seriousness," and that "in terms of the . . . seriousness of [the offense], the long-standing, long-term engagement in it certainly does not mitigate [sic] in favor of any leniency."

Therefore, all I know about the district court's findings on (a)(2)(A) is that it found the offense to be very serious. It is inconceivable that the judge's finding on seriousness of the offense alone would translate into a sentence at the bottom half of the statutory sentencing range of 15 to 30 years, let alone a sentence only two and a half years above the statutory minimum. The court, in conducting its (a)(2)(A) inquiry, may have concluded that the three relevant considerations were in tension—with the seriousness of the offense counseling a sentence at or near the top of the statutory range, but, for example, with Irey's impaired volition and advanced age decreasing the need for just punishment and respect for the law. If this were the case, the evidence in the record could support a sentence of 17.5 years,[81] but it is not our province to make this explanation for the judge. Without making intelligible findings on just punishment and respect for law, and without explicitly weighing the three inquiries and reaching a conclusion on how they bore

_____

[81] On the other hand, if the district court's findings on just punishment and respect for the law were consistent with his finding on the seriousness of the offense, (a)(2)(A) would drive Irey's sentence, and a sentence of 17.5 years could not be reasonable. Because the judge's findings on (a)(2)(A)—unlike the three subsidiary inquiries under (a)(2)(A)—cannot be weighed against the other (a)(2) factors, the sentence imposed would have to be harsh enough to satisfy the strong (a)(2)(A) need.

on the (a)(2)(A) need, I simply cannot say on appellate review that the sentence imposed was supported by the district court's factfindings. All I have is the district court's finding on the seriousness of the offense, and I know that it cannot be reconciled with the sentence imposed. No rational judge could have sentenced Irey to 17.5 years based on the only intelligible finding—that seriousness rose to the top for this "horrific" crime.[82] I would therefore vacate Irey's sentence on the ground that it is not supported by the district court's findings, as I am able to understand them.[83]

---

[82] Contrary to the court's characterization of my opinion, I would not vacate Irey's sentence on the ground that the district court's findings are insufficiently "detailed" or "lacking in specificity or effort." Ante at 68, 72. My point is not, as the court implies, that a district court's findings need be of a certain length or belabor unnecessary points.

My point on substantive reasonableness is that a district court's findings must be reconcilable with the sentence imposed. Had the district court imposed a sentence that was reconcilable with the (a)(2)(A) findings it made, I would not vacate Irey's sentence on substantive reasonableness grounds, even if the district court had failed to make proper (a)(2)(A) findings on respect for the law and just punishment. In this instance, I would vacate the sentence because the findings the district court made on the seriousness of the offense cannot be reconciled with the sentence imposed, and given the district court's failure to properly address the other (a)(2)(A) considerations, I cannot assume that they balanced the court's finding on seriousness of the offense.

[83] It is also unclear what the district judge's findings on general deterrence were and whether they supported the sentence, though I need not address this question because it is clear that the sentence imposed was not supported by the judge's findings on (a)(2)(A). Here is the entirety of the court's discussion of § 3553(a)(2)(B):

There are other aspects of the statute that essentially are subjective in nature. Of course, adequate deterrence to criminal conduct. I mean a serious sentence is hopefully going to deter others from conducting similar affairs, although when we're dealing with an illness like this, I'm not sure that that rationally follows. But, nevertheless, deterrence is an appropriate consideration, and a stiff sentence is in keeping with the seriousness of this offense.

I would remain Irey's sentence to the district court so that the district court can make (a)(2) findings and resentence Irey accordingly—rather than making our own (a)(2) findings to determine whether the sentence is reasonable. To do so, we would have to step out of our role as a reviewing court and assume the role of resentencer. As I now explain, this is precisely the error the court makes today.

## IV. The Court's Approach

Today, the court needlessly assumes the role of resentencer. In so doing, it cements this circuit's answer to a question that continues to vex the nation's courts of appeals: after <u>Booker</u>, what does appellate review of sentences for substantive "reasonableness" under an abuse of discretion standard mean?[84] The

---

(<u>Id.</u> at 60.)

The court's statement that general deterrence is "essentially subjective in nature" indicates that the court did not understand the § 3553(a)(2)(B) inquiry. The inquiry includes the incidence of the crime in the community and the community view of the offense. The court should have taken into account its earlier finding that child pornography is an "epidemic," driven by its ready availability on the Internet. Regardless, it is unclear what the court found at the end of the day regarding the need for general deterrence—whether it reasoned that the need for general deterrence should be discounted because of the illness of pedophilia or whether the need for general deterrence was great and counseled a harsh sentence. If it were the latter, the sentence imposed may not be sufficient to satisfy the need for general deterrence as found by the district judge.

[84] The federal courts of appeals, including this court, approach substantive reasonableness review inconsistently. This is not surprising since, as the Supreme Court itself has recognized, "<u>Apprendi</u>, <u>Booker</u>, <u>Rita</u>, <u>Gall</u>, and <u>Kimbrough</u> have given the lower courts a good deal to digest over a relatively short period." <u>Spears v. United States</u>, 129 S. Ct. 840, 845 (2009) (per curiam) (quotation omitted). Specifically, the courts and their judges differ in the amount of deference they purport to afford the district court's weighing of the § 3553(a) factors. <u>Compare</u> <u>United States v. Pugh</u>, 515 F.3d 1179, 1191 (11th Cir. 2008) ("[W]e may find that a district court has abused its considerable discretion if it has weighed the factors in a manner that demonstrably yields an unreasonable sentence. We are therefore still required to make the

---

correct answer, as I demonstrate in parts III and IV, <u>supra</u>, is to apply classic

abuse of discretion review.  The court's answer is shocking: a simple objection

that a sentence is "unreasonable" grants a disappointed party the functional

equivalent of a new sentencing hearing before the court of appeals.  The court

considers evidence and arguments never offered to the district court, makes new

findings, reweighs the § 3553(a) factors, and concludes as a matter of law that

William Irey must be sentenced to 30 years' imprisonment.  In the process, the

---

calculus ourselves . . . .") <u>and</u> <u>United States v. Tomko</u>, 562 F.3d 558, 585-86 (3d Cir. 2009) (Fisher, J., dissenting) ("As the remainder of our analysis reveals, the District Court's over-reliance on § 3553(a)(1) as justification for the significant qualitative and quantitative variance it granted pales in comparison to the numerous § 3553(a) factors which suggest that a term of imprisonment is warranted . . . .  [W]e conclude that the relevant § 3553(a) factors advocate in the strongest possible terms for a sentence including a term of imprisonment.") <u>with</u> <u>Tomko</u>, 562 F.3d at 574 (majority opinion) ("Accordingly, the substantive reasonableness of each sentence must be evaluated on its own terms, <u>based on the reasons that the district court provided</u>, in light of the particular facts and circumstances of that case.") (emphasis added) <u>and</u> <u>United States v. Smart</u>, 518 F.3d 800, 808 (10th Cir. 2008) ("We may not examine the weight a district court assigns to various § 3553(a) factors, and its ultimate assessment of the balance between them, as a legal conclusion to be reviewed de novo.").

       Moreover, appellate courts and circuit judges across the country have openly expressed confusion about the appropriate role of appellate courts.  <u>See, e.g.</u>, <u>United States v. Feemster</u>, 572 F.3d 455, 467 (8th Cir. 2009) (Colloton, J., concurring) ("[O]ne searches in vain for a principled basis on which to conduct a consistent and coherent appellate review for reasonableness."); <u>United States v. Funk</u>, 534 F.3d 522, 530 (6th Cir. 2008) (Boggs, C.J., dissenting) ("This case represents essentially a judgment call under the rather unclear standard of 'reasonableness' that we have been given by the Supreme Court in the wake of <u>Rita</u>, <u>Kimbrough</u>, and <u>Gall</u>.").  Likewise, commentators have noted the Supreme Court's seemingly contradictory imperatives.  <u>E.g.</u>,Frank O. Bowman, III, <u>Debacle: How the Supreme Court has Mangled American Sentencing Law and How It Might Yet Be Mended</u>, 77 U. Chi. L. Rev. 367, 459–60 (2010) (claiming that the Supreme Court's entire line of Sixth Amendment sentencing cases presents a "tangle of rules and exceptions" that "is obviously neither simple nor, as illustrated at length above, logical");  Lindsay C. Harrison, <u>Appellate Discretion and Sentencing after Booker</u>, 62 U. Miami L. Rev. 1115, 1115–16 (2008) ("What has resulted is primarily confusion about the role of the appellate courts in reviewing sentences.  Several often seemingly conflicting imperatives are at play after <u>Booker</u> . . . .").

court does immense and immeasurable institutional damage.  Part A sets out the court's approach; Part B explains the harm that it causes.

## A. Appellate Resentencing

According to the court, the question presented is whether Irey's sentence is "reasonable."  Ante at 35.  In determining whether the sentence is "reasonable," the court unabashedly explains that its job is to take the facts found by the district court and any others it finds in the record, and then make its own findings for each § 3553(a) factor.  Id. at 58–59.  After making its own findings, the court reweighs the § 3553(a) factors and determines for itself what range of sentences is reasonable.  Id. at 58 ("In order to determine whether that has occurred, we are 'required to make the [sentencing] calculus ourselves' and to review each step the district court took in making it.") (quoting United States v. Pugh, 515 F.3d 1179, 1191 (11th Cir. 2008)).  By "reasonable," the court means the sentencing range that it thinks is objectively correct to satisfy the sentencing purposes of § 3553(a).

The court even goes so far as to declare, incorrectly and without any support, that the weight of facts under § 3553(a) presents a question of law.  Id. at 59 ("[T]he importance of facts in light of the § 3553(a) factors is not itself a question of fact but instead is an issue of law.") (emphasis added); id. at 118, n.33 (justifying the court's new finding on the need for specific deterrence in sex crime

217

cases because "[n]o member of this Court . . . has ever before suggested that in determining the law we ought to confine ourselves to the decisions that were cited in the district court") (emphasis added).[85]

In reaching this conclusion, the court disregards the Supreme Court's analysis in Gall. See, e.g., Gall, 552 U.S. at 56–57, 128 S. Ct. at 600–602, (reversing the Eighth Circuit because "[a]lthough [it] correctly state[ed] that the appropriate standard of review was abuse of discretion, it engaged in an analysis that more closely resembled de novo review of the facts presented" by, for example, concluding that the district court "gave too much weight to Gall's withdrawal from the conspiracy") (quotations omitted); United States v. Smart, 518 F.3d 800, 808 (10th Cir. 2008) (reversing precedent as inconsistent with Gall that had reviewed "de novo the weight assigned to various § 3553(a) sentencing factors because we considered this weighing process to be a question of law."). It also ignores this circuit's precedent—we have repeatedly held that "[t]he weight given to any § 3553(a) factor is within the sound discretion of the district court and we will not substitute our judgment in weighing the relevant factors." E.g.,

_____

[85] The court does not seem to be claiming that whether a fact is relevant, in the evidentiary sense, presents a question of law. Rather, the court says that a given fact's "importance," that is, weight, in deciding a § 3553(a) issue presents a question of law. See ante at 60 (explaining that the district court cannot write facts out of the record by ignoring them, even if it reflects the court's judgment that "those facts are not important" to the § 3553(a) inquiry).

United States v. Amedeo, 487 F.3d 823, 832 (11th Cir. 2007); United States v.

Gardner, 363 Fed. App'x 688, 690 (11th Cir. 2010) (unpublished); United States

v. Pertil, 344 Fed. App'x 569, 573 (11th Cir. 2009) (unpublished).[86]

Whatever the case, because questions of law are reviewed de novo even

under the abuse of discretion standard,[87] the court does not give—or even think it

owes—deference to the district court's § 3553(a) analysis.  See ante at 44–45

("Section 3553(a) plays a critical role in appellate review of sentences, just as it

does in the initial sentencing decision" and the court of appeals must "apply those

same factors in determining whether a sentence is reasonable.") (emphasis added).

The court purports to apply abuse of discretion because it will give some

---

[86]  Though the court is convinced that it is not committing the same mistake as the Eighth
Circuit in Gall—conducting an inquiry of the § 3553(a) factors akin to de novo review—there
are striking similarities between the two analyses.  Compare United States v. Gall, 446 F.3d 884,
889 (8th Cir. 2006) ("First, the district court gave too much weight to Gall's withdrawal from the
conspiracy because the court failed to acknowledge the significant benefit Gall received from
being subject to the 1999 Guidelines."), rev'd 552 U.S. 38, 128 S. Ct. 586, and id. at 891 ("[T]he
district court did not properly weigh the seriousness of Gall's offense.  While the district court
observed that Gall's offense level did not adequately reflect the offense conduct because it was
based 'solely on drug quantity,' the district court ignored the serious health risks ecstasy
poses."), with ante at 92–95 ("The facts about Irey as a husband, father, and member of the
community  are not disputed, the question is how to weigh them for sentencing purposes. . . .
We would find grossly unreasonable, however, any suggestion that the credit Irey may be due
for his family's feelings for him could even remotely approach the heavy weight stacked against
him for the criminal acts he committed."), and ante at 123 ("With child sexual abuse of the kind
that we know Irey is capable of and has committed . . . . [E]ven with an assumed low risk of
recidivism following release in 15 years and 3 months, imprisonment for that length of time does
not afford adequate protection from further crimes by him.").

[87]  See Koon v. United States, 518 U.S. 81, 100, 116 S. Ct. 2035, 2047 (1996)
("[W]hether a factor is a permissible basis for departure under any circumstances is a question of
law, and the court of appeals need not defer to the district court's resolution of the point.").

deference to a district court's <u>conclusion</u>. Specifically, the court notes that "[a] district court's sentence need not be the most appropriate one, it need only be a reasonable one" and because "we are to vacate the sentence if, but only if, we are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors." <u>Id.</u> at 60, 62 (quotation omitted). But the line between "unreasonable" and "most appropriate" blurs. And it blurs quickly when the court conceives of its role as to conduct the § 3553(a) inquiry for itself and identify the range of sentences the district court could have reasonably imposed (as opposed to reviewing the district court's reasoning from its § 3553(a) factfindings to its conclusion). Once the court of appeals has independently identified what it believes is the range of permissible sentences (explicitly or implicitly), appellate review becomes an inquiry into whether the district court's sentence falls within the range of sentences it, the court of appeals, would have imposed. This approach amounts to <u>de novo</u> review in the guise of abuse of discretion. See <u>Curtiss-Wright Corp. v. Gen. Electric Co.</u>, 446 U.S. 1, 10, 100 S. Ct. 1460, 1466 (1980) (instructing that when conducting abuse of discretion review, the role of appellate courts is not to "reweigh the equities or reassess the facts but to make sure that the conclusions derived from [the district court's] weighings and assessments are judicially sound and supported by the

220

record.").[88]

What is worse, the court does not confine its new analysis of the § 3553(a)

factors to the evidence, arguments, and objections offered to the district court.[89]

---

[88] The court relies on United States v. Taylor, 487 U.S. 326, 108 S. Ct. 2413 (1988), for the proposition that courts of appeals must scrutinize a sentencing decision more closely because a sentence is arrived at by considering a number of statutory factors. Ante at 59–60 & n.15. In Taylor, though—which addressed only the issue of whether a district court abused its discretion by dismissing charges with prejudice when the Government committed a Speedy Trial Act violation—the Supreme Court specifically limited its analysis to whether the factfindings supported the decision to dismiss the charges with prejudice. The Court started with the district court's order—dismissing the charges with prejudice—and then looked to see whether the record supported that conclusion. Ultimately, because the district court did not fully explain its reasoning, the Court held that "[t]he District Court failed to consider all the factors relevant to the choice of a remedy under the Act. What factors it did rely on were unsupported by factual findings or evidence in the record." Taylor, 487 U.S. at 344, 108 S. Ct. at 2423. Finding insufficient support in the record for the district court's decision and refusing to conjure its own explanations, the Court held that the district court abused its discretion. Tellingly, the court did not conduct the Speedy Trial Act remedy inquiry for itself: It did not reach its own conclusions on the way each Speedy Trial Act factor cut and it did not decide whether the case should be dismissed with or without prejudice. Rather, because the decision is left to the district court's discretion, the court simply returned the question to it for reconsideration.

[89] The court contends that "much" of my criticisms on this score stem from the "faulty premise that the government made only a 'simple objection' that Irey's sentence is 'unreasonable.'" Ante at 138 n.44. With this mischaracterization of my position in hand, the court purports to defeat it by citing a number of our cases reaching the uncontroversial conclusion that a party need not repeat in the Jones colloquy arguments it had already made to the district court. See, e.g., United States v. Weir, 51 F.3d 1031, 1032 (11th Cir. 1995) (declining to apply the waiver rule when the district court "clearly understood the [party's] position and specifically rejected it.").

My criticism is different. It is true that a general objection will preserve more specific arguments a litigant actually made to the district court, id., but a general objection does not preserve specific arguments that a litigant never made. Here, for example, the Government did argue in general terms that only a 30-year sentence would be reasonable due to the seriousness of Irey's crimes. But the Government did not contend—as the court does today—that the good behavior credit would reduce Irey's sentence, or that such a sentence would amount to " less than four months for each of [Irey's] 50 victims." Ante at 103. Had the Government made these arguments and the others the court considers for the first time here, the district court may have imposed a different sentence. Since the Government did not, we may not consider them for the first time on appeal.

In so doing, the court ignores well-established rules of appellate procedure and implicitly overrules United States v. Jones, 899 F.2d 1097, 1102 (11th Cir. 1990) overruled on other grounds by United States v. Morrill, 984 F.2d 1136 (11th Cir. 1993) (en banc).[90]  In Jones, this court explicitly ruled out considering new arguments and evidence in sentencing appeals.  Thus, without explanation or apology, the court works a revolution in the rules governing the scope of review. The court's willingness to do so underscores that its conception of substantive reasonableness review bears no resemblance to traditional abuse of discretion review.[91]

---

[90]  Any conclusion that objecting to a sentence's "substantive unreasonableness" triggers the functional equivalent of a new sentencing hearing on appeal is tantamount to overruling Jones.  Jones required that the district court have the first opportunity to correct its errors; an objection that a sentence is "substantively unreasonable" without explaining why does not give the court that opportunity.

[91]  In United States v. Brown, 415 F.3d 1257 (11th Cir. 2005), this court discussed abuse of discretion review in another fact-heavy, individualistic context.  There, the issue was whether expert testimony could be admitted under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786 (1993).  This court explained in some detail the reasons for abuse of discretion review, most notably that the "rules relating to Daubert issues are not precisely calibrated and must be applied in case-specific evidentiary circumstances that often defy generalization" and that "we don't want to denigrate the importance of the trial."  Brown, 415 F.3d at 1266.  On appeal, this court did not reweigh the Daubert factors to determine whether the district court abused its discretion.  Instead, this court explained that even though the expert evidence met only one of the four Daubert factors, we could not say that in this "particular situation" the district court abused its discretion, especially "given the heavy thumb—really a thumb and a finger or two—that is put on the district court's side of the scale."  Id. at 1268.
The same should be true with sentencing.  Sentencing decisions defy precise calibration and must be applied to the unique facts of specific cases.  District courts are uniquely suited to make the judgment demanded by § 3553(a) and the parsimony principle, and reopening the record on appeal certainly diminishes the importance of the sentencing hearing.

Instead, the court conducts a free-wheeling inquiry—conjuring new arguments and citing new evidence. With respect to § 3553(a)(1), for example, the court creates for the first time an argument that the district court's view of Irey as a victim "permeated" and "tainted" the court's weighing of the § 3553(a) factors, although the prosecutor never objected to the characterization of Irey as a victim. Ante at 80–81.[92] The court also argues, for the first time, that the district court clearly erred when it found that Irey's misconduct was "not purely volitional," and that even accepting the district court's finding on volition, the case would still fall in the heartland because almost all pedophiles are child molesters.[93] Id. at 84–87. To prove both of these points, the court cites to expert

[92] When I say "for the first time," I mean that these arguments were not made to the district court.

[93] I recognize, of course, that after the court explains why the finding was clearly erroneous, it states that it accepts the finding because the Government did not challenge it on appeal. But see ante at 84–85. If the court is truly accepting the finding, however, I do not understand why the court takes the time to conjure new evidence and arguments.

It could be that though the court ostensibly accepts the district court's volitional finding, its explanation that it is clearly erroneous is very important to its analysis. The court ultimately concludes that the finding "cannot reasonably carry much weight" because, at least in part, it is clearly erroneous. Id. If the court really accepted that Irey's misconduct was "due in substantial part" to diminished capacity, id. at 85, it could not conclude—as it ultimately does—that the district court would have abused its discretion as a matter of law if it had imposed a sentence of even one day less than the statutory maximum. See id. at 137 ("Nothing less than the advisory guidelines sentence of 30 years, which is the maximum available, will serve the sentencing purposes set out in § 3553(a).").

In any event, my point is that when reviewing sentences, this court should not consider or conjure evidence and arguments that have never been offered to the district court. That is inconsistent with classic principles of appellate review and will cause immense damage to the institutional relationship we have with the district courts of this circuit.

evidence never offered to the district court.[94]  See id. at 83, 87 (citing Bruce J.

Winick, Sex Offender Law in the 1990s: A Therapeutic Jurisprudence Analysis, 4

Psychol. Pub. Pol'y & L. 505, 524 (1998), and Ryan C.W. Hall & Richard C.W.

Hall, A Profile of Pedophilia: Definition, Characteristics of Offenders,

Recidivism, Treatment Outcomes, and Forensic Issues, 82 Mayo Clinic Proc. 457,

458 (2007)).

Nor did the Government ever argue, as the court does, that the district court

clearly erred in finding that Irey had good character and had contributed positively

to his family and community.  See id. at 89–95 (contending that, categorically,

anyone who commits the crime Irey committed and causes his family to lose its

business and home cannot be a good family man and have good character).  Nor

did the Government argue to the district court that it should not have considered

Irey's old age in his favor because to do so would reward him "for evading

detection and it is unreasonable to do that."  Id. at 96.

Similarly, in reweighing each of the § 3553(a)(2) purposes, the court

conjured new arguments and cited new evidence never heard by the district court.

Regarding the need for punishment, the Government never argued, as the court

---

[94]  Though I label this expert "evidence," it is not technically evidence because it was not entered into the record.  A more apt term might be "extra-record information."  Vining v. Sec'y, Dep't of Corr., No. 07-15681, slip op. at 4 (11th Cir. June 28, 2010).  Nevertheless, because it performs the function of evidence in the court's analysis, I refer to it as such.

does, that the good behavior credit would reduce Irey's sentence to 15.5 years, which amounts to "less than four months for each of [his] 50 victims." Id. at 103. Nor did the Government argue that Irey's sentence does not reflect the seriousness of the offense because he received only 2.5 years longer than the 15 years he would have served had he taken one lewd picture of a 17-year-old girl. Id. at 104.

With respect to general deterrence, the court's entire analysis would be new to the district court. The Government never argued that the need for general deterrence is especially compelling in the child pornography context. But see id. at 108–12. The Government never pointed to Supreme Court cases underscoring that importance, or to appellate cases reversing district courts for questioning the logic of general deterrence when pedophilia was involved. But see id.

The Government completely ignored specific deterrence at the sentencing hearing.[95] The Government never questioned, as the court does today, the district court's finding that a 65-year-old male would be too old for sexual activity from a "physiological standpoint." But see id. at 114–15. Obviously then, the Government did not cite to published opinions involving sex offenders over age 60 to make this point. But see id. at 115–16. Nor did the Government enter

---

[95] In fact, the Government stipulated that Irey fell into criminal history category I, which in essence means the Government stipulated that no prison time beyond that called for by his offense level was needed for specific deterrence. Accordingly, the Government never argued, for example, that Irey's criminal history category under-represented his potential for recidivism.

expert evidence about the comparatively high recidivism rates of older sex offenders. But see id. at 117 (citing Mark Motivans & Tracey Kyckelhahn, Federal Prosecution of Child Sex Exploitation Offenders 2006, Bureau Just. Stat. Bull., Dec. 2007 for the proposition that 7.3% of all sex offenders are over 60, and Ryan C.W. Hall & Richard C.W. Hall, A Profile of Pedophilia: Definition, Characteristics of Offenders, Recidivism, Treatment Outcomes, and Forensics Issues, 82 Mayo Clinic Proc. 457 (2002), for the proposition that up to 44% of pedophiles were in the older adult range (age 40 to 70 years) and that pedophiles "offend in their later years at a greater rate than other sexual offenders").

Still on specific deterrence, the Government never argued that a lifetime of supervised release would be insufficient to protect the public by pointing to Bureau of Justice statistics, other expert evidence, and cases demonstrating that it is possible to recidivate when under supervision. But see id. at 118–21 (citing Bureau of Justice Statistics, Dep't of Justice, Federal Criminal Justice Trends, 2003, (2006); Loretta J. Stalans, Adult Sex Offenders on Community Supervision: A Review of Recent Assessment Strategies and Treatment, 31 Crim. Just. & Behav. 564 (2004); James L. Johnson, Sex Offenders on Federal Community Supervision: Factors that Influence Revocation, Fed. Probation, June 2006; Patrick A. Langan et al., Bureau of Justice Statistics, Recidivism of Sex Offenders

Released from Prison in 1994 (2003); 2009 Annual Report of the Director: Judicial Business of the United States Courts (forthcoming spring 2010); Protecting Our Nation's Children from Sexual Predators and Violent Criminals: What Needs to Be Done?, Hearing Before the Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary, 109th Cong. 30 (2005) (statement of Fred S. Berlin, M.D., Associate Professor, Johns Hopkins University)).

Finally, with respect to § 3553(a)(6), the Government never argued that Irey's sentence would produce unwarranted disparity. Obviously, then, it never cited twelve cases for the proposition that the defendants in those cases committed a less serious crime than Irey but received a more serious sentence. Id. at 130–34.

If the court's analysis leaves any doubt that the court has assumed the role of resentencer, its conclusion removes it. After conducting the functional equivalent of a new sentencing hearing, the court concludes that "[n]othing less than the advisory guidelines sentence of 30 years, which is the maximum available, will serve the sentencing purposes set out in § 3553(a)." Id. at 137. Accordingly it vacates Irey's sentence and remands the case with the instruction that the district court impose a sentence of 30 years' confinement. Id. at 140–41. With this unprecedented step, it is indisputable that the court has resentenced Mr.

227

Irey.[96]

* * *

After today's opinion, it is the law of this circuit that a party who is disappointed by the sentence the district court has imposed may apply to this court for resentencing.[97] Except for live testimony, the disappointed party can brief evidence never offered and arguments never articulated to the district court. From its new vantage point, this court will then second-guess the district court's sentence. We will determine the range of objectively correct sentences based on the new facts and new arguments; if the sentence handed down by the district court falls outside of that range, we will reverse. Sometimes, that range could be a single point. Here, the court holds that any sentence other than 30 years' imprisonment would constitute an abuse of discretion—if the district court had sentenced Irey to 29 years, 11 months, and 29 days, it would have abused its

---

[96] Though we have reversed sentences on substantive reasonableness grounds before, we have never ordered the district court to impose a particular sentence. See, e.g., United States v. Livesay, 587 F.3d 1274, 1278–79 (11th Cir. 2009) (vacating a sentence and instructing that imprisonment was required but leaving the length of the term to the district court's discretion); Pugh, 515 F.3d at 1204 (remanding without stating what the sentence should be); United States v. Martin, 455 F.3d 1227, 1241–42 (11th Cir. 2006) (same); Crisp, 454 F.3d at 1291–92 (same).

[97] In this case, the Government is the disappointed party. But suppose the defendant were the disappointed party, claiming that the sentence the district court imposed was so severe as to be "unreasonable." If the defendant had sandbagged the district court by withholding evidence that mitigated the need for punishment and by failing to cite the sort of published authorities cited in the court's opinion, we would not consider the withheld evidence and published authorities (because we do not consider matters not presented to the district court) unless we invoked the plain error doctrine.

discretion as a matter of law.[98]  The court is not taking the abuse of

---

[98]  Not only is the court's approach inconsistent with abuse of discretion review, it also risks reintroducing the constitutional infirmity cured by Booker.  In short, the court's approach turns the appellate court into the post-Booker Sentencing Commission: rather than the Commission's Guidelines, the court of appeals will determine the bounds of a district court's discretion by identifying the range of "reasonable sentences" for a given set of facts.

Pre-Booker, the mandatory Guidelines set the Apprendi statutory maximum because, based only on the facts reflected by a jury verdict, a defendant could be sentenced to no greater than the sentencing range identified for his base offense level and criminal history category score.  A defendant could receive a higher sentence if—but only if—the district court found facts to support specific offense characteristics or adjustments by preponderance of the evidence.  This was true even though district courts could disregard the Guidelines in extraordinary circumstances, because in "most cases, as a matter of law, the Commission will have adequately taken all relevant factors into account, and no departure will be legally permissible."  United States v. Booker, 543 U.S. 220, 234, 125 S. Ct. 738, 750 (2005).  This was also true even though the district court had virtually unfettered discretion to sentence a defendant within the range identified by the mandatory Guidelines.

Transforming the Guidelines from mandatory to advisory cured the Sixth Amendment violation because the Court had "never doubted the authority of a judge to exercise broad discretion in imposing a sentence within a statutory range."  United States v. Booker, 543 U.S. at 233, 125 S. Ct. at 740.  Thus, a defendant risked any sentence along the statutory range, so long as the district court did not abuse its discretion.  Because the district court's authority to exercise "broad discretion" to sentence offenders along the statutory range is what allows the Booker remedy to cure the Sixth Amendment violation of mandatory Guidelines, and because appellate review is the check on that authority, properly defining the scope of appellate review is essential.

Giving proper content to appellate review is the key to assuring that the advisory-Guideline remedy actually rights the Sixth Amendment wrong identified by Booker.  If appellate review is too stringent, it will carve up statutory sentencing ranges in exactly the same way the Sentencing Commission's mandatory Guidelines did.  For example, suppose the statutory range for a particular crime is 5 to 40 years' imprisonment.  Suppose that in one case, the appellate court decides that for any defendant who commits the crime under X facts, the district court would necessarily abuse its discretion unless it imposed a sentence of at least 10 years' imprisonment.  Suppose that in another case, a defendant commits the same crime, again under X facts, and the appellate court decides that the district court would necessarily abuse its discretion if it imposed a sentence above 20 years' imprisonment.  After those two decisions, the court has created a sentencing range that is identical in all relevant respects to a mandatory-Guidelines sentencing range: as a matter of law, a defendant who violates the crime under X set of facts must receive a sentence of somewhere between 10 and 20 years' imprisonment.  If the defendant did not admit all of the facts, then the district court would base that sentence on judge-found facts by a preponderance of the evidence.  The district judge would then have unfettered discretion to sentence a defendant who commits the crime under X facts from between 10 and 20 years, but would have no discretion to sentence beyond that range (just as the district judge had

discretion standard seriously.

## B. Institutional Harm

The court's willingness to resentence does immense and immeasurable

institutional damage. "'It has been uniform and constant in the federal judicial

tradition for the sentencing judge to consider every convicted person as an

individual and every case as a unique study in the human failings that sometimes

---

unfettered discretion to sentence within the range of sentences identified by the mandatory Guidelines).

Today, the court takes a step in this direction. The court conceives of its role as to determine what range of sentences is "reasonable." In other words, the court is deciding as a matter of law the bounds of the district court's discretion within the statutory range on the particular set of facts contained in this record. The court concludes that under the facts of this case, Irey must be sentenced to no less than 30 years' imprisonment or the district court would necessarily abuse its discretion. If we follow the court's approach and declare what range of sentences is objectively "reasonable" based on our own assessment of the § 3553(a) factors in light of a particular set of facts, we will, over time, carve up statutory sentencing ranges to the point that it will be possible to identify the maximum sentence that can be imposed based solely on the facts embodied in the jury verdict. In fact, after today, I fail to see how a district court could impose a sentence of less than 30 years for a materially similar defendant. Once that occurs, this court will have reintroduced the Sixth Amendment violation supposedly cured by Booker.

The standard of review I set out in part II.E, supra, gives meaning to appellate review of sentences while avoiding this result as much as possible. Under my approach, this court is not in the business of reweighing all of the facts in the record, conducting a § 3553(a) inquiry de novo, and declaring a range of sentences that is objectively correct or "reasonable." Rather, under my approach, when we reverse a sentence on substantive grounds, we are simply holding that under the non-clearly erroneous facts found by the district judge and in light of the district judge's explanation, no rational judge could have imposed that sentence. We would not hold as a matter of law that on a given set of facts, only a sentence of at least so-many years' imprisonment is reasonable. Nor would we decide the import of particular facts to the § 3553(a) inquiry for all time; for example, we would not hold, as the court does, that pedophilia-as-diminished-capacity can never form the basis for a downward departure in a sex crimes case. Such a standard gives district judges maximum discretion to sentence a defendant anywhere along the statutory sentencing range and thus is more consistent with the remedy fashioned by the Supreme Court in Booker.

230

mitigate, sometimes magnify, the crime and the punishment to ensue.'" Gall, 552 U.S. at 52, 129 S. Ct. at 598 (quoting Koon v. United States, 518 U.S. 81, 113, 116 S. Ct. 2035, 2053 (1996)). The district court is unquestionably the best judicial actor to conduct this "unique study" and to undertake the open-ended and fact-heavy § 3553(a) inquiry. See, e.g., Gall, 552 U.S. at 51–52, 129 S. Ct. at 597–98 (explaining that the district court is in a "superior position to find facts and judge their import under § 3553(a) in the individual case" because it looks the defendant and witnesses in the eye, gains insights not conveyed by the cold record, and has extensive sentencing experience) (quotation omitted). The district court's effective use of its expertise, however, turns on the active participation of the lawyers—the prosecutors and defense counsel—in the adversary proceeding envisioned by Rita and Gall and fleshed out by my opinion today. Their professionalism is vital to the sentencing process. Indeed, if sentences are to inspire the confidence of the defendant and the public, the sentencing hearing in the district court must be the "main event," rather than a "tryout on the road" for the real forum that will determine the sentence. Wainright v. Sykes, 433 U.S. 72, 96, 97 S. Ct. 2497, 2508 (1977).

Today's decision sends the unmistakable message that the district court is nothing but a tryout on the road. This diminishes the district courts' institutional

231

role in the eyes of the public and the legal profession because it <u>de facto</u> strips the district courts of their Congressionally given authority.[99]  If the district court procedure is merely a tryout, a busy district court may be inclined to pay mere lip service to its § 3553(a) duty and simply impose a Guidelines sentence;[100] after all, its sentence would only be tentative, subject to second-guessing on appeal.  And even if the district court wanted to do its duty, the prosecutor may not present the government's best case to the district court—better to wait and see what sentence the court imposes before expending the government's resources.[101]

---

[99]  In this case, the Government participated in the diminishment through the prosecutor's failure to present a robust sentencing argument to the district court and failure to adequately call attention to the mistakes she believed the district court made.  Defense counsel are required by the Sixth Amendment to perform at the highest professional level and to treat the sentencing hearing before the district court as the main event.  If defense counsel's performance is wanting, counsel may have to answer for it in a collateral proceeding alleging a violation of the defendant's Sixth Amendment right to the effective assistance of counsel.  The prosecutor, however, does not run the risk of having to answer to a district judge in a collateral proceeding on a charge of inept performance.

[100]  This would not only flout the Congressional command embodied in § 3553(a), it would also deny justice for either the United States or the defendant.  If the facts and circumstances of the case call for a sentence outside the Guidelines sentencing range to satisfy the § 3553(a)(2) purposes of a federal sentence—and they often will—the sentence will not be tailored to the unique facts before the court, will not serve the parsimony principle, and will work an injustice on one of the parties.

[101]  District courts' tendency to impose sentences within the Guidelines range worsens this already perverse incentive.  This circuit's district courts imposed Guidelines sentences in 65.6% of the cases from October 1, 2008 through September 30, 2009.  <u>See</u> United States Sentencing Commmission, <u>Sourcebook of Federal Sentencing Statistics</u>, tbl. 26 (2009).  The court's approach gives the government every incentive to rest on the Guidelines and put on no § 3553(a) evidence before the district court (as the government frequently does).  In the infrequent event that the district court imposes a below-Guidelines sentence, the government would lose nothing because it could make its § 3553(a) case for the first time before the court of appeals.

The court's willingness to ignore time-honored contemporaneous objection and procedural default rules diminishes the status of the district courts for another reason.[102] These rules are designed to force the parties to give the district court everything it needs to make sound decisions and the first chance to fix any errors. This, in turn, leads to an enhanced quality of judicial decision making, preserves the sentence's finality, and may prevent unnecessary appeals. The court's message to the prosecutors in this circuit is: don't bother, there is no need to try to put the district court in the best position to make decisions.

Sadly, our approach today diminishes the district court's role for no good reason. It transfers sentencing authority from district judges to the courts of appeals, which lacks the district judges' experience and expertise in imposing criminal sentences. As the length of today's opinion shows, even attempting to duplicate the district judge's § 3533(a) task requires a huge investment of this court's resources. Despite the huge investment, there is no real return: due to our lack of experience and expertise, we are poorly suited to the job and will not infrequently reach a wrong result. Moreover, our fact-intensive resentencing

---

[102] Jones, after all, is simply an application of the contemporaneous objection rule to the sentencing context. Sentencing is unique because the district court is not bound by the evidence, the parties' proposed findings and conclusions, and the parties' arguments at the close of the hearing. If the district court bases the sentence on findings or arguments not articulated at the sentencing hearing, the parties must have an opportunity to object to the court's findings and conclusions and obtain the correction of any error the district court may have made.

decisions will be incapable of generalization and will hinder our ability to establish clear guidance for the district courts of our circuit. See Koon v. United States, 518 U.S. at 98–99, 116 S. Ct. at 2046–47; see also Buford v. United States, 532 U.S. 59, 65–66 121 S. Ct. 1276, 1281 (2001) (explaining that if the question presented "grows out of, and is bounded by, case-specific detailed factual circumstances," then the "value of appellate court precedent" is limited). Lastly, as we fritter away our resources on sentencing appeals, other litigants in the appellate queue will suffer.

This court is not well-suited to sentence offenders for another and even more important reason. The Supreme Court has made abundantly clear the crucial role that process plays in sentencing. See Gall, 552 U.S. at 49–50, 128 S. Ct. at 596–97. The public's and the defendant's confidence in the justice of a sentence turn on how the sentencer arrived at it. Given the strictures of appellate review, it is impossible for us to accord a defendant the process that is due. See e.g., Fed. R. Crim P. 32(i). When this court resentences a defendant, it deprives him of a meaningful hearing in which he has the right to address a judge who can look him in the eye before deciding his fate. See Fed. R. Crim. P. 32(i)(4)(A)(2)(ii). Because the defendant's first notice of the reasons for the resentence and its

234

factual bases is provided by this court's opinion imposing the sentence,[103] he is deprived of the right to object to the reasons and factual bases.[104] And, crucially, it deprives him of a right to appeal. Such treatment of a litigant not only breeds disrespect for the rule of law, but also raises serious due process concerns. See Gardner v. Florida, 430 U.S. 349, 362, 97 S. Ct. 1197, 1207 (1977) (plurality opinion) (concluding that the due process clause was violated when "the death sentence was imposed, at least in part, on the basis of information which he had no opportunity to deny or explain").

In sum, when placed on a balance sheet, the grave institutional harm caused by the court's approach significantly outweighs any benefit the approach might yield.[105] Resentencing defendants on appeal diminishes the role of the district court in the eyes of the legal profession, and it diminishes the public's confidence in the district courts as an institution for administering criminal justice. It

---

[103] That the Government's brief cites evidence and advances arguments not presented to the district court in the first instance is of no moment. Defense counsel would assume that this court, adhering to its time-honored rule that matters not presented to the trial court will not be considered, Dupree v. Thomas, 946 F.2d 784, 793 (11th Cir. 1991), would refuse to entertain the evidence and arguments, and thus would not waste precious briefing space to respond.

[104] The defendant would have the right to petition the court for rehearing, but a rehearing petition does not perform the same service a post-sentence objection would provide in the district court.

[105] The only benefit that comes to mind is finality. In resentencing the defendant, we make his sentence final and bring his case to a close.

235

misallocates and gobbles up judicial resources.[106]  None of this is necessary.[107]  If

a sentence constitutes an abuse of discretion, we should simply say so and return

the case to the district court, the appropriate forum for the main event.

V.

For the foregoing reasons, I would vacate Irey's sentence and remand to the

district court for resentencing.

---

[106]  The court acknowledges that we have reviewed hundreds of cases for substantive reasonableness since Booker was decided, but minimizes the impact of its decision by pointing out that the Eleventh Circuit has only reversed sentences in four of these cases.  See ante at 61.  After today's decision, however, we may see more sentence appeals because any dissatisfied party can ask this court to resentence the defendant based on information favorable to its position that the district court presumably ignored by neglecting to mention the information in stating its reasons for the sentence.  And with the precedent that we can consider evidence not in the record and make new arguments for or against a party on appeal, we may see more sentences vacated—or defendants resentenced.  The court's decision could affect many of the hundreds of sentencing appeals we will see in the years to come.

[107]  The court claims that if Irey's sentence is reasonable, then any sentence is reasonable and that would return us to the pre-SRA days where a district judge was a "law unto himself or herself."  See ante at 137 (quotation omitted).  These arguments do not justify the court's approach of resentencing Irey.  First, we can say that Irey's sentence is unreasonable and set it aside under classic abuse of discretion review—we need not resentence Irey to solve the reasonableness concern.  Second, we need not worry about a return to the pre-SRA days given the post-Booker requirements that district judges exercise their sentencing discretion only after conducting a formal process, applying statutory factors, and explaining their rationale—which is then subject to appellate review for abuse of discretion.

236

EDMONDSON, Circuit Judge, dissenting, in which BIRCH, BARKETT, and MARTIN, Circuit Judges, join:

The limit that the law places on the right use of appellate court power to interfere with the sentencing decisions of United States District Judges (who, of course, have -- under the law -- powers of their own) is, for me, what this appeal is about. The specific case before us involves a serious crime and ghastly conduct -- "horrific" in the District Judge's words -- on the part of Defendant. And, no party has contended that the District Judge, in imposing the sentence, made a significant procedural error.[1] The government prosecutors (who bear the burden of showing reversible error) contend that the sentence imposed in district court is too lenient and that no sentence would be lawful except the maximum sentence of imprisonment that the pertinent criminal statute will allow: 30 years.[2]

The issue is not whether federal appellate judges ought to do their duty. They must. And the issue is not whether appellate courts can review sentences and sometimes correctly set them aside, even when the sentence was imposed

---

[1] Only a case without a substantial procedural error is in my mind as I write this dissent.

[2] Because of the interplay of the Guidelines and the pertinent criminal statute, the Guidelines (which the District Judge recognized as a sentencing factor) called, in this case, for 30 years' imprisonment. But the Guidelines are not mandatory as everyone knows. See, e.g., Nelson v. United States, 129 S. Ct. 890 (2009) (reversing Fourth Circuit and stressing that "Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable" by sentencing courts.); Spears v. United States, 129 S. Ct. 840 (2009) (reversing Eighth Circuit and upholding a below-Guidelines sentence in crack cocaine case based entirely on sentencing District Judge's policy disagreement with Guidelines).

237

without procedural errors. They can. Appellate judges do have some legitimate power to review the substance of sentences: that is, to determine whether a District Judge has imposed a sentence that is either too lenient or too harsh as a matter of law. The general question presented here is what is the limit, under the law, on the power of appellate judges in deciding such reviews.

The legal limit on the power of appellate judges to interfere with sentences imposed by District Judges is staked out by the standard of review. In <u>Gall v. United States</u>, 552 U.S. 38, 128 S. Ct. 586 (2007), the Supreme Court -- in the course of reversing an appellate court judgment that had overturned a district court's sentence as too light[3] -- set the standard of review: we only look to see if the sentence is reasonable in the light of a "deferential abuse-of-discretion standard." <u>Id.</u> at 40, 128 S. Ct. at 591.

This standard of review promotes (among other things) finality in criminal cases. But the deferential abuse-of-discretion standard was selected mainly to

---

[3] In reversing the District Judge's far-below-the-Guidelines sentence, the Eighth Circuit in <u>Gall</u> had studied the record and opined that the District Judge in sentencing had given "too much weight" to X, "did not properly weigh" Y, given "too much emphasis" to Z, and so on. The Supreme Court said, "Although the Court of Appeals correctly stated that the appropriate standard of review was abuse of discretion, it engaged in an analysis that more closely resembled <u>de novo</u> review of the facts presented and determined that, in its view, the degree of variance [from the advisory guideline] was not warranted." <u>Gall</u>, 552 U.S. at 56, 128 S. Ct. at 600.

Although the Eighth Circuit vacated the sentence imposed by the district court and remanded for resentencing, the Eighth Circuit did not set a precise sentence to be imposed on Mr. Gall on remand.

recognize that the Sentencing Guidelines are advisory only and a District Judge must <u>not</u> presume that the sentence indicated by the Sentencing Guidelines is a reasonable sentence for the convicted person standing before the District Judge: the District Judge must make for each convicted person "an individualized assessment based on the facts presented." <u>Gall</u>, 552 U.S. at 50, 128 S. Ct. at 597. Thus, sentencing is a fact-bound determination. When the Supreme Court laid down the law, the Court pointed out that a District Judge "is in a superior position [relative to an appellate court] <u>to find facts and judge their import under § 3553(a)</u> in the individual case. The judge sees and hears the evidence, makes credibility determinations, has full knowledge of the facts and gains insights not conveyed by the record." <u>Id.</u> at 51, 128 S. Ct. at 597 (internal quotation omitted and emphasis added).

In sentencing, a District Judge is to "impose a sentence <u>sufficient, but not greater than necessary</u>, to comply with the purposes set forth in" 18 U.S.C. § 3553(a)(2). (emphasis added).[4]

_____

[4] The sentence imposed needs

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant; and

In my view of the law, a District Judge's decision on what sentence to impose is essentially a fact finding, especially as here where witnesses testified at the sentencing hearing: oral evidence particularly raises issues of credibility. Consider Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 401-02, 110 S. Ct. 2447, 2459 (1990) (discussing deferential standard of review for sanctions imposed under Fed. R. Civ. P. 11 as one to review a fact-intensive question). And "[w]hen an appellate court reviews a district court's factual findings, the abuse-of-discretion and clearly erroneous standards are indistinguishable: . . ." Id. at 401, 110 S. Ct. at 2458.

The clearly erroneous/deferential abuse-of-discretion standards deprive the appellate court of the authority to reweigh conflicting evidence and to reconsider facts already weighed and considered by a district court. See Cooter & Gell, 496 U.S. at 400-04, 110 S. Ct. at 2458-60; see also Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 857-58, 102 S. Ct. 2182, 2190 (1982). As I grasp it, the deferential abuse-of-discretion standard (while certainly no "any evidence" rule or scintilla rule) calls for nothing more than some reasonable basis in the record for the District Judge's decision. Because the standard prohibits appellate judges

---

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

240

from making their own determination of where the weight of the evidence lies, the law greatly restrains the maneuvering room of appellate courts. The restraint flows directly from the deferential abuse-of-discretion standard of review chosen for us by the Supreme Court. I submit that an appellate court's reweighing of the evidence or giving the facts a different construction -- to grant something in the record more or less value than the District Judge did and so to conclude that the record overall weighs more heavily for a higher sentence -- smacks of a kind of <u>de novo</u> review à la the Eighth Circuit's approach in <u>Gall</u>: the appellate court oversteps its authority.

Appellate courts can set aside a sentence as too lenient to be reasonable as a matter of law. But appellate courts first need to ask only one question: could an objectively reasonable District Judge looking at the record "on the whole" have found the ultimate sentence imposed to be a "sufficient" one, when the record (including all the evidence and reasonable inferences and credibility evaluations) is viewed in the light most favorable to the sentence. If the answer is "Yes," the appellate courts can correctly do nothing but affirm the sentence. This deferential standard limits severely the authority of appellate judges to interfere with sentences, even when the appellate judges -- giving more or less weight to one circumstance or another -- think the sentence, in an immediate case, is not "just"

or not the most "just."

On the other hand, this standard of review -- because it demands some objective, reasonable basis in the record -- guards against true arbitrariness and stops short of allowing District Judges the freedom to sentence simply as they please. The deferential abuse-of-discretion standard of review acknowledges that sentencing is about marshaling the facts and applying the fact-dependent legal criteria set out by 18 U.S.C. § 3553(a). The pertinent standard places the main responsibility and legal power for sentencing squarely on United States District Judges whose business is fact finding; this standard very greatly restricts the authority of appellate judges to interfere, although the appellate judges would have definitely imposed some other sentence. "[I]t is not for the Court of Appeals to decide de novo whether . . . the sentence [is] reasonable." Gall, 552 U.S. at 59, 128 S. Ct. at 602. "The fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court." Id. at 51, 128 S. Ct. at 597.

Turning to the facts of the particular case before us, I conclude that the experienced District Judge did not abuse his discretion in deciding that 17.5 years of imprisonment plus a lifetime of supervised release was a sufficient sentence given all the circumstances. That this serious crime deserves a substantial term of

242

imprisonment is beyond debate (and, in reality, has never been debated). I trust that most American judges (I hope all of them) would accept that 17.5 years of imprisonment is a substantial term of imprisonment.[5] And it is years beyond the statutory minimum sentence for the only crime with which Defendant was charged.[6]

The government says that nothing but 30 years of imprisonment would be a lawful sentence in the circumstances of this case. I cannot agree with that legal conclusion. First, I think the argument belittles the punishment involved in a lifetime of supervised release that follows a substantial term of imprisonment. The Supreme Court, in <u>Gall</u>, made it plain to me that supervised-release punishments count -- under the law -- as real punishments and must not be treated by appellate courts as nothing or, at least, nothing significant when sentences are being reviewed. <u>See</u> <u>id.</u> at 48-49, 128 S. Ct. at 595-96. Second, the record in this particular case contains many things that, I accept, would allow (that is, provide

_____

[5] Defendant might actually serve something less than 17.5 years because the Executive Branch, over the years, "may" award him some limited credit toward service of his sentence if the prison administrators determine Defendant has "displayed exemplary compliance with institutional disciplinary regulations." <u>See</u> 18 U.S.C. § 3624(b)(1). How much credit Defendant will actually be awarded in the uncertain future is highly speculative. For review purposes, it seems best to me to treat a sentence imposed by a district court -- in this case, 17.5 years plus a lifetime of supervised release -- as a fixed sentence. I believe this approach has been our custom.

[6] The government only charged Defendant with one count of production of child pornography per 18 U.S.C. § 2251(c). Other cases involving longer sentences in child pornography cases involved either prior criminal convictions or more counts or both.

an adequate evidentiary/factual basis for) an objectively reasonable judge to back off the absolute thirty-years-imprisonment maximum sentence.

It is undisputed that Defendant surrendered after being indicted, plead guilty, and expressed remorse. He accepted responsibility and relieved the Government of the trouble and expense of a trial.[7] After surrendering and posting bond, he entered into a residential treatment center: a step toward rehabilitation. It is also undisputed that Defendant has no prior criminal convictions. Furthermore, Defendant did not obstruct justice and, to the contrary, cooperated with the government providing information about the nature of his offense (time, places, identity of others with whom he dealt and so forth). These kinds of things have traditionally and commonly been reflected in a lessening of a sentence from what it would have otherwise been. In the context of the full record, these things provide a reasonable basis for the sentence in this case to be less than the maximum allowed by the statute.

Moreover, at the sentencing hearing in district court, the Defendant stood

---

[7] Contrast United States v. Kapordelis, 569 F.3d 1291 (11th Cir. 2009), where defendant -- a medical doctor charged, among other things, with producing pornographic images of underage boys (including one underage boy who was his near relative and another underage boy who had been the doctor's patient: defendant had seemingly drugged the boys first) -- insisted (despite powerful photographic evidence against him) on a trial by jury and, at his sentencing, never accepted responsibility, and called prosecutors "liars" and compared them to Hitler; and the district court found the defendant would not likely be rehabilitated given "his attitude and lack of remorse."

before and spoke to the judge who would impose the sentence upon him; and Defendant presented witnesses on his behalf: this case is an oral-evidence case. The government presented no witnesses. Several friends and family members testified to Defendant's characteristics generally and history of good works as an employer, parent, and so on and to their own loyalty and support of Defendant, as a human being who was in disgrace and in trouble. I appreciate that this kind of humanizing testimony raises a familiar debate about whether it is possible for character to be compartmentalized so that a person who is weak (or wicked) in one way can really be strong (or good) in some other ways or whether character must be viewed holistically so that a person's weak or wicked character in one context produces a reliable conclusion in every context. This familiar debate has been taken up by Aristotle and Kant and other Greats. And I doubt the power of a Court of Appeals to resolve it as a matter of law. Whatever I personally might think about this family-and-friend evidence, the District Judge in this case had the legal right to determine the credibility of the witnesses before him and to give the testimony the weight that he did.[8] Given the entire record, this evidence was reasonable evidence to support a sentence less than the maximum sentence

---

[8] I think it was Robert Frost who said that "there are tones of voice that mean more than words." A District Judge hears those tones. Furthermore, a District Judge sees the witness's demeanor as well as hears the testimony. I submit these opportunities are big advantages when it comes to fact finding.

245

allowed by the pertinent statute.

In addition, at the sentencing hearing, Defendant presented an expert witness: Dr. Shaw. The government did not; and the government did not object to the expertise of the Defendant's expert witness. The expert never suggested (nor has anyone else) that Defendant was not guilty on account of some mental disorder. But the mental health expert did testify that this Defendant was afflicted with a recognized mental disorder: heterosexual pedophilia. The expert testified that this disorder was not something that Defendant had chosen to have, but was something that was "within" Defendant (something "natural biological") and caused Defendant to have a tendency toward being attracted to sexual behavior with prepubescent children. (This evidence, I submit, supports the District Judge's reference to Defendant as a "victim": in the sense of a victim of the circumstance of Defendant's own biology.) The expert also testified that the disorder was treatable, that this Defendant was amenable for treatment, that Defendant's aging[9] -- a reduction naturally in testosterone and a reduction

---

[9] Defendant was 50 at the time of sentencing. According to the Census Bureau, a white male of 50 would typically have a life expectancy of less than 30 years. See U.S. Census Dep't., 2010 Statistical Abstract, Table 103 (available at http://www.census.gov/compendia/statab/2010/tables/10s0103.pdf). A 30-year maximum sentence then had a realistic likelihood of being, in fact, life imprisonment for this Defendant. Congress, in 18 U.S.C. § 2251(c) -- the statute of Defendant's conviction -- does not call for life imprisonment as a statutory punishment. (Taking into account life's uncertainty, I understand that any term of imprisonment might turn out to be actually life imprisonment; but, in reality, some sentences of years are, for some defendants, more likely to be life sentences than other

naturally in sex drive -- would likely be helpful to his treatment, and that Defendant was not likely to be a recidivist. The District Judge who saw and heard this expert witness could credit the evidence. Given the entire record, this evidence is reasonable evidence to support a sentence of less than the maximum allowed by the statute.

Of course, a number of elements make up the total record. Still, while I accept that other facts and evidence (some of it conflicting) are in the record, I think what I have summarized is legally enough to justify -- I do not say compel -- an objectively reasonable judge to find that a sentence of less than the 30 years of imprisonment would be sufficient.

However I might have judged the weight of the evidence and facts in my own reckoning of the best sentence, I accept that the record as a whole was sufficient to allow -- as a matter of law -- the imposition of something less than the maximum sentence. Imponderables are involved, and a District Judge has unique access to and familiarity with the individual defendant. Here, the

---

sentences for other defendants. This reality of human age seems all right to consider, although never would I contend that persons aged 50 or older are, as a matter of law, exempt from a 30-year term of imprisonment under the pertinent statute.) The District Judge thought that Defendant's age was pertinent to sentencing, especially Defendant's advanced age upon his release from imprisonment. I accept that the circumstance of Defendant's age was a permissible, reasonable basis, in conjunction with everything else, for a sentencing court to impose a sentence of less than the maximum on this Defendant.

sentencing District Judge thought out and selected a sentence for this case that involved a substantial period of imprisonment, including a period of years (not hours, weeks or months, but years of imprisonment) above the statutory minimum. Then, to follow the term of imprisonment, the sentencing judge imposed a lifetime of supervised release with many special conditions[10]: a "substantial restriction of freedom" as the Supreme Court put it in Gall. Gall, 552 U.S. at 48, 128 S. Ct. at 595.

The sentencing range under the one statute involved is not very wide: only 15 years from the minimum sentence (15 years) to the maximum sentence (30 years). Cf., e.g., 18 U.S.C. § 2422(b) (a sexual offense allowing for imprisonment of ten years to life); 21 U.S.C. § 841(b)(1)(A) (a drug offense allowing for imprisonment of ten years to life). So, the room for the exercise of sentencing discretion is markedly controlled from the start by the statutory range set by Congress; therefore, it seems to me that it is harder for a sentencing judge to go far off the rails. This observation seems even clearer to me where, as here, the District Judge did impose a lengthy sentence of imprisonment: not the maximum, but neither did he impose the minimum sentence (or something that was merely hours, weeks, months, or only one year beyond the minimum).

---

[10] The list of conditions of supervised release was long and tailored for someone like Defendant.

248

I think the record would support a variety of lawful sentences, including some sentences heavier than the one actually imposed. Nevertheless, the government's prosecutors have failed to demonstrate to me that there is no legitimate basis for the district court's actual sentencing decision. All things considered and applying the deferential abuse-of-discretion standard, I cannot conclude that the sentence imposed was beyond the outside borders of reasonable. For more background, see United States v. Irey, 563 F.3d 1223 (11th Cir. 2009) (vacated for rehearing en banc).

In the federal judicial system, I believe that the district courts have duties and powers -- mainly about fact finding and about weighing in the balance some facts against others -- that are theirs and not ours. I believe that one of the important duties of appellate judges is to allow District Judges room to carry out the duties of District Judges. I believe the deferential abuse-of-discretion standard set out and applied in Gall was intended to buttress the district courts' sentencing powers and to limit the appellate courts' powers to recast what is essentially a factual issue into a question of law. Given these principles, I believe it is jurisprudentially important to steer clear of de novo review, or something resembling it, in an appeal about the substantive-reasonableness of a sentence. Considering this record and all, I would defer to the District Judge's decision and

249

affirm the sentence in today's case.

I dissent with respect and not without regret.

BIRCH, Circuit Judge, dissenting:

The time-worn adage in jurisprudence that hard facts often lead to bad law is certainly applicable to this case. I have little doubt that had I been the sentencing judge I might well have fashioned a different and harsher sentence for this defendant. But the decision at play here is the respective roles of the appellate court and the sentencing court. Our appellate role is properly constrained by the standard of review to which we are required to adhere. As Judge Edmondson persuasively describes the application of that standard to the record, it compels an affirmance of the sentencing court's judgment in this case. Accordingly, I respectfully dissent and join in the dissenting opinions of Judge Edmondson and Judge Barkett.

BARKETT, Circuit Judge, dissenting, in which BIRCH and MARTIN, Circuit Judges, join:

I agree with just about everything in Judge Edmondson's dissent. If there is any point of departure, it is the addition (or clarification, in my view), that the district judge must articulate the reasons for the sentence imposed based on the evidence in the record. Because the record may support a number of reasonable sentences, this articulation is necessary so that the appellate court can be satisfied that the district judge actually considered how all of the § 3553 factors relate to the defendant's individual case.

I previously explained why it is important for district judge's to give reasons in my dissent in United States v. Docampo, 573 F.3d 1091 (11th Cir. 2009).

First, Congress explicitly mandated the articulation of reasons:

> Congress requires the district court to "state in open court the reasons for its imposition of the particular sentence," § 3553(c), and before doing so, the court must consider each of the factors delineated in § 3553(a) to arrive at the appropriate sentence.

Docampo, 573 F.3d at 1106. Second, not every case requires an elaborate explanation:

> What is "enough" or "adequate" depends upon the circumstances of the particular case at hand[] . . . . [L]ess may be required if a case is "simple" or "typical." The

252

logical corollary of this conclusion, however, is that more is required when a judge is faced with an <u>atypical</u> case or the defendant argues that a departure from the Guidelines is warranted.

. . . .

. . . Thus, while a mechanical discussion of each § 3553(a) factor may not be necessary in every case, a district court has a responsibility to analyze the relevant factors on the record. These would include a particular § 3553(a) factor raised by a defendant, or one clearly implicated by the specific facts of that case . . . .

Moreover, the sentencing judge should be able to articulate the rationale that justifies the actual number of months or years that make up a defendant's sentence, whether that number is within or outside the Sentencing Guidelines. A reasonable sentence is one for which there is an explanation of how the particular length of the imposed sentence corresponds to the individual sentencing needs of the particular defendant. For example, how does a sentence of fifteen years, as opposed to a sentence of five or ten years, or twenty-two years for that matter, serve the needs of individual and general deterrence while also addressing the nature of the crime and the individual characteristics of the defendant in a given case? The number of years cannot be determined simply by an individual judge's gut feeling. As a society that values due process, we must have some rationalization for every step of our judicial system. There should be a transparent, logical, and reasonable justification to support the amount of jail time prescribed for a particular defendant based on the § 3553 factors.

<u>Id.</u> at 1106-08, n.7.

Here, the district judge meticulously and conscientiously followed the

dictates of Congress.  Indeed, I do not see what more the district judge could reasonably have done to assure us that he considered and weighed all of the § 3553 factors as they applied to this case.  The district judge considered every piece of evidence in the extensive record before him, which is clearly sufficient to permit meaningful appellate review.  The problem, if there is one, is that, beyond the offense itself, the government failed to present any evidence whatsoever to rebut or challenge any of the defendant's witnesses at sentencing.  And, it was not the district judge's job, nor is it ours, to supply and rely on evidence that was not presented.

The bottom line is that the majority—based on its own finding of facts and credibility determinations—simply disagrees with the district judge's conclusion that seventeen years followed by a lifetime of supervised release is an appropriate sentence for Irey.  Notably, the majority really does not offer any explanation for mandating that the district judge impose a sentence of thirty years of imprisonment in lieu of Irey's current substantial sentence.[1]  Because the majority is not

_____

[1] The majority cites to numerous published and unpublished cases involving various different offenses against minors in which the defendants therein received sentences in excess of thirty years to suggest that Irey's sentence of seventeen and one-half years creates a "substantial disparity" that renders it unreasonable.  Majority Op. at 130-134.  Looking at only the length of the various sentences in the cited cases, Irey's sentence arguably presents a disparity.  However, Congress did not command sentencing courts to avoid mere "disparities" or even "substantial disparities."  What it did require is that sentencing courts consider the need to avoid <u>unwarranted</u> disparities among similarly situated defendants.  <u>See</u> 18 U.S.C. § 3553(a)(6).  Whether one defendant's sentence creates an <u>unwarranted</u> disparity from other defendants necessarily requires

254

"reviewing" the district judge's judgment but rather is substituting its own and is

assuming the role that the prosecutor failed to perform in presenting evidence that

could arguably support a longer sentence, I dissent.[2]

---

a sentencing court to undertake a fact-intensive inquiry in the first place to determine whether the defendants are similarly situated.  See United States v. Docampo, 573 F.3d 1091, 1101 (11th Cir. 2009) ("A well-founded claim of disparity, however, assumes that apples are being compared to apples.") (citation omitted). I believe a court cannot truly assert that one defendant's sentence creates an unwarranted disparity from another or several defendants' without the benefit of the entirety of the sentencing records of all the defendants.  However, even if this extremely fact-intensive analysis can be based on the information contained in appellate opinions alone, consideration of any potential unwarranted sentencing disparity is not a task for the appellate court to complete in the first instance as the majority does in this case.

Moreover, several of the majority's cited cases contain facts that could just as legitimately support a finding that those defendants were not similarly situated to Irey and thus do not support the conclusion that the sentence imposed on Irey created an unwarranted disparity.  For example, several of the cases concern defendants who, unlike Irey, proceeded to trial. We have previously held that defendants who plead guilty and assist the government are not similarly situated to those who proceed to trial.  See e.g., Docampo, 573 F.3d at 1101 (holding that a defendant who proceeded to trial was not similarly situated to his co-conspirators who plead guilty and assisted the government and thus there was no unwarranted disparity between the defendant's lengthy 270 month sentence and his co-conspirator's substantially shorter sentences).

[2] As I also noted in my dissent in Docampo:

> Appellate courts have had no difficulty finding unreasonableness when asking [whether a sentence is enough punishment]. See, e.g.,[United States v.]Pugh, 515 F.3d [ ]1179 [(11th Cir. 2008)] (finding that probation for a possessor of some child pornography was insufficient).  We should likewise be willing to find that, in a case that warrants it, "a within-Guidelines sentence is 'greater than necessary' to serve the objectives of sentencing," Kimbrough [v. United States], [552 U.S. 85, 91], 128 S. Ct. [558], 564 (quoting § 3553(a)).  Our appellate sentencing review should not develop into a one-way rachet upwards.  Just as the district court has an obligation not to assume the Guidelines are automatically reasonable, we too—as a circuit that does not apply a reasonableness presumption—are obligated to ask whether a within-Guidelines sentence is reasonable without any thumb on the

scale. Thus, reiterating what we have previously noted, there are "many instances where the Guidelines range will not yield a reasonable sentence. . . . In some cases it may be appropriate to defer to the Guidelines; in others, not." United States v. Hunt, 459 F.3d 1180, 1184 (11th Cir. 2006).

Docampo, 573 F.3d at 1110-11.